# United States District Court
# Southern District of Texas

## Case Number: 03mc386

## ATTACHMENT

Description:

☐ State Court Record          ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part **116** of _____

☐ Exhibit to: _____

                number(s) / letter(s) _____

Other: _____

_____

_____

```
 1              interview with the defendant; is that
 2              true?
 3    A    Some testing and some eyewitness
 4              statements.
 5    Q    So you have reviewed some eyewitness
 6              reports given to you by Mr. Guerinot?
 7    A    Mr. Easterling.
 8    Q    And then you interviewed the defendant?
 9    A    Yes.
10    Q    Did you interview him in the Harris
11              County Jail?
12    A    Yes.
13    Q    What type of facilities did you
14              interview him in?  What type of room was
15              it?
16    A    It's a booth with Plexiglas between us
17              and a small speaker screen.
18    Q    It's kind of like a closet, isn't it?
19    A    Yes.
20    Q    You're surrounded by concrete and it's
21              real loud in there?
22    A    Yes.
23    Q    It's difficult to hear who you're
24              conversing with; is that correct?
25    A    Yes.
```

148

1   Q   Would you say it's probably the worst

2        situation or circumstances in which to

3        conduct a clinical interview?

4   A   Yes.  I prefer the old jail.

5   Q   But in the new jail that's the way it's

6        set up?

7   A   Yes.

8   Q   The information that you used to

9        complete your report and to give your

10       opinion to this jury is based a lot on

11       your interview with the defendant; is

12       that correct?

13   A   Yes.

14   Q   Now, you testified that you administered

15       some tests to him.  Did I hear you say

16       that?

17   A   Yes.

18   Q   What type of tests did you administer to

19       him?

20   A   It's called the Millon Clinical

21       Multiaxial Inventory Two.

22   Q   Inventory Tool?

23   Q   Two, number two.

24   Q   What is the purpose of that test?

25       What's the objective?

149

1   A   This test is for mainly to measure the
2       different personality styles.  That's   .
3       its most useful use.  It can also give
4       some indication of major psychiatric
5       disorders and substance abuse, but it's
6       primary tool is to determine or help
7       determine personality style, personality
8       disorder.
9   Q   The manner in which the test is
10      administered, are you asking him
11      questions and he responds verbally, or
12      does he have to write something?
13  A   He has to answer true or false so it's a
14      paper and pencil test.
15  Q   So the test is purely self-supporting in
16      that whatever he tells you, that's what
17      you go with?
18  A   That's correct.  True.
19  Q   There's no way to back up what he says?
20      You don't interview other people or
21      other witnesses to verify what he has
22      told you; is that correct?
23  A   Once the results are in and it gives you
24      some impressions, you have to judge that
25      against the clinical interview and

1      historical background to see if it makes

2      sense.  Then you either accept the test

3      or reject the test.

4   Q   So you make a judgment call in that

5      regard?

6   A   Yes.

7   Q   Do you have a copy of that test with

8      you?

9   A   Yes.

10  Q   May I see it, please?

11  A   Yes.

12  Q   Dr. Quijano, just to give the jury an

13     idea what kind of questions that they're

14     asked, I'd like to go through some of

15     this.

16          Is this a common question?  "I

17     always follow my own ideas rather than

18     doing what others expect of me."  True

19     or false.

20          Is that one of the questions?

21  A   Yes.

22  Q   "I always feel like I'm not wanted in a

23     group."

24          Is that a question?

25  A   Yes.

                                         151

```
1   Q   "I enjoy doing so many different things
2       that I can't make up my mind what to do
3       first."
4   A   That's also a question.
5   Q   "I think I'm a very social and outgoing
6       person."
7               Is that a question that you ask?
8   A   Yes.
9   Q   "I have a talent to be dramatic."
10  A   Yes.
11  Q   "I think I'm a special person which
12      deserves special attention from others."
13              These are some of the questions
14      that you said you asked?
15  A   Yes.
16  Q   "I was on the front cover of several
17      magazines last year."
18  A   Yes.
19  Q   "I feel very often that I lose my
20      ability  to feel any sensation in parts
21      of my body."
22  A   Yes.
23  Q   "I use my charm to get the attention of
24      other people."
25              Is that a question?
```

152

1    A    Yes.

2    Q    "For some time now I've been feeling

3         very guilty because I can't do things

4         right anymore."

