# United States District Court
# Southern District of Texas

Case Number: 03mc386

## ATTACHMENT

Description:

☐ State Court Record     ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part 119 of _____

☐ Exhibit to: _____

number(s) / letter(s) _____

Other: _____

_____

_____

1    he also shoots his own sister, the woman

2    he grew up with, the woman he knew.  He

3    knew she had a family.  He knew all

4    about her and yet he was the kind of

5    person who could point a gun at her

6    chest, watch her face, pull the trigger,

7    and then go on to commit more acts

8    within just a few minutes.

9           Think about what kind of a

10   person it took to do that.  Think about

11   when he shot Phyllis Taylor.  At that

12   time he was a continuing threat to

13   society when he went on to shoot the

14   other people, was he not?  He shot

15   Kenneth Butler.  After he shot Kenneth

16   Butler was he a continuing threat to

17   society?  If Debra were here, she'd

18   vouch for that because then he shot

19   Debra Gardner.

20          This is a man that made

21   deliberate decisions.  Think about this.

22   After you had killed a person, after you

23   had shot someone at close range with a

24   gun we could imagine the type of damage

25   it would do, the person is spitting up

265

1   blood, gasping for air, and you see the

2   results of your handiwork, saw the

3   results of what he did, and yet he's the

4   type of person that continues his

5   assault.  He continues his path to the

6   next victim, to the next victim, to the

7   next victim.

8            That tells you about this person

9   and is something you should consider

10  when you're determining whether or not

11  he's a continuing threat to society.

12  These are the type of factors that I'm

13  asking you to consider when you make

14  that determination.

15           You know that if he goes into

16  the general population in prison that he

17  is a risk with alcohol and with drugs.

18  The experts told you that.  You also

19  heard from the evidence that alcohol and

20  drugs are available in prison.  It's a

21  sad commentary on our system but it's

22  the truth.  You know all these things.

23  You know those risk factors are going to

24  be there.  As we have discussed,

25  everybody in society has the right to be

266

1    protected from this defendant wherever

2    he may go.

3         He has proven to you that he is

4    going to be a continuing threat.   I

5    don't think there's any way that

6    reasonable people can look at this

7    defendant's background and the evidence

8    in this case, and his lack of remorse,

9    and his deliberateness of action, and

10   argue reasonably that he would not be a

11   continuing threat to society.   Remember

12   it's only a probability that he will be

13   a threat to society.   I think the answer

14   to Question Number One is clearly yes.

15        Briefly with regard to Issue

16   Number Two, you know your job is to look

17   at all of the evidence.   We talked about

18   this on voir dire too.   There is simply

19   nothing there.   Think about the facts of

20   what this defendant has done, the

21   enormity of his crime, the enormity of

22   what he has left behind, the results of

23   his crime, and you weigh the threat that

24   this man is to society, there is nothing

25   you can find in the evidence that

267

1    mitigates towards a life sentence for

2    this defendant.  It's just not there.

3              Everybody has had hardships in

4    life.  Everyone has had hard times.

5    Probably everybody here has had a parent

6    who has died or someone close to them

7    who has died that made their life sad.

8    Everybody has had bad times.  A lot of

9    people have had a parent or maybe even

10   two parents that did not live up to

11   their expectations.  That does not give

12   you a free ticket to kill and it does

13   not excuse your behavior.

14             Mr. Easterling argues to you

15   about cocaine and alcohol dependency.

16   There is no evidence whatsoever that

17   this defendant was under the influence

18   of any alcohol or cocaine at the time he

19   committed the offense.  I believe one

20   witness stated he had a beer in his hand

21   when he first came to Debra's house the

22   first time.  That's the only evidence of

23   that.  He doesn't get points for that.

24             Whether he has a cocaine or

25   alcohol problem or otherwise, you may

268

1     think that because he has been arrested

2     for possession of cocaine.  On the other

3     hand, he also sold cocaine.  That

4     doesn't prove anything.  There's no real

5     evidence of that other than his self-

6     reporting to his expert.

7            He has low intelligence but he

8     is not mentally retarded.  He's around

9     the average intelligence group that you

10    would find in the prisoner jail

11    population according to the expert. You

12    know that if a person is in the lower

13    range of intelligence that they have a

14    higher likelihood of being violent.

15    That's what their own expert told you,

16    so when you weigh that it balances out.

17    He may have a little lower intelligence

18    but he's more likely to be violent.

19           There is absolutely nothing

20    that's in evidence that would call for

21    you as the jury to give this man some

22    type of break because he doesn't deserve

23    it.  He made a lot of choices almost two

24    years ago and he knew the results of

25    what his choices were going to be. He

269

knew the victims.  It wasn't anything to
do with an impulsive act where he didn't
have time to think about what the
results were going to be or what the
aftermath of his crime was going to be.
He knew Debra Gardner.  He had lived in
the house there with her.  He knew that
she had children.  He knew they were
going to be left behind without a mother
to raise them and that they'd have to
live with different family members.  He
knew that his sister had children.
Maybe he didn't know that much about
Kenneth Butler but at least he knew he
had a brother.  He knew he didn't
deserve to die.

     He knew when he shot Debra
Gardner that she was begging for her
life.  He knew her own children were
watching her and he knew that her own
children were begging him not to kill
their mother.  What kind of man would do
that?  He knew there were younger
children involved that loved Debra
Gardner.  You heard about the little

270

CAUSE NO. **72810**

## IN THE COURT OF CRIMINAL APPEALS
### AT AUSTIN, TEXAS

---

DUANE EDWARD BUCK

Appellant

VS.

THE STATE OF TEXAS,

Appellee

---

TRIAL CAUSE NO. 699684
APPEAL FROM THE 208TH DISTRICT COURT
OF HARRIS COUNTY, TEXAS
JUDGE DENISE COLLINS, PRESIDING

---

REPORTER'S RECORD

EXHIBITS

June 25, 1996 - May 7, 1997

**FILED IN**
COURT OF CRIMINAL APPEALS

JAN 5   1998

Troy C. Bennett, Jr., Clerk

VOLUME   30   OF   30   VOLUMES

MARILYN SKINNER
Certified Official Court Reporter
208th District Court
Harris County, Texas

CAUSE NO. 699684

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT OF |
| | ) | |
| VS. | ) | HARRIS COUNTY, T E X A S |
| | ) | |
| DUANE EDWARD BUCK | ) | 208TH JUDICIAL DISTRICT |

APPEARANCES:

FOR THE STATE OF TEXAS:

Ms. Joan Huffman
Assistant District Attorney
201 Fannin
Houston, Texas 77002
Telephone No:  (713) 755-5800
SBOT No.:  10296500

Ms. Linda Hood
Assistant District Attorney
201 Fannin
Houston, Texas 77002
Telephone No:  (713) 755-5800
SBOT No.:  09943423

FOR DEFENDANT:

Mr. Danny K. Easterling
Attorney at Law
1018 Preston, 6th Floor
Houston, Texas 77002
Telephone No.:  (713) 228-4441
Fax No.  (713) 228-4072
SBOT No.:  01472017

Mr. Jerry Guerinot
Attorney at Law
1314 Texas Avenue, Suite 1515
Houston, Texas 77002
Phone:  (713) 225-0094
Fax No.:  (713) 225-0099
SBOT No.:  08571500

## MASTER EXHIBIT INDEX

### VOLUME 2 - PRETRIAL HEARINGS:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|-----|-------------|-------|------|------|------------|
| S-1 | Pen Packet | 98 | 98 | 98 | 30 |
| S-2 | Fingerprint Card | 97 | -- | -- | -- |

### VOLUME 25 - TRIAL, MAY 1, 1997:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|-----|-------------|-------|------|------|------------|
| S-1 | Photograph | 60 | 61 | 61 | 30 |
| S-2 | Photograph | 60/189 | 61 | 61 | 30 |
| S-3 | Photograph | 60 | 61 | 61 | 30 |
| S-4 | Photograph | 60 | 61 | 61 | 30 |
| S-5 | Photograph | 60 | 61 | 61 | 30 |
| S-6 | Photograph | 60 | 61 | 61 | 30 |
| S-7 | Photograph | 60 | 61 | 61 | 30 |
| S-8 | Photograph | 60/189 | 61 | 61 | 30 |
| S-9 | Photograph | 60/189 | 61 | 61 | 30 |
| S-10 | Photograph | 60 | 61 | 61 | 30 |
| S-11 | Photograph | 60 | 61 | 61 | 30 |
| S-12 | Photograph | 60 | 61 | 61 | 30 |
| S-13 | Photograph | 60/132 | 61 | 61 | 30 |
| S-14 | Photograph | 60 | 61 | 61 | 30 |
| S-15 | Photograph | 60 | 61 | 61 | 30 |
| S-16 | Photograph | 60 | 61 | 61 | 30 |
| S-17 | Photograph | 60 | 61 | 61 | 30 |
| S-18 | Photograph | 60 | 61 | 61 | 30 |

1

MASTER EXHIBIT INDEX CONTINUED

VOLUME 25 - TRIAL, MAY 1, 1997:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|---|---|---|---|---|---|
| S-19 | Photograph | 60 | 61 | 61 | 30 |
| S-20 | Photograph | 60 | 61 | 61 | 30 |
| S-21 | Photograph | 60 | 61 | 61 | 30 |
| S-22 | Photograph | 60 | 61 | 61 | 30 |
| S-23 | Photograph | 60 | 61 | 61 | 30 |
| S-24 | Photograph | 60 | 61 | 61 | 30 |
| S-25 | Photograph | 60 | 61 | 61 | 30 |
| S-26 | Photograph | 60 | 61 | 61 | 30 |
| S-27 | Photograph | 60 | 61 | 61 | 30 |
| S-28 | Photograph | 60 | 61 | 61 | 30 |
| S-29 | Photograph | 60 | 61 | 61 | 30 |
| S-30 | Photograph | 60 | 61 | 61 | 30 |
| S-31 | Photograph | 60 | 61 | 61 | 30 |
| S-32 | Photograph | 60 | 61 | 61 | 30 |
| S-33 | Audio Cassette | 85/198 | -- | -- | -- |
| S-34 | Audio Cassette | 84/197 | -- | -- | -- |
| S-35 | Large Diagram | 30 | 30 | 30 | 30 |
| S-36 | Search Warrant | 43/80 | *44 | *50 | 30 |

2

## MASTER EXHIBIT INDEX CONTINUED

VOLUME 25 - TRIAL, MAY 1, 1997:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|------|------------|-------|------|------|------------|
| S-37 | Box containing shell casing | 69 | 71 | 72 | -- |
| S-38 | Box containing shell casing | 69 | 71 | 72 | -- |
| S-39 | Box containing shell casing | 69 | 71 | 72 | -- |
| S-40 | Bullet fragment from autopsy | 76 | 77 | 78 | -- |
| S-41 | Bullet fragment from autopsy | 76 | 77 | 78 | -- |

3

<u>MASTER EXHIBIT INDEX CONTINUED</u>

<u>VOLUME 25 - TRIAL, MAY 1, 1997:</u>

| <u>NO.</u> | <u>DESCRIPTION</u> | <u>I.'D.</u> | <u>OFF.</u> | <u>ADM.</u> | <u>SHOWN VOL.</u> |
|------|-------------|------|------|------|------------|
| S-42 | Plastic bag containing live .22 round | 73 | 74 | 75 | -- |
| S-43 | Empty shell casing | 73 | 74 | 75 | -- |
| S-44 | Magazine | 79 | 79 | 79 | -- |
| S-45 | Large Diagram | 65/133 | 66 | 66 | 30 |
| S-46 | Marlin .22 Cal. rifle | 84 | -- | -- | -- |
| S-47 | Marlin .12 gauge shotgun | 84/112 | -- | -- | -- |
| S-48 | Large Diagram | 86 | 86 | 86 | 30 |
| S-49 | Photograph Butler | 123 | -- | -- | -- |

*FOR PURPOSE OF THE MOTION TO SUPPRESS HEARING

## MASTER EXHIBIT INDEX CONTINUED

VOLUME 26 - TRIAL, MAY 2, 1997:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|-----|-------------|-------|------|------|------------|
| S-25 | Photograph | 256 | * | * | 30 |
| S-33 | Audio Cassette | 317 | -- | -- | -- |
| S-34 | Audio Cassette | ** | 317/ 318 | 318 | -- -- |
| S-37 | Box containing Shell Casing | 330 | * | * | -- |
| S-38 | Box containing shell casing | 330 | * | * | -- |
| S-39 | Box containing shell casing | 330 | * | * | -- |
| S-41 | Bullet fragment from autopsy | 348 | * | * | -- |

5

MASTER EXHIBIT INDEX CONTINUED

VOLUME 26 - TRIAL, MAY 2, 1997:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|------|-------------|---------|------|------|------------|
| S-47 | Marlin .12 gauge shotgun | 330 | -- | -- | -- |
| S-49 | Autopsy Photograph -Butler | 344/345 | 345 | 345 | 30 |
| S-50 | Photograph- Gardner | 354 | 355 | 355 | 30 |
| S-51 | Autopsy Report- Gardner | 343 | 343 | 344 | 30 |
| S-52 | Autopsy Report- Butler | 343 | 343 | 344 | 30 |
| S-53 | Autopsy Photograph -Butler | 344/ 345 | 345 | 345 | 30 |
| S-54 | Photograph | 344/ 345 | 345 | 345 | 30 |
| S-55 | Photograph | 344/ 345 | 345 | 345 | 30 |
| S-56 | Photograph | 354 | 355 | 355 | 30 |