5              Is that a question?

6    A    Yes.

7    Q    "Many people have been prying in my

8         private life for a year."

9              Is that a question?

10   A    Yes.

11   Q    "I often get angry with people that do

12        things slowly."

13   A    Yes.

14   Q    These are pretty much the nature of the

15        questions that you go through with them?

16        I see there are a hundred and seventy-

17        five of those questions; is that

18        correct, sir?

19   A    Yes.

20   Q    After you've gone through about a

21        hundred and seventy-five of those

22        general type of questions, do you often

23        feel you have a pretty good handle on

24        the person, or enough of a handle on the

25        person to make the type of diagnosis

                                              153

1              that you have made?

2     A    It gives you some tips or ideas as to

3          the direction to go in and then you

4          confirm with your clinical data.

5     Q    Your clinical data being what?

6     A    Interviews, histories, eyewitness

7          statements.

8     Q    Of course, that all comes within the

9          time period that you've told the jury

10         that you have spent on the case?

11    A    Yes.

12    Q    And that's based on a synopsis from the

13         Defense about their version of the facts

14         of the case; is that correct?

15    A    Yes.

16    Q    Are you aware of any determination by

17         the American Psychological Association

18         where they have determined that it is

19         unethical for a psychiatrist to testify

20         in a capital murder case about the

21         future dangerousness of the defendant?

22    A    No, that's not true.

23    Q    You disagree with that?

24    A    That is not true.  The American

25         Psychological Association does not

                                              154

1       control psychiatrists.  That statement

2       is by the American Psychiatric

3       Association.

4   Q   Here's what I asked you.  I said the

5       American Psychiatric Association.  That

6       is my question.

7   A   If that is your question, then it is

8       true that the American Psychiatric

9       Association has made that statement.

10      The American Psychological Association

11      has not made that statement.

12  Q   That's not the question I asked but

13      thank you for clarifying that.

14                  MR. EASTERLING:  Excuse

15              me, Judge, but the record will

16              show that she did say the

17              American Psychological

18              Association.  Probably wasn't

19              intentional but that's how she

20              asked the question.

21  Q   In any event, sir, let's move on.  I'd

22      like to ask you some questions from your

23      report that I've had a chance to look

24      over during the lunch hour.

25                  You and I have never spoken

1    before you came in to testify today; is

2    that correct?

3  A  No, we haven't.

4  Q  In fact, is it true that the State of

5    Texas didn't know in advance that a

6    Defense expert was going to testify one

7    way or another in this prosecution; is

8    that correct?

9  A  I don't know.  Sometimes they know and

10    sometimes they don't because I get calls

11    from prosecutors sometimes before I

12    testify.

13  Q  In this case you and I have not spoken?

14  A  No, we haven't.

15  Q  I have a few questions about your report

16    that I would ask you to explain to me,

17    if you don't mind.  You made the comment

18    that the defendant appeared to be of

19    questionable reliability as an

20    informant.

21        Was that based upon your general

22    impression of the defendant or on

23    something that didn't pan out from his

24    test as opposed to what you knew about

25    the facts of the case?

156

1   A   It was just the way he described his

2       situation to me.  Some of his version

3       did not make sense.

4   Q   So you had some questions about that?

5   A   Yes.

6   Q   You also mentioned that through the

7       administration of the tests that it

8       appeared that he had magnified the level

9       of experienced illness.  What does that

10      mean?

11  A   In that test we discussed in some of the

12      questions that you read, there is a

13      mechanism built into the test to measure

14      the degree in which the respondent

15      either pulls too much appearing too sick

16      or pulls too much to feeling too well,

17      too healthy.  So on one side you have

18      exaggeration and on the other side you

19      have minimization.  This particular

20      respondent showed some exaggeration of

21      symptoms.