6

## MASTER EXHIBIT INDEX CONTINUED

### VOLUME 26 - TRIAL, MAY 2, 1997:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|---|---|---|---|---|---|
| S-57 | Photograph | 354 | 355 | 355 | 30 |
| S-58 | Photograph | 354 | 355 | 355 | 30 |

*PREVIOUSLY OFFERED AND ADMITTED

**IDENTIFIED VOLUME 25, PAGES 84/197

### VOLUME 28 - PUNISHMENT, MAY 6, 1997:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|---|---|---|---|---|---|
| S-59 | Jail Booking Records | 10 | 9/11 | 21/26 | 30 |
| S-59A | Jail Booking Records | 8 | -- | -- | -- |
| S-60 | Jail Booking Records | 10 | 9/11 | -- | |
| S-60A | Jail Booking Records | 8 | -- | -- | -- |
| S-61 | Jail Booking Records | 10 | 9/11 | 21/26 | 30 |
| S-61A | Jail Booking Records | 8 | -- | -- | -- |
| S-62 | Jail Booking Records | 10 | 9/11 | 23/26 | 30 |
| S-62A | Jail Booking Records | 8 | -- | -- | -- |

7

## MASTER EXHIBIT INDEX CONTINUED

VOLUME 28 - PUNISHMENT, MAY 6, 1997:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|-----|-------------|-------|------|------|------------|
| S-63 | Jail Booking Records | 10 | 9/11 | 21/ 26 | 30 |
| S-63A | Jail Booking Records | 8 | -- | -- | -- |
| S-64 | Jail Booking Records | 10 | 9/11 | 23/ 26 | 30 |
| S-64A | Jail Booking Records | 8 | -- | -- | -- |
| S-65 | Jail Booking Records | 10 | 9/11 | -- | -- |
| S-65A | Jail Booking Records | 8 | -- | -- | -- |
| S-66 | Pen Packet | 8 | 9 | 26 | 30 |
| S-67 | Judgment and Sentence | 28 | 28 | 28 | 30 |
| S-68 | Judgment and Sentence | 27 | 28 | 28 | 30 |
| S-69 | Video-Record Information | 73 | 73 | 73 | -- |
| S-70 | Fingerprint Card | 6 | -- | -- | -- |

8

MASTER EXHIBIT INDEX CONTINUED

VOLUME 28 - PUNISHMENT, MAY 6, 1997:

| NO. | DESCRIPTION | I.'D. | OFF. | ADM. | SHOWN VOL. |
|-----|-------------|-------|------|------|------------|
| S-70 | Summary of State's Evidence | *240/242 | -- | -- | -- |
| D-1 | Forensic Psychological Evaluation | 117 | 118/120 | 234 | 30 |
| D-1A | Forensic Psychological Evaluation | 143 | 143 | **143 | 30 |
| D-2 | Curriculum Vitae-Patrick Lawrence Ph.D | 178 | 178 | 179 | 30 |
| D-3 | Psychological Evaluation | 216 | 217 | 234 | 30 |

*DEMONSTRATIVE PURPOSES ONLY

**APPELLATE PURPOSES ONLY

NOTE:  EXHIBITS WERE PREMARKED BY ATTORNEYS.

9

DEFENSE EXHIBIT NO. 1

FORENSIC PSYCHOLOGICAL EVALUATION



DEFENDANT'S
EXHIBIT
5-6-97

**FORENSIC PSYCHOLOGICAL SERVICES**
psychological consultations in the practice of law

2040 North Loop 336 West, Suite 322
Conroe, Texas 77304

**Walter Y. Quijano, Ph. D.**
Clinical Psychologist                    VOICE: (409) 539-2226
a professional corporation               FAX: (409) 539-6308

_____

## FORENSIC PSYCHOLOGICAL EVALUATION

<u>NAME</u>: Duane E. Buck                         <u>DATE</u>: 8 March 1997

<u>INTRODUCTION</u>:

Duane, a 33-year-old widowed Black male with a high school education and auto mechanics work background, was referred for a forensic psychological evaluation by his counsel, Danny Easterling, Esq. to assist in his defense. The defendant was charged with capital murder (Cause No. 699684 in the 208th Judicial District of Harris County, Texas).

He was advised that this report was to be submitted to his counsel and that he had the right not to participate in the examination and to terminate the examination at any point he wanted to. He knew of and anticipated the examination.

The information used in this report was gathered for the avowed purpose of assisting in his own defense and should not be used as the basis for determining guilt or innocence.

<u>PROCEDURES</u>:

1. Clinical interview with defendant on 2/14/97
2. Millon Clinical Multiaxial Inventory-II (MCMI-II)
3. Review of defense lawyer's notes on witnesses' statements.

<u>FINDINGS</u>:

**Behavioral Observations/Mental Status.** The defendant was examined at the Harris County Jail. He was appropriately dressed and groomed. Gait was normal. No unusual gestures were observed. Voice was appropriate for the situation. The defendant was friendly and cooperative.

he was generally oriented

Duane E. Buck, 3/8/97

1  |to   time,
|Speech was  reactive and  expressive and  contained no  association,  |
3  |delusion,   or  hallucination  disorders.  Memory  was  intact  by  |
4  |interview  and  fair  by self-report.  No  memory  problems  were  |
5  |reported.  Abstract thinking was normal by interview  in  that  he  |
6  |was  able  to conduct a meaningful conversation.  Attention  and  |
7  |concentration  were normal,
8  /|

21  |   The  defendant's mood and affect were normal.

34  |
35  |      Vegetative  signs were reviewed. He sleeps  in peace  because  |
36  |of  the  love  of Jesus. His appetite is fair; he  fasts   for  his  |
37  |spiritual  growth.  Energy level is normal.
38  |
39  |
40  |
41  |      History.  The  defendant attended school  through  the  12th  |
42  |grade, and completed a trade school curriculum in paint and  body  |
43  |automobile repair. He also studied auto mechanics in TDCJ-ID.  He  |
44  |has worked with his father in auto mechanics and used parts "all  |
45  |my  life".
46  |
47  |
48  |
49  |      The  defendant has had two common law marriages.  The  first  |
50  |marriage  from  1984  till  1989 produced a  son,  now  nine.  |
51  |
52  |
|                               He and former wife continue  to  be  |
54  |friends. His second marriage from 1991 till 1995 was with the now  |
55  |deceased complainant. They had no children.