22  Q   Of course, at the time the defendant is

23      speaking with you in the jail setting,

24      he knows because you've informed him

25      that you're interviewing him for

                                        157

1    four-year old girl that the officer

2    believed was also her daughter.  He knew

3    that.  He knew that she was begging him

4    not to kill her in front of her

5    children, begging for her life, and yet .

6    he killed her.  That tells you what kind

7    · of man he is.

8            Society encompasses a lot of

9    people.  Society has the right to be

10   protected from people like Duane Buck.

11   Cases like this are why the State of

12   Texas has the death penalty because

13   people like Duane Buck make choices in

14   their life.  He's done nothing for

15   society.  He's a burden to society.

16   You've seen nothing that shows that he

17   can give anything to society.  He's

18   given nothing, nothing at all except to

19   kill and leave in his wake a family who

20   grieves.  That's all that's left.

21           I'm asking you to do the job

22   that you've been selected to do.  I'm

23   asking you to go back to that jury room

24   and to fairly look at the evidence and

25   look at this man very carefully and

271

1      think about the acts that he did, the

2      intentional and deliberate acts he

3      committed, and I think in your heart you

4      will find that he deserves exactly what

5      the evidence shows, what it shows you

6      that he deserves, and that is a yes

7      answer to the first issue and a no

8      answer to the second issue.  I would ask

9      you to answer those questions in that

10     way.

11             Thank you very much.

12

13                 (At this time the jury is

14                  retired to deliberate.)

272

THE STATE OF TEXAS

COUNTY  OF HARRIS

       I, MARILYN SKINNER, Official
Court Reporter in and for the 208th District
Court of Harris County, State of Texas, do
hereby certify that the above and foregoing
contains a true and correct transcription of
the proceedings reported by me in the above
styled and numbered cause, to the best of my
knowledge and belief, all of which occurred
in open court or in chambers.

       I further certify that this
transcription of the record of the
proceedings truly and correctly reflects the
exhibits, if any, offered by the respective
parties.

       WITNESS MY HAND this the ___9th___

day of ___December___ A.D., 1997.

_____
Marilyn Skinner
Official Court Reporter
208th District Court
Harris County, Texas

Certificate No. 689
Date of Expiration: 12-31-98
301 San Jacinto
Houston, Texas 77002
(713) 775-6374

273

1          purposes of making a determination about
2          your opinion as to his future
3          dangerousness; is that correct?
4     A    Yes.
5     Q    Certainly the defendant knows that at
6          some point in the future he's going to
7          go to trial, right?
8     A    Yes.
9     Q    And at some point you're going to
10         testify before a jury about your
11         opinion, correct?
12    A    Yes.
13    Q    Is that a fair statement?
14    A    Yes.
15    Q    Looking at your report regarding the
16         future dangerousness issue and the
17         statistical factors including when you
18         analyzed his past crimes, I believe you
19         stated that this was non-contributory,   .
20         correct?   .
21    A    Yes.
22    Q    I believe or I'm assuming you testified
23         to that because you thought all of his
24         past offenses were non-violent, correct?
25    A    True.

1    Q   Is that based on self-reporting and

2         maybe a synopsis of the Defense's notes?

3    A   Mostly self-reporting.

4    Q   If you were informed that the defendant

5         in fact had a history of abuse towards

6         women and had been assaultive and

7         combative and had threatened women with

8         weapons before, would that alter that

9         factor under this statistical factor

10       category?

11   A   Yes.

12   Q   So would that increase the probability

13       then of future dangerousness if that

14       were a factor that you would consider?

15   A   That would increase the probability with

16       that population of victims, yes.

17   Q   Now, you also mentioned that it was your

18       opinion that as a person becomes older

19       that they are less likely to commit

20       violent crimes.  Is that true?

21   A   Yes.

22   Q   Isn't it true that even though it may be

23       less likely that it is a fact that

24       people of a greater age than thirty-

25       three do in fact commit extremely

159

1           violent crimes?

2      A    Yes.

3      Q    So you can't rule that possibility out

4           that an older defendant would commit

5           violent crimes, correct?

6      A    No, we are talking about decreasing

7           probability and not impossibility.