2

24   |       **MCMI-II.** The Personality code was: 8B 3 1 2 ** - * 8A + 7 4 |
25   |6A ' // S ** - * //. The Syndrome code was: B D ** A * // - ** CC |
26   |*.  The test was valid, though he appeared to have magnified  the  |
27   |level of experienced illness. Suggested Axis I impressions were:    |
28   |                                                                     |
29   |      296.33 Major depression, recurrent, severe without psychotic |
30   |             features                                                |
31   |      305.00 Alcohol abuse                                           |
32   |      300.02 Generalized anxiety disorder.                           |
33   |                                                                     |
     |Suggested Axis II impression was a configuration of:                 |
35   |                                                                     |
36   |      301.22 Schizotypal personality disorder                        |
37   |      301.90 Personality disorder NOS (Self-defeating)               |
38   |      301.60 Dependent personality disorder.                         |
39   |                                                                     |

3

<u>CLINICAL</u> <u>IMPRESSION</u>:

     Axis I - 303.90 Alcohol dependence, in remission by
                     incarceration
            304.20 Cocaine dependence, in full remission by
                     report

    Axis II - 301.60 Dependent personality features

   Axis III - None reported

    Axis IV - Psychosocial stressors: incarceration, pending
               capital murder charge

    Axis V - Global Assessment of Functioning: 60
               GAF before jail: 50

<u>CLINICAL</u> <u>RECOMMENDATIONS</u>:

1. Substance abuse treatment program:

   A. If released to community:

      1) Relapse prevention groups: 48 weekly sessions and then
         aftercare.
      2) Supervised antagonist therapies: Antabuse for alcohol
         and Naltroxene for cocaine.
      3) Random urinalysis at least twice a month.

   B. If incarcerated, participate in an in-house substance abuse
      program.

2. Individual therapy to identify Dependent personality disorder
features that may have contributed to the conduct charged and
modify them.

<u>FORENSIC</u> <u>RECOMMENDATIONS</u>:

1. Encourage the defendant to recall the remainder of what he did
upon his second return to the house, when he was accused of
fatally shooting his girlfriend and a male companion, and
shooting his sister. The claim of sudden onset of amnesia just
prior to the shootings, after a detailed recollection of the rest
of the events, is not credible and not psychological supportable.

Duane E. Buck, 3/8/97

2. **Future Dangerousness,** Whether there is probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? The following factors were considered in answer to the question of future dangerousness: statistical, environmental, and clinical judgment.

## I. STATISTICAL FACTORS

1. **Past crimes.** Non-contributory. His past offenses were non-violent drug offenses.

2. **Age.** Decreased probability. He is now 33; street crimes are of lesser probability with this age group and older.

3. **Sex** Increased probability. Males are more violent than females as a group.

4. **Race.** Black: Increased probability. There is an over-representation of Blacks among the violent offenders.

5. **Socioeconomics.** Stable by self-report: Decreased probability. Unstable by a witness' report: increased probability.

6. **Employment stability.** Stable by self-report: Decreased probability. Unstable by a witness' report: increased probability.

7. **Substance abuse.** Yes for alcohol at the time of the conduct charged, and cocaine by history: Increased probability.

## II. ENVIRONMENTAL FACTORS

1. **Family environment.** No exposure to family abuse/violence: Decreased probability.

2. **Peer environment.** Did not Associate with peers that encouraged assaultive crimes: Decreased probability.

3. **Job Environment.** Past jobs were not conducive to violence: Decreased probability.

4. **Availability of victims.** Narrow victim pool: Decreased probability. This appears to be "family" type violence with a conjugal Jealousy precipitated by a perception of wife's infidelity; the victims were not randomly picked. Non-random victimizers are less dangerous than random victimizers.

5. **Availability of weapons.** Yes: Increased probability.

6. **Availability of drugs.** Yes: Increased probability.

## III. CLINICAL JUDGMENT FACTORS

1. **Mental illness.** There is no history of thinking disorder

7

Duane E. Buck, 3/8/97

that is associated with assaultiveness. This factor is considered to reduce dangerousness.

**2. Anti-social personality disorder.** The defendant does not meet the criteria of anti-social personality disorder, though he has antisocial features. This factor argues for less probability for continuing violent threat to society.

**3. Specificity of the situation that induced the conducts charged.** This appears to be a family type violence, influenced by conjugal jealousy precipitated by his perception of wife's infidelity. This factor argues for less probability for continuing violent threat to society.

**4. Deliberateness.** Insufficient data from self-report. He does not remember shooting the victims, though he admitted to police he did the shootings at the time of his arrest. He appeared to be deliberate from witnesses' statements showing he returned a second time with a gun, forced himself into the house, and ignored pleadings not to shoot: Increased probability

**5. Remorse.** He does not remember shooting the victim, though he admitted to the police he did the shootings at the time of his arrest: Increased probability.

6. **Post-conducts charged behaviors.**

a. Continuing crimes. None of the versions showed continuing crimes after the conduct charged since he was promptly arrested. This factor is not applicable as he did not have the opportunity to commit more crimes.

b. Fun:

This factor argues for more probability for continuing violent threat to society.

c. Surrender. He peacefully cooperated with his arrest, though the police had a gun pointed at him at the time of arrest. This factor argues for less probability for continuing violent threat to society.

**7. Personal factors that contributed to the conducts charged.** There were personal factors reportedly operating at the time of the conduct charged that may have made the conduct charged specific and limited to this offense circumstance, such that repetition of the offense in the future is unlikely. The apparent motivation was conjugal jealousy precipitated by his perception of his wife's infidelity. This factor argues for less probability for continuing violent threat to society.

**9. Environmental factors that contributed to the conducts charged.** There were environmental factors reportedly operating at the time of the conducts charged that may have made the conducts

8

Duane E. Buck, 3/8/97

specific and limited to this offense circumstance, such that repetition of the offense in the future is unlikely, i.e., The presence of individuals that he perceived as participants in the wife's infidelity. He did not hurt the children. This factor argues for less probability for continuing violent threat to society.

   10. **Effect of prolonged incarceration.** The defendant is of course less likely to be dangerous while incarcerated. The effect of prolonged incarceration (e.g., aging) in conjunction with physical restraints (e.g., security level and housing), rehabilitative efforts (e.g., education, substance abuse, punishment, psychiatric services) needs to be estimated. The prison system has enough resources to subdue what level of dangerousness he may bring with him: classification/security level system, housing restraints (administrative segregation and super segregation), supervision, crisis intervention (major use of force techniques), and psychiatric medication intervention.

   His behavior record in jail and in previous prison stays may be used as a sign that he may do well in prison. He reported no assaults while in incarceration; he worked and attended school. Furthermore, lifers in the prison system tend to do well and better than short termers. The conditions, e.g., more space, less in-cell time, more out-of-cell activities, in prison is less conducive to acting out.

   Overall, it appears that, without intervention, the defendant is more likely than not to constitute a continuing violent threat to society. However, if given life instead of death, the prison system has enough resources to safely incarcerate him. Additionally, the factors that can be manipulated and presently contribute to dangerousness can be controlled in prison.

Employment and financial instability is no longer a factor in prison. It is more difficult to gain access to drugs and alcohol and weapons in prison. His victim pool, already narrow in the instant offense because of its family violence features, becomes narrower in prison; furthermore, the prospective victims in prison are less naive in that they are aware of their environment and take the necessary precautions to minimize victimization. The dependent husband/wife relationship, that contributed to the conduct charged, is gone.