8      Q    You have determined that the sex factor,

9           that a male is more violent than a

10          female because that's just the way it

11          is, and that the race factor, black,

12          increases the future dangerousness for

13          various complicated reasons; is that

14          correct?

15     A    Yes.

16     Q    Now, as far as the socioeconomic factor,

17          I believe you said that the report of

18          his working stability was self-

19          reporting?

20     A    Yes.

21     Q    Which decreased the probability,

22          correct?

23     A    Yes.

24     Q    What if you had information that in fact

25          that the defendant wasn't a steady

                                              160

1        worker, that he worked for someone who

2        paid him in cash, that he worked only

3        sporadically.  Would that increase the

4        probability more so than you initially

5        stated in your report?

6     A  The second sentence says unstable by

7        witness report because one of the

8        witness' statement said that he refused

9        to work.

10    Q  So that increases it?

11    A  Yes.

12    Q  Let's talk about environmental factors.

13       In your report you talked about the

14       availability of victims, that the victim

15       pools become smaller in a prison

16       situation.

17    A  Yes.

18    Q  Would you agree with me though that in

19       fact there are victims available in the

20       prison population?

21    A  Yes.

22    Q  Without a doubt that there are crimes

23       that occur in the prison population,

24       correct?

25    A  Yes.

161

1    Q    You worked in TDC yourself for several
2         years, correct?
3    A    Yes.
4    Q    Certainly you've been aware of instances
5         where an inmate was killed by another
6         inmate, correct?
7    A    Yes.
8    Q    And incidents of guards being killed by
9         inmates?
10   A    Very, very seldom, but it has happened.
11   Q    Other people who are in the prison
12        system for various reasons have been
13        killed before; is that true?
14   A    Yes.
15   Q    So you can't tell this jury that violent
16        crimes do not happen in prison because
17        in reality it does occur, correct?
18   A    I'm not telling the jury that it
19        doesn't.
20   Q    Also you mentioned earlier that there is
21        a prosecution --
22   A    Unit.
23   Q    Thank you very much.  That a prosecution
24        unit is set up to prosecute people who
25        commit crimes in prison.  Of course,

162

1        what happens is that when they are

2        prosecuted and found guilty and are

3        punished, they're sent back to prison,

4        right?

5    A   Or remain in prison.

6    Q   That's what happens.  They're in prison

7        and they commit a crime and they're

8        prosecuted and they go back to prison,

9        right?

10   A   Yes.

11   Q   Let's talk about the factor of

12       availability of weapons which is also

13       one of the factors that you say would

14       increase probability.  Is it true that

15       weapons are available in prison?

16   A   Yes.

17   Q   Have you had occasion during your time

18       working in the prison system to see an

19       almost incredible variety of weapons

20       that can be fashioned by inmates in

21       prison?

22   A   Yes.

23   Q   In fact, they're almost ingenious in

24       what they can come up with and what they

25       can use to make a deadly weapon; is that

1        not true?

2    A   Yes.

3    Q   They can use toothbrushes, toothpicks,

4        and fashion all kinds of things that

5        they use to injure, assault, or maim

6        other people; is that correct?

7    A   Yes.

8    Q   Let's talk a little bit about drugs and

9        alcohol in prison.  You have that as an

10       increased probability and that's

11       because, unfortunately, there are drugs

12       available in the Texas Department of

13       Corrections, correct?

14   A   Yes.

15   Q   And it is a known fact, however it gets

16       in there, that there is a network of all

17       kinds of illegal and illicit substances

18       in the Texas Department of Corrections,

19       correct?

20   A   Yes.

21   Q   You talked about clinical factors that

22       you consider when you make the

23       assessment of a continuing threat and

24       the dangerousness issue.  You could not

25       give an opinion basically because of

164

1   insufficient data from the defendant's
2   self-reporting; is that correct?
3   A   From his version, not sufficient data.
4       From the eyewitnesses, it appeared
5       deliberate.
6   Q   So the more information you would know
7       about the time period, the
8       thoughtfulness the defendant put into
9       committing his crime, or let's just call
10      it the premeditation factor for lack of
11      a better word, that went into it, the
12      number of intentional acts it took to
13      perpetrate his crime, all those are
14      important factors to consider when
15      determining the probability for future
16      dangerousness, correct?
17  A   Yes.
18  Q   So the more deliberate the act, the more
19      thought that went into the act, the more
20      awareness of the result of a person's
21      act, the less impulsive the act, the
22      more likely the person would be a danger
23      and violent in the future?
24  A   Yes.
25  Q   Would that be a fair statement?