   Thank you for consulting me on this difficult but interesting case. Please feel free to contact me if you have any questions.

Walter Y. Quijano, Ph.D., P.C.
Clinical Psychologist.

9

DEFENDANT'S EXHIBIT NO. 1(A)

FORENSIC PSYCHOLOGICAL EXAMINATION



DEFENDANT'S EXHIBIT (A)

**FORENSIC PSYCHOLOGICAL SERVICES**
psychological consultations in the practice of law

2040 North Loop 336 West, Suite 322
Conroe, Texas 77304

**Walter Y. Quijano, Ph. D.**
Clinical Psychologist                VOICE: (409) 539-2226
a professional corporation           FAX: (409) 539-6308

---

## FORENSIC PSYCHOLOGICAL EVALUATION

<u>NAME</u>: Duane E. Buck                              <u>DATE</u>: 8 March 1997

<u>INTRODUCTION</u>:

Duane, a 33-year-old widowed Black male with a high school education and auto mechanics work background, was referred for a forensic psychological evaluation by his counsel, Danny Easterling, Esq. to assist in his defense. The defendant was charged with capital murder (Cause No. 699684 in the 208th Judicial District of Harris County, Texas). The defense lawyer wrote in his 1/13/97 letter to this psychologist that the defendant is "alleged to have shot and killed his ex-girlfriend and a male companion as well as shooting his half sister in the same criminal transaction...".

He was advised that this report was to be submitted to his counsel and that he had the right not to participate in the examination and to terminate the examination at any point he wanted to. He knew of and anticipated the examination.

The information used in this report was gathered for the avowed purpose of assisting in his own defense and should not be used as the basis for determining guilt or innocence.

<u>PROCEDURES</u>:

1. Clinical interview with defendant on 2/14/97
2. Millon Clinical Multiaxial Inventory-II (MCMI-II)
3. Review of defense lawyer's notes on witnesses' statements.

<u>FINDINGS</u>:

**Behavioral Observations/Mental Status.** The defendant was examined at the Harris County Jail. He was appropriately dressed and groomed. Gait was normal. No unusual gestures were observed. Voice was appropriate for the situation. The defendant was friendly and cooperative.

The defendant was oriented to person, place, and situation. He initially said he did not know the date because he has been in jail since July 1995, but when pressed he was generally oriented

1

Duane E. Buck, 3/8/97

to time, thinking it was Friday 2/13/97 instead of 2/14/97. Speech was reactive and expressive and contained no association, delusion, or hallucination disorders. Memory was intact by interview and fair by self-report. No memory problems were reported. Abstract thinking was normal by interview in that he was able to conduct a meaningful conversation. Attention and concentration were normal by interview and fair by self-report. Asked if he has noticed anything wrong with his thinking, he stated that he used to have suicide thoughts, and that he thinks about the drunk driver that killed his mom when he was 12, and about his favorite dog that was run over when he was 10 or 11. Insight was mixed; good in that he realized his legal predicament, and poor in his claim of amnesia of the shootings he is accused of. Furthermore, he enumerated examples of depressive episodes including his parents' divorce, his mom's and dog's deaths, and his past drinking and drugging, but did not include the death of Debra Gardner, who he considered to be his common-law wife. Judgment was poor. The defendant appeared to be of questionable reliability as an informant.

The defendant's mood and affect were normal. Asked about his mood, he stated he "wanted my own and be in peace, but the devil does not want you to be in peace". Asked again about his mood, he said he was happy because "Jesus is in my life". Asked about any depressive episodes, he stated that he was depressed over his parents' divorce, his dog's death, and his mom's death. He also was depressed when he was drinking and drugging in the 80's because he was not satisfied with his frame of mind. He reported that he discontinued substance abuse, but engaged in gambling and in the accumulation of material things, which was also depressing to him. He described himself as good tempered and self-controlled when he is not substance abusing. He reported no dysfunctions related to his temper.

Vegetative signs were reviewed. He sleeps in peace because of the love of Jesus. His appetite is fair; he fasts for his spiritual growth. Energy level is normal. Asked about his sex drive, he stated he did not have any as "part of self-control". Active suicide ideation was denied.

**History.** The defendant attended school through the 12th grade, and completed a trade school curriculum in paint and body automobile repair. He also studied auto mechanics in TDCJ-ID. He has worked with his father in auto mechanics and used parts "all my life". He stated that he "worked all the time". He described his father as fair and supportive, and stated that he believed anyone who accepted Christ is now his real family.

The defendant has had two common law marriages. The first marriage from 1984 till 1989 produced a son, now nine. He described the marriage as a beautiful relationship, but they separated because substance abuse led to physical confrontation, and it was time to separate. He and former wife continue to be friends. His second marriage from 1991 till 1995 was with the now deceased complainant. They had no children.

Duane E. Buck, 3/8/97

The defendant's medical history was noncontributory. He has no history of psychological treatment. The defendant stated he was raised by an alcoholic grandfather, and began drinking at age seven or eight. His last drinking episode was on the day of the instant conduct charged when he was drunk, having drank some liquor with friends and a six pack of beer by himself. He considered his alcohol use abusive through the 1980's. He abstained from alcohol between 1988 and 1989, but resumed drinking again in the early 1990's, quitting in 1994. He remained abstinent until one or two weeks before the instant conduct charged. He also admitted to powder and crack cocaine abuse in 1988 and between 1992 and 1993.

Criminal history was reviewed. In 1989 the defendant was convicted of Possession of cocaine, and was sentenced to three years in TDCJ-ID, though he served in jail. In 1990 he was convicted of Delivery of cocaine, and served one year of a ten year sentence in TDCJ-ID. While in prison, he did well with no assaults and no trouble; he worked and attended auto mechanics school. He served another year of jail time for a parole violation, missing three sessions of substance abuse treatment. He was on parole at the time of his arrest.

**MCMI-II.** The Personality code was: 8B 3 1 2 ** - * 8A + 7   4 6A ' // S ** - * //. The Syndrome code was: B D ** A * // - ** CC *.  The test was valid, though he appeared to have magnified the level of experienced illness. Suggested Axis I impressions were:

    296.33 Major depression, recurrent, severe without psychotic
           features
    305.00 Alcohol abuse
    300.02 Generalized anxiety disorder.

Suggested Axis II impression was a configuration of:

    301.22 Schizotypal personality disorder
    301.90 Personality disorder NOS (Self-defeating)
    301.60 Dependent personality disorder.

**Conduct Charged.** The defendant said he is charged with Capital murder, shooting and killing his common-law wife and a male companion, and shooting but not killing his half-sister.