165

1    A    Yes.

2    Q    The lack of remorse, the fact that a

3         person showed very little or absolutely

4         no remorse for the results of his action

5         even for an extremely violent act, would

6         that show that that person has a greater

7         likelihood of being a threat in the

8         future?

9    A    Yes.

10   Q    Talking about post-conduct behavior,

11        things he did after he committed the

12        crime, you have a category called fun.

13        I don't know if that's a standard

14        category or whether it applies in this

15        case or not.  I'm not sure.  You made a

16        notation about the fact that you had

17        information that the defendant was

18        laughing.  If you had information that

19        the person thought it was quite

20        humorous, the crime that he committed,

21        which was an extremely violent and

22        heinous act, and even after seeing the

23        result of his handiwork with people

24        bleeding, people screaming, children

25        crying, children running over to their

                                              166

```
1         mother and hugging her before she died,
2         would that indicate to you that that
3         person with no remorse would have a
4         greater probability of being a danger in
5         the future?
6    A    Yes.
7    Q    In your report you indicated, and I
8         believe you testified to the jury that
9         you believed that the defendant if
10        incarcerated would not -- there would
11        not be the probability about him being a
12        continuing threat to society.  I believe
13        that was your opinion.
14   A    No.
15   Q    That was not your opinion?
16   A    A decreased probability but there is a
17        probability.
18   Q    So there's a probability that the
19        defendant would be a continuing threat
20        to society?
21   A    Right, but he would be on the low end of
22        the continuum.  I never rule out any
23        probability.
24   Q    Then there is a probability that he
25        would be a continuing threat to society?
```

167

1    A    Yes.

2                      MS. HUFFMAN:   No other

3                 questions, Doctor.   Pass the

4                 witness.

5

6                 REDIRECT EXAMINATION

7    BY MR. EASTERLING:

8    Q    First of all let's make it clear whether

9         or not you're a psychologist or a

10        psychiatrist and what the difference is

11        so the jury understands.   Are you a

12        psychiatrist?

13   A    I'm a psychologist.

14   Q    Tell the jury what the difference is

15        between an psychologist and a

16        psychiatrist.

17   A    About two hundred dollars an hour.

18                 A psychiatrist is a medical

19        doctor.   They go to medical school.   The

20        last three years they have to specialize

21        and they are trained in psychiatry which

22        is the medical diagnosis and treatment

23        of psychiatric disorders.   A

24        psychologist undergoes approximately the

25        same number of years in training but

                                            168

1    specializes in psychology and does not

2    use medication to treat but uses

3    established psychological principles and

4    not medical intervention.

5  Q  So it's the medical doctors, the

6    psychiatrists from the American

7    Psychiatric Association that don't

8    believe in coming in and testifying in

9    death penalty cases?

10  A  I don't think it's that simplistic.  It

11    simply says that you have to examine the

12    person and know the basis of your

13    prediction and that it's not enough to

14    predict.  You have to also explain the

15    basis for that prediction so that the

16    trier of facts can give the appropriate

17    weight to your opinion.

18  Q  But the American Psychological

19    Association has never taken the position

20    that there's something wrong with you

21    coming in here and testifying, have

22    they?

23  A  No.  The American Psychological

24    Association's guidance is to use

25    existing knowledge, psychological

169

1        knowledge, the body of knowledge that we

2        have, and apply to the specific

3        questions.  It warns us not to

4        exaggerate our opinions or overclaim.

5        That's why I'm very careful to state my

6        opinions in terms of probabilities and

7        not black and white type of assessment.

8  Q   If I would have asked you to do this

9        evaluation and you would have given me

10       the opinion that he was going to be a

11       high risk or there was a high

12       probability, then that would have been

13       the opinion we all would have had to

14       live with, right?

15  A   Correct, because it would have been

16       based on the facts of the case.