The defendant described the conduct charged as follows:

The defendant was working in his father's business. His wife (Debra) stopped him, along with his uncle John, who was driving his truck. She had come to deliver a change of clothes for the defendant. He bought her gasoline at her request. She told him she loved him and kissed him. The defendant told her he had a bad dream in which something bad happened to her. She said, "I'm all right," and left, supposedly to return to work at her father's business and later to pick up his sister, Phyllis.

Duane E. Buck, 3/8/97

| He went back to the shop and drank beer and liquor until 10:00 PM. He and his uncle went to shoot pool. They left at 3:00 AM. His uncle dropped him off at his father's house, and he drove home to his wife. He knocked on the front door, but nobody answered. He peeped over the fence and saw a man on the living room couch. He knocked harder, and when no one answered, he forced the door open and went in. He met his sister, Phyllis, and nobody else, and so he went to the bedroom and saw two men in the bedroom. He and his wife began arguing, and they slapped each other. One of the men held him back and they exchanged words.

The defendant wanted to leave, and packed clothes for himself and his son. The exchange of words with the man continued. The defendant got his tools from the trunk of the wife's car and put them in his truck. He reached out to his wife standing by the door to give her the keys to the car, but she avoided him. She got a knife, and the defendant told her to stab him in the back. The man took the knife from her. The defendant took six to seven beers from the refrigerator and drove off. He ran out of gas by the George R. Brown Convention Center, and had to walk to a service station. While there, he called the house and asked his sister, "Why are you doing this to me?", and asked more questions. He drove to his dad's house, and then returned to his house. He stated that he remembered nothing else from this point on until he was in jail.

In response to questions, the defendant stated that when he first returned to the house, he felt that everything was falling apart. He felt deceived, and as if someone had stabbed his heart. He was very confused and hurt, and felt like he could just die.

When he left the house after arguments with wife and one of the men, he just wanted to get away because he was very confused; he had suicide ideation. He stated that when he ran out of gas, "dark came over me"; he felt like he was headed toward a cliff without brakes; he was scared and hurt, and he wanted to jump off the freeway. He was in tears.

When he called his sister, he felt "different" from previous wife's infidelities, and just needed to talk to somebody. The conversation did not go well, and he felt he got no answers.

Upon his second return to his house, when the shootings allegedly happened, he stated that he does not remember how he felt. He stated that he and his wife were not separated; he was not living at his dad's house.

Notes of the defense lawyer of witnesses' statements were reviewed. Deputy P. E. McGinty reported that when he arrived at the crime scene on 7/30/95, Harold Ebnezer pointed to the defendant as the shooter of Debra Gardner, Kenneth Butler, and Phyllis Taylor, killing Debra and Kenneth and wounding Phyllis. The defendant admitted to Deputy McGinty that he shot Debra |

4

Duane E. Buck, 3/8/97

```
 1 |Gardner,  and was arrested. Harold Ebnezer told the  Deputy  that |
 2 |the defendant came  at 3:00 or 4:00 AM that  morning,  and  the |
 3 |police was called. The defendant returned at about 7:24 AM with a |
 4 |shot  gun  and kicked the door in. The defendant shot  at  Harold |
 5 |Ebnezer but missed. Harold Ebnezer and Debra Gardner ran out  the |
 6 |sliding  door,  and Harold Ebnezer heard more gun  shots  inside. |
 7 |Harold  Ebnezer  jumped the fence and got  on  the  road.  Debra |
 8 |Gardner  was at this time on the road too and the defendant  came |
 9 |out  and shot her. The defendant went to a white Jaguar. At  9:15 |
10 |AM  Deputy  J. Payne noted that the defendant wanted to  use  the |
11 |restroom and said "I fucked up! I shot my sister!" A 22 rifle was |
12 |found in the trunk of the Jaguar. |
13 | |
14 |     Kanetta J. Gardner, a niece of Debra Gardner, reported  that |
15 |the  defendant used to date her aunt Debra and was angry at  her |
16 |upon  his forced entry for having another man in the house.  The |
17 |defendant  hit  Debra in the face with his fist in  the  bedroom. |
18 |Later  that morning, upon hearing gunshots, Kanetta came  out  of |
19 |her  room  and saw Kenny laying on the hallway floor and  in  the |
20 |living  room  saw the defendant laid a gun on  the  floor  while |
21 |holding another gun. She followed the defendant outside the house |
22 |and  saw him shoot Debra in the street. He retrieved  the  gun |
23 |inside the house and put both guns in the trunk of the car. |
24 | |
25 |     Shennel L. Gardner, a child of Debra Gardner, reported  that |
26 |her  mother Debra had been seeing the defendant for  five  years. |
27 |After getting out of jail on 5/95, he stayed with them but  Debra |
28 |got  sick of him laying around and not wanting to work.  He  left |
29 |and  did not come around for two weeks, and Debra started  seeing |
30 |Kenneth  Butler. Shennel said the defendant hit Debra in the  eye |
31 |and  poured beer on her and left, which Debra  reported  to  the |
32 |police.  Early the next morning after being awakened by a lot  of |
33 |commotion,  Shennel saw Kenneth bleeding on the hall floor  and |
34 |Phyllis  in  the living room holding her chest and  calling  the |
35 |police.  Shennel ran outside and saw Debra unsuccessfully  trying |
36 |to  stop  a car, and the defendant chased Debra  and  shot  her. |
37 |During  the bond hearing, Shennel testified that she was  beating |
38 |on the defendant's back, telling him not to shoot her mother, but |
39 |he shot her anyway. |
40 | |
41 |     Harold W.  Ebnezer, a brother of Kenneth Butler,  who  knew |
42 |Debra for about six or seven years, reported that Kenneth started |
43 |dating Debra  two  days prior. He reported  that  the  defendant |
44 |forced himself into the house earlier in the evening after  Debra |
45 |refused to answer the door, and started to beat on Debra.  Harold |
46 |and  Kenneth put themselves between Debra and the defendant,  who |
47 |picked  a fight with Kenneth by inviting him to take care of  it |
48 |outside; he added that he wanted to go back to the  penitentiary. |
49 |Arguments continued for about 30 to 45 minutes, and the defendant |
50 |called  Debra  a whore, bitch, and other names. Upon  the |
51 |defendant's  second  forced entry, he had a shotgun and shot  at |
52 |Harold  but  missed. Harold ran and told Kenneth in the  bedroom |
53 |that the defendant had a gun, and Kenneth got out of bed and went |
54 |to  the hallway and the shooting started. Harold and  Debra  went |
55 |out the bedroom patio door and jumped the fence, and Harold heard |
```