17  Q   You didn't give your opinion to me

18       because I wanted you to give that

19       opinion or Mr. Buck wanted you to give

20       that opinion or Mr. Guerinot wanted you

21       to give that opinion.  You gave us your

22       professional experienced opinion; is

23       that correct?

24  A   Correct.  Nobody interfered with my

25       opinion nor lobbied me.  I wrote my

1          report and I submitted it the way it is.

2     Q    What is the I.Q. of Duane Buck that you

3          know from your testing?

4     A    I did not do the testing myself but the

5          tests from some other psychologist shows

6          74, I think.

7     Q    Could it be 72 to 74?.

8                         MS. HUFFMAN:   I'd object

9               to the leading, Your Honor.

10                        THE COURT:   Sustained.

11

12    BY MR. EASTERLING:

13    Q    If it was around 74, is that on the low

14         or high end of I.Q.?

15    A    That would be what is called the low end

16         of the borderline range.

17    Q    Do you feel that had some effect on what

18         Ms. Huffman pointed out, that he was a

19         questionable informant about information

20         and details?

21    A    That opinion came from his report to me

22         that he could not remember details up to

23         a certain point and that is where I said

24         that his reliability is questionable,

25         the lack of recollection of details

                                              171

1          after a certain point.

2     Q    You then used facts that you learned

3          from the police report and the

4          witnesses' statements about the details

5          of the murders, correct?

6     A    Yes.  The witnesses' statements were

7          detailed enough to pick up where he left.

8          off.  It was very beneficial for me to

9          read that and to make a judgment in this

10         case, and the witnesses' statements were

11         responsible for many of the favorable

12         judgments I made of this defendant.

13    Q    Now, you were aware that there was some

14         history of some alleged assaultive

15         behavior to a woman.  You were aware of

16         that.  You are still aware of it today.

17              Does that change your opinion in

18         any way concerning the fact that he's at

19         the low end of probability of committing

20         future acts of violence?

21    A    No, my opinion would be the same.  Many

22         of these factors that are true to him

23         now would not be true in prison.  When

24         you're deciding on a person's

25         dangerousness, you not only look at the

                                                  172

1    factors that contribute to dangerousness

2    but you also look at where the people

3    will be and the facts of that

4    environment.  You look at those factors

5    and know that many of those factors will

6    be controlled in prison.  They cannot be

7    ruled out completely but they are

8    controlled much better in prison than in

9    free society.

10   Q   It's very unlikely that he would have a

11       relationship with a woman in the

12       penitentiary; is that true?

13   A   That would be unlikely.

14   Q   And that would reduce the victim pool

15       that you talked about, correct?

16   A   Correct.  Particularly in his case where

17       the assaulted victims were always

18       involved in a romantic relationship.

19       When that victim pool is removed, the

20       probability of him being assaultive

21       towards other people as shown by his

22       previous prison record would be expected

23       to be good.

24              MR. EASTERLING:  May I

25       approach the witness, Your

1              Honor?

2                    THE COURT:  Yes, sir.

3

4    BY MR. EASTERLING:

5    Q    You talked about weapons with Ms.

6         Huffman, about weapons in prison.  Do

7         inmates walk around with .22 rifles in

8         prison?

9    A    No, they are no guns in prison.

10   Q    Do they walk around with .12 gauge

11        shotguns in prison?

12   A    No.

13   Q    The kinds of things she's talking about

14        is like an inmate getting a fork from

15        the cafeteria and filing it down and

16        making it into a little knife.  That's

17        the kind of thing she's talking about,

18        correct?

19   A    There are no more forks, so it's

20        toothbrushes and pens and bones.  There

21        are no more forks.

22   Q    Does Duane Buck have any history of

23        using a knife or that type of deadly

24        weapon with anybody?

25   A    No, not when he was in prison and in

                                           174

1       jail.

2    Q  In fact, there is no data or record

3       indicating that Duane Buck has ever used

4       a knife or a toothbrush or a razor blade

5       all the time that he was in the County

6       Jail or in TDC, correct?

7    A  True.

8    Q  Ms. Huffman talked to you about there

9       being no remorse immediately after the

10      crime.  Let me talk to you about your

11      opinion about that.  If the defendant

12      cried in open court when the witnesses

13      were testifying, do you have an opinion

14      about whether or not that's remorse?