5

Duane E. Buck, 3/8/97

three or four shots. Harold started knocking on doors. Harold saw
the defendant with his gun follow Debra into the street. Debra
3   went to the car (a blue Chevy hatchback) parked in front of the
4   defendant's car, but it pulled off and left. The defendant said
5   "Look at them run now." Harold ran around the corner till the
6   police arrived and told the defendant to get down on the ground.
7   Harold told the police the defendant did the shooting, and the
8   police arrested the defendant. Harold saw the defendant laugh
9   like this was funny to him.
10
11  CLINICAL IMPRESSION:
12
13      Axis I - 303.90 Alcohol dependence, in remission by
14                       incarceration
15               304.20 Cocaine dependence, in full remission by
16                       report
17
18      Axis II - 301.60 Dependent personality features
19
20      Axis III - None reported
21
22      Axis IV - Psychosocial stressors: incarceration, pending
23               capital murder charge
24
25      Axis V - Global Assessment of Functioning: 60
26               GAF before jail: 50
27
28  CLINICAL RECOMMENDATIONS:
29
30  1. Substance abuse treatment program:
31
32      A. If released to community:
33
34          1) Relapse prevention groups: 48 weekly sessions and then
35             aftercare.
36          2) Supervised antagonist therapies: Antabuse for alcohol
37             and Naltroxene for cocaine.
38          3) Random urinalysis at least twice a month.
39
40      B. If incarcerated, participate in an in-house substance abuse
41         program.
42
43  2. Individual therapy to identify Dependent personality disorder
44  features that may have contributed to the conduct charged and
45  modify them.
46
47  FORENSIC RECOMMENDATIONS:
48
49  1. Encourage the defendant to recall the remainder of what he did
50  upon his second return to the house, when he was accused of
51  fatally shooting his girlfriend and a male companion, and
52  shooting his sister. The claim of sudden onset of amnesia just
53  prior to the shootings, after a detailed recollection of the rest
54  of the events, is not credible and not psychological supportable.
55

Duane E. Buck, 3/8/97

2. Future Dangerousness, Whether there is probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? The following factors were considered in answer to the question of future dangerousness: statistical, environmental, and clinical judgment.

## I. STATISTICAL FACTORS

   1. **Past crimes.** Non-contributory. His past offenses were non-violent drug offenses.

   2. **Age.** Decreased probability. He is now 33; street crimes are of lesser probability with this age group and older.

   3. **Sex** Increased probability. Males are more violent than females as a group.

   4. **Race.** Black: Increased probability. There is an over-representation of Blacks among the violent offenders.

   5. **Socioeconomics.** Stable by self-report: Decreased probability. Unstable by a witness' report: increased probability.

   6. **Employment stability.** Stable by self-report: Decreased probability. Unstable by a witness' report: increased probability.

   7. **Substance abuse.** Yes for alcohol at the time of the conduct charged, and cocaine by history: Increased probability.

## II. ENVIRONMENTAL FACTORS

   1. **Family environment.** No exposure to family abuse/violence: Decreased probability.

   2. **Peer environment.** Did not Associate with peers that encouraged assaultive crimes: Decreased probability.

   3. **Job Environment.** Past jobs were not conducive to violence: Decreased probability.

   4. **Availability of victims.** Narrow victim pool: Decreased probability. This appears to be "family" type violence with a conjugal jealousy precipitated by a perception of wife's infidelity; the victims were not randomly picked. Non-random victimizers are less dangerous than random victimizers.

   5. **Availability of weapons.** Yes: Increased probability.

   6. **Availability of drugs.** Yes: Increased probability.

## III. CLINICAL JUDGMENT FACTORS

   1. **Mental illness.** There is no history of thinking disorder

7

Duane E. Buck, 3/8/97

that is associated with assaultiveness. This factor is considered to reduce dangerousness.

2. **Anti-social personality disorder.** The defendant does not meet the criteria of anti-social personality disorder, though he has antisocial features. This factor argues for less probability for continuing violent threat to society.

3. **Specificity of the situation that induced the conducts** charged. **This appears to be a family type violence, influenced by** conjugal jealousy precipitated by his perception of wife's infidelity. This factor argues for less probability for continuing violent threat to society.

4. **Deliberateness.** Insufficient data from self-report. He does not remember shooting the victims, though he admitted to police he did the shootings at the time of his arrest. He appeared to be deliberate from witnesses' statements showing he returned a second time with a gun, forced himself into the house, and ignored pleadings not to shoot: Increased probability

5. **Remorse.** He does not remember shooting the victim, though he admitted to the police he did the shootings at the time of his arrest: Increased probability.

6. **Post-conducts charged behaviors.**

   a. Continuing crimes. None of the versions showed continuing crimes after the conduct charged since he was promptly arrested. This factor is not applicable as he did not have the opportunity to commit more crimes.

   b. Fun: From one of the witnesses' statements, he supposedly gloated as people scrambled for safety, i.e., "Look at them run now.", and he appeared to laugh like the whole thing was funny. This factor argues for more probability for continuing violent threat to society.

   c. Surrender. He peacefully cooperated with his arrest, though the police had a gun pointed at him at the time of arrest. This factor argues for less probability for continuing violent threat to society.

7. **Personal factors that contributed to the conducts** charged. **There were personal factors reportedly operating at the** time of the conduct charged that may have made the conduct charged specific and limited to this offense circumstance, such that repetition of the offense in the future is unlikely. The apparent motivation was conjugal jealousy precipitated by his perception of his wife's infidelity. This factor argues for less probability for continuing violent threat to society.

9. **Environmental factors that contributed to the conducts** charged. **There were environmental factors reportedly operating at** the time of the conducts charged that may have made the conducts

Duane E. Buck, 3/8/97

specific and limited to this offense circumstance, such that
repetition of the offense in the future is unlikely, i.e., The
presence of individuals that he perceived as participants in the
wife's infidelity. He did not hurt the children. This factor
argues for less probability for continuing violent threat to
society.

       10. **Effect of prolonged incarceration.** The defendant is of
course less likely to be dangerous while incarcerated. The effect
of prolonged incarceration (e.g., aging) in conjunction with
physical restraints (e.g., security level and housing),
rehabilitative efforts (e.g., education, substance abuse,
punishment, psychiatric services) needs to be estimated. The
prison system has enough resources to subdue what level of
dangerousness he may bring with him: classification/security
level system, housing restraints (administrative segregation and
super segregation), supervision, crisis intervention (major use
of force techniques), and psychiatric medication intervention.

       His behavior record in jail and in previous prison stays may
be used as a sign that he may do well in prison. He reported no
assaults while in incarceration; he worked and attended school.
Furthermore, lifers in the prison system tend to do well and
better than short termers. The conditions, e.g., more space, less
in-cell time, more out-of-cell activities, in prison is less
conducive to acting out.

       Overall, it appears that, without intervention, the defendant
is more likely than not to constitute a continuing violent threat
to society. However, if given life instead of death, the prison
system has enough resources to safely incarcerate him.
Additionally, the factors that can be manipulated and presently
contribute to dangerousness can be controlled in prison. He can
continue to age in prison; with minimum of 40 years time served,
he will be in his 70's at the time of eligibility for discharge.
Employment and financial instability is no longer a factor in
prison. It is more difficult to gain access to drugs and alcohol
and weapons in prison. His victim pool, already narrow in the
instant offense because of its family violence features, becomes
narrower in prison; furthermore, the prospective victims in
prison are less naive in that they are aware of their environment
and take the necessary precautions to minimize victimization. The
dependent husband/wife relationship, that contributed to the
conduct charged, is gone.