15   A  Yes.

16   Q  What is that?

17   A  It's remorse.

18   Q  That, of course, would decrease

19      probability under all the facts that you

20      talked about concerning future violence?

21   A  Yes.

22   Q  To make sure that the jury understands,

23      you're saying that it's at the very low

24      end of probability that he would commit

25      any criminal acts of violence in the

                                         175

1       prison population where he would be

2       incarcerated; is that correct?

3    A  Yes.

4    Q  You realize that the issue they have to

5       decide, the jury has to decide, is the

6       phrase beyond a reasonable doubt in

7       front of probability in that issue,

8       correct?

9    A  Yes.

10                  MR. EASTERLING:  Pass the

11              witness, Judge.

12                  MS. HUFFMAN:  No

13              questions.

14

15                  (At this time the witness

16              is excused from the

17              courtroom.)


                                              176

1              PATRICK GORDON LAWRENCE

2       was called as a witness by the Defense and,

3       having been duly sworn, testified as follows:

4

5                   DIRECT EXAMINATION

6       BY MR. EASTERLING:

7       Q    State your name to the jury, please.

8       A    Patrick Gordon Lawrence.

9       Q    Where do you live, Dr. Lawrence?

10      A    Garrison, Texas.

11      Q    Will you tell the jury where that is?

12      A    North of Nacogdoches about eighteen

13           miles on Highway 59 if you're driving

14           from Houston to Shreveport.

15      Q    Tell the jury your educational

16           background and your professional

17           credentials, please.

18      A    I have a Doctorate in Philosophy and

19           Clinical Psychology from the California

20           School of Professional Psychology in

21           Fresno.  I took that in 1979.  Prior to

22           that I had a Masters in Psychology from

23           Texas A. & I. University in Kingsville

24           in 1971.  Prior to that I had a

25           Bachelors in Financial Management, a

1      B.B.A. in Financial Management in 1969

2      from Texas A. & I. in Kingsville.  I

3      belong to the American Psychological

4      Association, the Texas Psychological

5      Association and I'm Director of the

6      Division of Applied Psychology of the

7      Texas Psychological Association.  I

8      belong to the American Correctional

9      Association, the Association for

10     Professional Psychologists, the East

11     Texas Psychological Association.  I

12     believe that's all.  I believe that's

13     pretty much all the professional

14     associations I belong to.

15  Q   Let me show you Defendant's Exhibit

16     No. 2.  Do you know what that is?

17  A   That's my Curriculum Vitae.

18  Q   And that shows all your educational

19     experience and the professional

20     associations that you belong to as well

21     as your bibliography on the third page?

22  A   Yes.

23               MR. EASTERLING:  I tender

24     this exhibit to the State and

25     offer it in evidence.

1              MS. HUFFMAN:   No

2         objection.

3              THE COURT:   Defense No. 2

4         is admitted.

5

6    BY MR. EASTERLING:

7    Q    What is your current position?

8    A    I work for the University of Texas

9         Medical Branch in Galveston, a managed

10        care company providing psychological

11        services for the inmate offenders of the

12        Texas Prison System at the Skyview

13        Psychiatric Facility.  I am Supervising

14        Psychologist for a fifty-bed acute care

15        mission unit where we see approximately

16        thirty new inmates a month and evaluate

17        those people and decide what level of

18        care they need, whether they need long-

19        term institutional care or just short-

20        term care for depression or anxiety, or

21        if they need care on an out-patient

22        basis.  I've been there since 1988.

23   Q    And you have a private practice that

24        you've been working in since 1987?

25   A    Yes, I've had a private practice there

                                           179

1        in Garrison since 1987.  I've appeared

2        in several courts in East Texas doing

3        evaluations for both the Defense and the

4        prosecution, evaluating particular

5        fellows they have brought to my

6        attention for a variety of different

7        offenses.