       Thank you for consulting me on this difficult but
interesting case. Please feel free to contact me if you have any
questions.

Walter Y. Quijano, Ph.D., P.C.
Clinical Psychologist.

9

DEFENSE EXHIBIT NO. 2

VITA OF PATRICK G. LAWRENCE, Ph.D.


DEFENDANT'S
EXHIBIT
2

# PATRICK G. LAWRENCE, Ph.D.
## CLINICAL & FORENSIC PSYCHOLOGY
P. O. Box 628
Garrison, Texas 75946-0628
(409) 347-2086 - Home
(409) 347-2649 - Fax
(903) 683-5781 - Skyview

### EDUCATION

| | |
|---|---|
| 1976 - 1979 | California School of Professional Psychology-Fresno, Ph.D. in Clinical Psychology |
| 1968 - 1971 | Texas A & I University at Kingsville, Master of Science in Psychology |
| 1964 - 1961 | Texas A & I University at Kingsville Bachelor of Business Administration in Financial Management |
| 1958 - 1961 | Peacock Military Academy, San Antonio, High School |

### PROFESSIONAL CREDENTIALS

Allied Medical Staff, Nacogdoches Memorial Hospital
Licensed psychologist, Texas #2228
Listed in the National Register of Health Service Providers in Psychology,
Certificate #32082

### PROFESSIONAL EXPERIENCES

| | |
|---|---|
| 1988 - Present | SUPERVISING PSYCHOLOGIST, Texas Department of Criminal Justice, Skyview Psychiatric Facility, Admissions Unit |
| 1987 - Present | PRIVATE PRACTICE, Consultant to the Nacogdoches Memorial Hospital, Texas Department of Health |
| 1987 - 1988 | DIRECTOR OF PATIENT CARE SERVICES, Pinelands Hospital, clinical supervision for 40 bed unit |
| 1984 - 1987 | DIRECTOR OF MENTAL HEALTH SERVICES, Wichita Falls MHMR Community Center, management of a comprehensive psychiatric service delivery system including 55 residential beds, psychosocial day treatment, 24 hour emergency service crisis intervention, out-patient treatment program and 2 Fairweather Lodges |
| 1981 - 1984 | PRIVATE PRACTICE, consultant to the Corpus Christi State School, Guadalupe County Probation Department, Seguin Independent School System |

Patrick G. Lawrence, Ph.D.
Page 2

1983 - 1984          DIRECTOR OF PSYCHOLOGICAL SERVICES for River Gardens, New
                     Braunfels, clinical supervision and behavior management for a 160 bed
                     ICF-MR Level V Facility

1981 - 1983          EXECUTIVE DIRECTOR, Guadalupe County Guidance Center, a
                     community mental health and substance abuse treatment program in
                     Seguin, Texas

1980 - 1981          PSYCHOLOGIST, Big Spring State Hospital, unit psychological services
                     for a 110 bed geriatric unit

1979 - 1980          PSYCHOLOGICAL INTERN, San Luis Obispo Community Mental
                     Health Center, crisis intervention, day treatment, out-patient and program
                     evaluation

1976 - 1978          PSYCHOLOGICAL INTERN, California Men's Colony, Assessment,
                     group and individual therapy for a maximum security psychiatric prison

1972 - 1975          CLINICAL PSYCHOLOGIST, New Mexico Forensic Treatment System,
                     psychotherapy for mentally ill offenders, competency to stand trial and
                     competency at the time evaluations for referred defendants

1971 - 1972          ASSOCIATE SCHOOL PSYCHOLOGIST, Region 20, Texas Education
                     Agency

## ACADEMIC EXPERIENCES

1996 - Current       The University of Texas Medical Branch, Galveston.  Conjoint
                     appointments: Department of Psychiatry and Behavioral Sciences and the
                     Department of Preventive Medicine and Community Health Instructor in
                     Institutional and Correctional Health Care.

1989                 Stephen F. Austin State University, Nacogdoches, Texas.  Department of
                     Psychology, Associate Professor.

1977 - 1979          California Polytechnic State University at San Luis Obispo.  Department
                     of Counseling and Guidance, Assistant Professor.

1968 - 1971          Texas A&I University at Kingsville.  Department of Psychology and
                     Sociology, Graduate Assistant.

## PRESENTATIONS & PUBLICATIONS

A guide to preventing parent burnout: A skills improvement program for
coping with family stress (1983).  Seguin, Texas: Patrick G. Lawrence, Ph.D.

An update on the standards and practice in forensic evaluations (1996). Presented at the Texas Psychological Association Convention, Dallas, Texas.

A passion for excellence: The psychosocial model (1986). Presented at the National Council of Community Mental Health Centers, Oklahoma City, Oklahoma.

A Solomon four group validation study of Rational Behavior Training with the highly anxious incarcerated patients (1981). Presented at the Psychological Association Convention, Houston, Texas.

Characteristics of inmates referred for inpatient psychiatric treatment (1996). Presented at the Biennial Conference of the American Psychology - Law Society, Hilton Head, South Carolina.

Faking good with the MMPI on Death Row revisited (1996). The Correctional Psychologist, 28, 1-4.

History of psychology in the criminal justice system (1992). Presented at the Texas Psychological Association Convention, Dallas, Texas.

Issues in the treatment of incarcerated persons (1979). Assert, 26, 2.

Psychologists as consultants (1981). Presented at the Southwestern Psychological Association Convention, Houston, Texas.

Practical techniques in conducting treatment groups with self-injurious inmates (1991). Presented at the National Conference on Correctional Health Care, San Antonio, Texas.

Psychological care of Death Row inmates (1989). Presented at the Texas Psychological Association Convention, Austin, Texas.

Psychology and the criminal justice system (1976). Presented at the Southwestern Psychological Association Convention, Albuquerque, New Mexico.

The prediction of future dangerousness (1996). Presented at the Texas Criminal Defense Lawyers Association Capital Murder Seminar, Houston, Texas.

The prediction of future dangerousness in prison for capital murder defendants (1996). Voice for the Defense, 25, 32-35.

Voting Patterns of Mexican-Americans in South Texas (1969). Presented at the Rocky Mountain Social Science Association Convention, Lubbock, Texas.

## PROFESSIONAL ASSOCIATIONS

American Association for Correctional Psychology
American Correctional Association
American Psychological Association
    Division of Clinical Psychology
American Psychology - Law Society
East Texas Psychological Association
Texas Psychological Association
    Division of Applied Psychology, Director, 1996-97
Texas State Board of Examiners of Psychologists
    Oral Examiner