8    Q   Did you also work at the Pine Lands

9        Hospital?

10   A   Yes, sir, I worked there for a brief

11       period of time from April until October

12       of 1987 as Director of Patient Care

13       services.  It was a private psychiatric

14       hospital in Nacogdoches.

15   Q   Then from 1984 until 1987 did you work

16       as Director of Mental Health Services at

17       the Wichita Falls MHMR Community Center?

18   A   Yes, sir, I was Director for the Mental

19       Health Services for the Wichita Falls

20       Mental Health Mental Retardation Center.

21       I supervised the provision services for

22       twelve hundred outpatients.  I had

23       fifty-five long-term residential care

24       units.  I had two fairly large programs

25       of structured living halfway house

1  facilities for mentally ill people.  I

2  also supervised our DNE process which is

3  a process for evaluating people for

4  mental retardation.  I supervised

5  services for Crisis Line and Crisis

6  Intervention Service within the

7  community which was a twenty-four hour

8  service.

9          I also supervised and did

10  evaluations on all the juvenile

11  offenders referred to us by the court,

12  the adult offenders referred to us by

13  the court as well as evaluating both

14  sexually abused children and sexual

15  offenders.

16  Q  Sometime between 1980 and 1987, did you

17     work at River Gardens, New Braunfels, as

18     Director of Psychological Services; and

19     as Executive Director for Guadalupe

20     County Guidance Center; and as

21     psychologist at Big Spring State

22     Hospital; and as a psychological intern

23     at San Luis Obisbo Community Mental

24     Health Center in California?  Did you

25     work at all of those places?

181

1    A    At San Luis Obisbo I was doing an

2         internship from 1978 to 1979.  The other

3         places were jobs where I was completing

4         my residency at Big Spring State

5         Hospital.  Then I took a job at

6         Guadalupe County Guidance Center where I

7         was evaluating mentally ill substance

8         abusers developing some alternative

9         program for them.  That program was

10        discontinued because of lack of Federal

11        Funds.

12   Q    Do you recall meeting me about a year

13        ago at a capital murder symposium

14        seminar as required by District Judges

15        for anyone to practice in capital murder

16        cases?  Do you remember that?

17   A    Yes, sir.

18   Q    Have you ever evaluated inmates or any

19        type of alleged offender or convict and

20        determined that they had the probability

21        to commit future acts of violence in the

22        future?

23   A    Yes, I have.

24   Q    Would you give us an example of one of

25        the projects that you did?  I believe it

                                          182

1          was in New Mexico.  Would you just give

2          us an idea of what you've done in the

3          past?

4      A   I was Staff Psychologist for the

5          Forensic Treatment System in New Mexico

6          from 1972 to 1975.  In New Mexico we had

7          a law that required that someone had to

8          be brought to trial within six months or

9          the charges would be dismissed.  So many

10         times the Defense would say that the

11         person was incompetent to stand trial

12         and send them away long enough to get

13         the charges dropped.

14             We developed an alternative way

15         of evaluating these people in a very

16         short period of time.  I evaluated

17         everyone in the State of New Mexico from

18         1972 through 1975 that was sent for

19         competency on the sanity issue.

20         Practically all of them had to do with

21         crimes of violence, either murder or

22         sexual assault, or some other heinous

23         crime where people wanted an evaluation.

24         We appeared in court for our evaluations

25         of these folks.

                                           183

1              In that process I saw a number

2         of inmates, a number of people that

3         later became convicted.  I was told by a·

4         friend of mine in --

5                   MS. HUFFMAN:  I'd object

6              to any hearsay.

7                   THE COURT:  Sustained.

8

9    BY MR. EASTERLING:

10   Q    Try to answer without saying what people

11        told you.

12   A    All right.  I evaluated seven of the

13        nine offenders that went out and killed

14        people in the New Mexico riot.  At the

15        time that I evaluated those people, I

16        did not see the other two offenders

17        because I wasn't there from 1976 to

18        1980.  The riot happened in January of

19        1980.  I evaluated seven of those

20        offenders and said that they would

21        probably commit heinous crimes or kill

22        again.

23   Q    Did they do so?

24   A    Yes.

25   Q    And ever since that time you have been

                                           184