# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**DUANE EDWARD BUCK,**  )
)
Petitioner,  )
)  CIVIL ACTION NO. 4:04-cv-03965
v.  )  ***CAPITAL CASE***
)
**WILLIAM STEPHENS,** Director,  )
Correctional Institutions Division,  )
Texas Department of Criminal Justice,  )
)
Respondent.  )

## MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)(6)

Petitioner, Duane Edward Buck, is currently confined on death row in the Polunsky Unit of the Texas Department of Criminal Justice, Livingston, Texas, in the custody of the Texas Department of Criminal Justice. Because Mr. Buck is confined in violation of the Constitution and laws of the State of Texas and the United States, he hereby files this *Motion for Relief From Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6).*[1]

### <u>Introduction</u>

By any measure, Duane Buck's death sentence is extraordinary. At sentencing, his trial attorney presented "bizarre and objectionable" expert testimony that Mr. Buck's race made him more likely to be dangerous in the future.

---

[1] Exhibits to this Application for Post-Conviction Writ of Habeas Corpus are cited as "Ex. _." Excerpts from the Reporter's Record are cited as "R.R. Vol. __ : __."

*Buck v. Thaler*, 132 S. Ct. 32, 33 (2011) (statement of Alito, J., respecting the denial of certiorari). Mr. Buck's state habeas attorney saw no error in trial counsel's decision to proffer this false and damning testimony and failed to challenge it in Mr. Buck's initial state habeas proceedings. Texas's Attorney General recognized the unconstitutionality in this testimony and promised to ensure that Mr. Buck received a new, fair sentencing, but Texas reneged on that promise after concluding that Mr. Buck's attorney – and not the State – was responsible for improperly injecting race into his capital sentencing hearing.

Ultimately, these shocking circumstances have yielded catastrophic results. Texas Court of Criminal Appeals (hereinafter "CCA") Judge (and former Harris County prosecutor)[2] Elsa Alcala (joined by Judges Tom Price and Cheryl Johnson), explained that Mr. Buck's case

> reveals a chronicle of inadequate representation at every stage of the proceedings, the integrity of which is further called into question by the admission of racist and inflammatory testimony from an expert witness at the punishment phase. . . . As a result of prior habeas counsel's errors and the combined force of state and federal procedural-default laws, no Court has ever considered the merits of [Mr. Buck's] legitimate claims for post-conviction relief.

*Ex Parte Duane Edward Buck*, No. WR-57004-03, 2013 WL 6081001, at *1 (Tex. Crim. App. Nov. 20, 2013). These circumstances overwhelmingly establish Mr.

---

[2]Judge Alcala's biography, found on the The CCA website, explains that: "Prior to becoming a judge, Judge Alcala was an assistant district attorney for nine years, serving under District Attorney Johnny Holmes at the Harris County District Attorney's Office." Texas Court of Criminal Appeals, *Judge Elsa Alcala*, http://www.cca.courts.state.tx.us/court/judge_ealcala.asp (last visited Dec. 23, 2013).

Buck's entitlement to relief under Rule 60(b), when viewed in combination with the U.S. Supreme Court's recent holdings in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) (allowing for federal review of procedurally defaulted claims of trial counsel ineffectiveness based on the ineffectiveness of state habeas counsel), which were decided after this Court reviewed Mr. Buck's federal habeas petition.

## Relevant Facts and Procedural History

### A. Mr. Buck's Capital Sentencing.

In 1996, Duane Buck, who is an African-American man, was charged with capital murder in connection with the shooting deaths of Debra Gardner and Kenneth Butler. Mr. Buck was represented at trial by appointed counsel, Danny Easterling and Jerry Guerinot. Mr. Guerinot has a well-documented history of inadequate representation of his capitally charged clients. By 2010, "[t]wenty of Mr. Guerinot's clients ha[d] been sentenced to death. That [was] more people than [were] awaiting execution in about half of the 35 states that ha[d] the death penalty." Adam Liptak, *A Lawyer Known Best for Losing Capital Cases*, N.Y. Times, May 17, 2010, www.nytimes.com/2010/05/18/us/18bar.html?_r=o (attached as Exhibit 1). Mr. Guerinot's representation of Mr. Buck was consistent with this history.

In preparation for the penalty phase of Mr. Buck's trial, counsel retained an expert psychologist, Dr. Walter Quijano, and asked Dr. Quijano to assess, *inter alia*, Mr. Buck's likelihood of future dangerousness. Before trial, Dr. Quijano provided

trial counsel with a report that made clear that he viewed Mr. Buck's race to be a fact which <u>increased</u> the likelihood of his posing a danger in the future. *Buck*, 132 S. Ct. at 33. Even though this alleged link between race and future dangerousness is false,[3] and such expert testimony would be profoundly prejudicial to Mr. Buck because a finding of future dangerousness is a prerequisite to a death sentence, trial counsel relied on Dr. Quijano's report and testimony at the penalty phase of Mr. Buck's trial. The outcome of this unreasonable decision was both predictable and disastrous.

At trial, Dr. Quijano testified that he had been "appointed by Judge Collins of the 208th District Court" to "do an evaluation of Duane Buck." Based on that examination, Dr. Quijano concluded that Mr. Buck would not be dangerous in the future because, among other things, Mr. Buck had no violent criminal record and did not display violent tendencies. R.R. Vol 28 at 103-04, 110-15 (attached as Exhibit 2). Although trial counsel knew that Dr. Quijano relied on race in making his threat assessment, trial counsel asked Dr. Quijano to recount the "statistical factors or environmental factors" he used to assess the future dangerousness of a person "such as Mr. Buck." *Buck*, 132 S. Ct. at 33. Dr. Quijano answered, "Race. It's a sad commentary that minorities, Hispanics and black people, are over represented in the Criminal Justice System." *Id*. at 35 (Sotomayor, J., joined by

---

[3] *See, e.g.*, J. W. Swanson et. al., *Violence and Psychiatric Disorder in the Community: Evidence from the Epidemiologic Catchment Area Surveys*, 41 Hosp. & Comm. Psych.,761-70 (1990) (when controlling for socioeconomic status, correlations between race and violence disappear); J. Monahan et. al., Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence, (2001) (same).

4

Kagan, J., dissenting from the denial of certiorari) (quoting Trial Tr., 111 (May 6, 1997)). At trial counsel's request, Dr. Quijano's report detailing that opinion was admitted and was freely available to the jury during their deliberations. *Id*. [4]

The trial prosecutor exploited trial counsel's error in her cross-examination of Dr. Quijano and in her closing argument. Specifically, the prosecutor asked Dr. Quijano whether "the race factor, black increases the future dangerousness for various complicated reasons" and Dr. Quijano answered, "Yes." *Buck*, 132 S. Ct. at 34. In closing the prosecutor characterized Dr. Quijano's testimony as encompassing an opinion that Mr. Buck would be dangerous in the future and urged the jury to rely on it to find Mr. Buck to be a likely future danger. *Id.* at 36. Trial counsel did not object to this improper line of questioning or to the prosecutor's closing argument. The jury found that Mr. Buck was likely to be a future danger and he was sentenced to death.

### B. Mr. Buck's Direct Appeal.

On direct appeal, the CCA affirmed Mr. Buck's death sentence. *Buck v. State*, No. 72,810 (Tex. Crim. App. Apr. 28, 1999). Direct appeal counsel did not challenge the effectiveness of trial counsel for their reliance on Dr. Quijano in Mr. Buck's sentencing hearing.[5] And even if direct appellate counsel did, it would have been

---

[4] The admission of the race-based hearsay report by the trial court was granted after – and in full view of – the expert's race-based opinion testimony about future dangerousness, including cross-examination.

[5] No petition for writ of certiorari was filed in the U.S. Supreme Court.

'virtually impossible for [counsel] to adequately present an ineffective assistance [of trial counsel] claim' on direct review" given the nature of Texas procedure, as the Supreme Court has recognized. See *Trevino*, 133 S. Ct. at 1918 (quoting *Robinson v. State*, 16 S.W.3d 808, 810-11 (Tex. Crim. App. 2000)).

### C. Mr. Buck's State Habeas Proceedings.

#### 1. Mr. Buck's Initial Habeas Petition.

In March 1997, Mr. Buck filed his initial state habeas application, represented by newly appointed counsel, Robin Norris. Like trial counsel, Mr. Norris has a history of poor representation of his death-sentenced clients. In *Ex Parte Medina*, the CCA found that Mr. Norris threw "his client under the bus" when he filed an initial state habeas application that was "only four pages long and merely state[d] factual and legal conclusions." 361 S.W.3d 633, 635-36 (Tex. Crim. App. 2011). The CCA found that the inadequacies of that filing were "not the result of mistake, inadvertence, negligence, or a lack of legal expertise." *Id.* at 636. Instead, it was "abundantly clear that counsel [was] intentionally jeopardizing applicant's 'one very well represented run at a habeas corpus proceeding.'" *Id.* (citing *Ex Parte Kerr*, 64 S.W.3d 414, 418-19 (Tex. Crim. App. 2002) (quoting Rep. Pete Gallego)). Mr. Norris' representation of Mr. Buck was similarly abysmal.

Mr. Buck's state habeas counsel "filed only non-cognizable or frivolous claims in [Mr. Buck's] initial application." *Buck*, 2013 WL 6081001, at *7. Specifically, as detailed by CCA Judge Alcala, that application failed "to adhere to the plain terms

of the habeas statute," *Id*. at *6, because "three of the four claims raised by initial habeas counsel were raised and rejected on direct appeal and, therefore, under the longstanding precedent of [the CCA], those claims were not cognizable on a post-conviction writ of habeas corpus." *Id*. at *4. Judge Alcala found that in the fourth claim, "habeas counsel asserted a wholly frivolous claim that applicant's trial counsel was ineffective for failing to request a jury instruction based on a non-existent provision of the penal code." *Id*. Thus, although "Texas courts . . . have directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review," *Trevino*, 133 S. Ct. at 1919, Mr. Norris did not challenge any aspect of trial counsel's reliance on Dr. Quijano's race-based "expert" opinion in the initial state habeas.

### 2. Texas Concedes Error.

In 2000, the constitutionality of Dr. Quijano's testimony linking race to dangerousness was raised in a petition for a writ of certiorari to the U.S. Supreme Court in the capital case of Victor Hugo Saldaño. *Saldaño v. State*, 70 S.W.3d 873, 875 (Tex. Crim. App. 2002) (quoting Pet. for Cert. at 3, *Saldaño v. State*, 530 U.S. 1212 (2000) (No. 99-8119)). In its response to the Saldaño petition, the Texas Attorney General (John Cornyn) confessed error, stating that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice" and the "infusion of race as a factor for the jury to weigh in making its determination violated [Mr. Saldaño's] constitutional right to be sentenced without regard to the color of his skin." Resp. to Pet. For Cert. at 8, *Saldaño v. State*, 530

U.S. 1212 (2000) (No. 99-8119). The U.S. Supreme Court granted certiorari, vacated the CCA's decision affirming Mr. Saldaño's capital murder judgment, and remanded the case to the Texas courts for further review. *Saldaño v. Texas*, 530 U.S. 1212 (2000).

After the Supreme Court's decision in *Saldaño*, Attorney General Cornyn announced that his office had conducted an "audit" of capital cases and identified six cases, including Mr. Buck's, that also involved unconstitutional racially-biased testimony by Dr. Quijano.[6] Press Release, Office of the Tex. Att'y Gen., U.S. Supreme Court Grants State's Motion in Capital Case (June 5, 2000) (attached as Exhibit 3); Press Release, Office of the Tex. Att'y Gen., Statement from Attorney General John Cornyn Regarding Death Penalty Cases (June 9, 2000) (attached as Exhibit 4). The Attorney General explained that, for those cases similar to *Saldaño*, Texas "will not object if they seek to overturn the death sentences based on Mr. Quijano's testimony," Jim Yardley, *Racial Bias Found in Six More Capital Cases*, N.Y. Times, June 11, 2000, http://www.nytimes.com/2000/06/11/us/racial-bias-found-in-six-more-capital-cases.html (attached as Exhibit 5), because "it is inappropriate to allow race to be considered as a factor in our criminal justice system . . . . The people of Texas want and deserve a system that affords the same fairness to everyone." Ex. 4, (Tex. Att'y Gen. Press Release) (internal quotation marks omitted). *See also* Steve Lash, *Texas Death Case Set Aside: U.S. Supreme*

---

[6] The Attorney General initially identified eight cases but ultimately concluded that two – Michael Blair and Anthony Graves – were unlike *Saldaño*. Mr. Blair was not a member of a racial group that Dr. Quijano linked to the risk of future dangerousness. In *Graves*, the State did not rely upon race testimony as a factor.

*Court Sees Possible Racial Bias*, Hous. Chron., June 6, 2000, at A1 ("Our goal is to assure the people of Texas that our criminal justice system is fairly administered.") (internal quotation marks omitted) (attached as Exhibit 6).

Prior to Attorney General Cornyn's admission of error, none of the defendants identified by the Attorney General had raised a claim challenging the constitutionality of Dr. Quijano's testimony in state or federal court. Nonetheless, in all of those cases, *except Mr. Buck's*, Attorney General Cornyn kept his promise, waived all procedural defenses, and conceded that Dr. Quijano's testimony violated equal protection and required new sentencing hearings.[7]

### D. Mr. Buck's Post-*Saldaño* State and Federal Habeas Proceedings.

#### 1. State Habeas Proceedings.

Two years after Attorney General Cornyn conceded error in Mr. Buck's case and five years after Mr. Buck's initial application for state habeas relief was filed, Mr. Buck's state habeas counsel challenged trial counsel's introduction of false and prejudicial expert testimony linking Mr. Buck's race to his likelihood of future dangerousness in a subsequent state post-conviction application. *See* Subsequent

---

[7] *See* Mem. Op. & Order at 15-17, *Blue v. Johnson*, No. 4:99-cv-00350 (S.D. Tex. Sept. 29, 2000), ECF No. 29; Op. at 1, *Alba v. Johnson*, No. 00-40194 (5th Cir. Aug. 21, 2000); Order at 1, *Alba v. Johnson*, No. 4:98-cv-221 (E.D. Tex. Sept. 25, 2000), ECF No. 31; Order at 1, *Garcia v. Johnson*, No. 1:99-cv-00134 (E.D. Tex. Sept. 7, 2000), ECF No. 36; Resp. to Supplemental Pet. and Confession of Error by TDCJ-ID, *Garcia v. Johnson*, No. 1:99-cv-00134 (E.D. Tex. Aug. 18, 2000), ECF No. 35; Order at 10-11, *Broxton v. Johnson*, No. 4:00-CV-01034 (S.D. Tex. Mar. 28, 2001), ECF No. 25; Final J. at 1, *Gonzales v. Cockrell*, No. 7:99-cv-00072 (W.D. Tex. Dec. 19, 2002), ECF No. 84.

Application for Writ of Habeas Corpus (Texas Code of Criminal Procedure 11.071)*,* *Ex Parte Buck*, No. WR-57,004-02 at 3, 8, 9.  In October 2003, the CCA denied Mr. Buck's initial habeas application and dismissed his subsequent post-conviction application without considering its merits.  Order, *Ex parte Buck*, No. WR-57,004-02 (Tex. Crim. App. Oct. 15, 2003).

2.    <b>Federal Habeas Proceedings.</b>

In October 2004, Mr. Buck, represented by new counsel, filed a federal habeas corpus petition.  By that time, John Cornyn had been elected to the United States Senate and Greg Abbott was the Texas Attorney General.  Attorney General Abbott presided over all of Mr. Buck's federal habeas corpus litigation.

Mr. Buck's federal habeas petition asserted, *inter alia*, that Mr. Buck's rights to equal protection, due process and effective assistance of counsel were violated by the introduction of evidence linking race to future dangerousness.  Pet. for Writ of Habeas Corpus at 55-62, *Buck v. Thaler*, No. 4:04-cv-03965 (S.D. Tex. Oct. 14, 2004), ECF No. 1 (hereinafter "Petition for Writ of Habeas Corpus").  Although Texas promised to concede constitutional error, waive its procedural defenses and allow Mr. Buck to receive a new, fair sentencing hearing untainted by racial bias, it instead argued that Mr. Buck's circumstances "present[ed] a strikingly different scenario than that presented in *Saldaño* — Buck himself, not the State offered Dr. Quijano's testimony into evidence." Resp't Dretke's Answer and Mot. for Summ. J. with Br. in Support at 17, *Buck v. Thaler*, No. 4:04-cv-03965 (S.D. Tex. Sept. 6, 2005), ECF No. 6 (hereinafter "Respondent's Answer").  And while Texas had

already conceded error in all five of the other *Saldaño*-like cases, including two[8] where Dr. Quijano was a defense witness, Texas declared that it was "compelled" to interpose its available procedural defenses because Mr. Buck's trial attorney – and not the State – injected race into the sentencing proceedings. *Id*. Texas therefore argued that federal review was foreclosed because Mr. "Buck did not raise the instant claims until his second state habeas application." *Id*. at 21. Texas also asserted that trial counsel's failure to object to Dr. Quijano's race-based testimony when it was elicited by the State served as an additional bar to federal review and relief on his equal protection and due process claims because "failure to make a contemporaneous objection as required by state law constitutes regularly and strictly applied procedural default." *Id*. at 22. Texas also argued that Mr. Buck's claim of ineffective assistance of counsel was procedurally defaulted by prior counsel's failure to timely raise it and it broke from its own protocol to preemptively argue that there was no cause to excuse Mr. Buck's default of this claim. *Id*. at 24 ("Although the Director does not normally speculate on what might have caused such a default, it must be noted that Buck's ineffective assistance of counsel claim cannot provide cause for his abuse of the writ default."). Texas stated, *inter alia*, that "state habeas counsel's ineffectiveness [in failing to challenge trial counsel's presentation of Dr. Quijano's testimony] cannot form the constitutional violation necessary to establish cause" because "there is no constitutional right to state

---

[8] *See* Mem Op. and Order at 15-17, *Blue,* No. 4:99-cv-00350 (S.D. Tex.), ECF No. 29; Order at 1, *Alba*, No. 4:98-cv-221 (E.D. Tex.), ECF No. 31.

habeas counsel and accordingly no constitutional right to effective assistance of state habeas counsel." *Id.* at 25 (internal citations omitted).

Ultimately, this Court concluded that Mr. Buck was not entitled to federal review of his Quijano-related claims because they were procedurally defaulted and ineligible for federal review absent proof of cause and prejudice or a fundamental miscarriage of justice – standards Mr. Buck was unable to meet at that time. Mem. & Order at 15-18, *Buck v. Thaler*, No. 4:04-cv-03965 (S.D. Tex. July 24, 2006), ECF No. 15 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).[9]

Between 2006 and 2011, Mr. Buck repeatedly, and unsuccessfully, sought review of this Court's decision through the federal appellate courts. *See Buck v. Thaler*, 132 S. Ct. 1085 (2012) (denying rehearing); *Buck v. Thaler*, 132 S. Ct. 32 (2011) (denying certiorari); *In re Buck*, 132 S. Ct. 69 (2011) (denying stay of execution and certiorari); *Buck v. Thaler*, 559 U.S. 1072 (2010) (denying certiorari); *Buck v. Thaler*, 452 F. App'x 423 (5th Cir. 2011) (denying motion for relief from judgment); *Buck v. Thaler*, No. 09-8589 (U.S. 2009); *Buck v. Thaler*, 345 F. App'x. 923 (5th Cir. 2009) (affirming denial of habeas relief due to procedural default and denying request for Certificate of Appealability). Because the law at the time of these filings offered no avenue for federal review or relief for Mr. Buck's Quijano-related ineffectiveness claims, *Coleman*, 501 U.S. at 752-53, these pleadings did not

---

[9] As detailed below, *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) modified *Coleman*'s holding regarding claims of ineffectiveness of state habeas counsel and cause to excuse a procedural default.

detail the substantial failings of Mr. Buck's counsel with respect to Dr. Quijano's testimony.

In response to these filings, Texas consistently asserted that Mr. Buck's trial counsel – and not the State – were responsible for placing Dr. Quijano's false and offensive testimony before the jury. Respondent's Answer at 17-18, 20; Thaler's Reply to Buck's Mot. for Relief from J. and Mot. for Stay of Execution at 10, 16-17, 19, *Buck*, No. 4:04-cv-3965 (S.D. Tex. Sept. 9, 2011), ECF No. 30; Resp. in Opp'n to Appl. for Certificate of Appealability at 22-25, 28-30, *Buck v. Thaler*, No. 11-70025 (5th Cir. Sept. 14, 2011); Br. in Opp'n at 12, 18-20, *Buck v. Thaler*, Nos. 11-6391 & 11A297 (2011).

The Fifth Circuit agreed with Texas. It affirmed this Court's decision that Mr. Buck's claims challenging the State's role in eliciting Dr. Quijano's testimony were ineligible for federal review and held that even if it were to review the merits of Mr. Buck's substantive due process and equal protection claims, they would fail because

> [i]t was Buck, not the prosecution, who introduced Dr. Quijano as an expert witness and then solicited testimony from him regarding the use of race as one of several statistical factors for predicting future dangerousness. Buck cannot now claim surprise at the opinions that Dr. Quijano expressed. Indeed, in the punishment phase of the trial, it was Buck's defense counsel who argued for the admission of Dr. Quijano's expert report into evidence, despite language in the report suggesting that Buck's race is one factor that might argue in favor of a finding of future dangerousness.

*Buck,* 345 F. App'x at 930.

Three Justices of the U.S. Supreme Court reached the same conclusion. In 2011, the Supreme Court rejected Mr. Buck's petition for a writ of certiorari. *Buck v. Thaler*, 132 S. Ct. 32 (2011). Justice Alito, joined by Justices Scalia and Breyer, authored a statement respecting the Court's denial of certiorari in which they concluded that responsibility for Dr. Quijano's "bizarre and objectionable," *id.* at 33, testimony linking Mr. Buck's race to his likelihood of future dangerousness "lay squarely with the defense." *Id.* at 35; *but see id.* at 33 (Sotomayor, J., joined by Kagan, J., dissenting from the denial of certiorari).

3. **Mr. Buck's 2013 State Habeas Application and the *Trevino* Decision.**

In March 2013, Mr. Buck filed a new state habeas application. Appl for Post-Conviction Writ of Habeas Corpus, *Ex Parte Buck,* No. WR-57,004-03 (Tex. Crim. App. Mar. 18, 2013). The convicting court found the application to be "subsequent" under Article 11.071, Tex. Code Crim. Proc. Ann. art. 11.071 (West 2013), and referred it to the CCA. On November 20, 2013, the CCA dismissed Mr. Buck's Application for "fail[ing] to satisfy the requirements of Article 11.071, § 5(a)." Order, *Ex Parte Buck*, No. WR-57,004-03 (Tex. Crim. App. Nov. 20, 2013).[10]

While Mr. Buck's Application was pending before the CCA, the U.S. Supreme Court announced in *Trevino v. Thaler* that *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), was applicable to Texas. 133 S. Ct. 1911 (2013), *Martinez* "'modif[ied] the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a

---

[10] On November 25, 2013, Mr. Buck filed a *Suggestion that the Court Reconsider on its own Initiative the Dismissal of Applicant's Habeas Application* with the CCA. That filing is pending.

post conviction proceeding does not qualify as cause to excuse a procedural default.'" *Trevino,* 133 S. Ct. at 1917 (quoting *Martinez*, 132 S. Ct. at 1315). Together, *Martinez* and *Trevino* allowed, for the first time, an opportunity for federal court review of claims of Texas trial counsel ineffectiveness that had not properly been raised due to the ineffectiveness of state habeas counsel. Specifically, a federal habeas court can now find cause to excuse a default where there is a "substantial" claim of ineffective assistance of trial counsel, where there was no counsel or ineffective counsel during the initial state post-conviction review, and where state law requires ineffective assistance of trial counsel claims be litigated on initial collateral review. *Trevino*, 133 S. Ct. at 1918 (quoting *Martinez*, 132 S. Ct. at 1318-20). A "substantial" claim is one that "has some merit." *Martinez*, 132 S. Ct. at 1318 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue). *Coleman* barred all of Mr. Buck's prior federal litigation and was the linchpin of this Court's prior ruling denying federal habeas relief.

## SUMMARY OF ARGUMENT

Mr. Buck's death sentence is the product of the following series of extraordinary events:

1. Mr. Buck's trial attorney knowingly presented expert testimony to the sentencing jury that Mr. Buck's race made him more likely to be a future danger;

2. Although required to act as gate-keeper to prevent unreliable expert opinions from reaching and influencing a jury, *see* Tex. R. Evid. 705(c); *Kelly v.*

*State*, 824 S.W.2d 568 (Tex. Crim. App. 1992), the trial court qualified Dr. Quijano as an expert on predictions of future dangerousness, allowed him to present race-based opinion testimony to Mr. Buck's capital sentencing jury, and admitted Dr. Quijano's excludable hearsay report linking race to dangerousness.

3.     The trial prosecutor intentionally elicited Dr. Quijano's testimony that Mr. Buck's race made him more likely to be a future danger on cross-examination, vouched for him as an "expert" in closing, and asked the jury to rely on Dr. Quijano's testimony to answer the future dangerousness special issue in the State's favor;

4.     Mr. Buck's state habeas counsel did not challenge trial counsel's introduction of this false and offensive testimony — or Texas's reliance on it — in Mr. Buck's initial state habeas application;

5.     The Texas Attorney General conceded constitutional error in Mr. Buck's case and promised to ensure that he received a new sentencing, but reneged on that promise after deciding that the introduction of the offensive testimony was trial counsel's fault;

6.     This Court ruled that federal review of Mr. Buck's trial counsel ineffectiveness claim was foreclosed by state habeas counsel's failure to raise and litigate the issue in Mr. Buck's initial state habeas petition, relying on *Coleman*, which has subsequently been modified by *Martinez* and *Trevino*;

7. The Fifth Circuit held Mr. Buck's trial counsel responsible for the introduction of Dr. Quijano's testimony linking Mr. Buck's race to his likelihood of future dangerousness;

8. Three Supreme Court Justices concluded that trial counsel was at fault for the introduction of Dr. Quijano's testimony;

9. Three Judges of the CCA found that "because [Mr. Buck's] initial habeas counsel failed to include any claims related to Quijano's testimony in his original [state habeas] application, no court, state or federal, has ever considered the merits of those claims," *Buck*, 2013 WL 6081001, at *5;

10. Mr. Buck's case is the only one in which Texas has broken its promise to waive procedural defenses and concede error, leaving Mr. Buck as the only individual in Texas facing execution without having been afforded a fair and unbiased sentencing hearing; and

11. *Martinez* and *Trevino* now allow for federal court review of "substantial" defaulted claims of trial counsel ineffectiveness.

Because Mr. Buck's case is extraordinary and because he has a "substantial" claim of ineffective assistance of trial counsel, relief under Rule 60(b) is appropriate.

## ARGUMENT

**I. MR. BUCK IS ENTITLED TO RELIEF UNDER RULE 60(b)(6) FROM THIS COURT'S JUDGMENT PROCEDURALLY DEFAULTING HIS MERITORIOUS CLAIM THAT HIS CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED.**

Mr. Buck's right to the effective assistance of counsel was violated by trial counsel's unreasonable introduction of expert opinion linking Mr. Buck's race to

future dangerousness. The extraordinary circumstances of this case, and the change in law since the filing of Mr. Buck's federal habeas petition, merit Rule 60(b) relief.

> **A.  Mr. Buck's Claim that Trial Counsel was Ineffective for Presenting Expert Testimony Linking Race to Dangerousness at Mr. Buck's Capital Sentencing is Substantial and Warrants Relief Under Rule 60(b).**

In his federal habeas petition, Mr. Buck asserted that he received constitutionally ineffective assistance of counsel at his capital sentencing hearing because his trial attorney knowingly presented expert testimony tying Mr. Buck's race to his future dangerousness. Petition for Writ of Habeas Corpus at 55-62. This Court did not reach the merits of that claim because, relying on *Coleman,* it concluded that federal review was foreclosed by state habeas counsel's default. On the merits, however, Mr. Buck is entitled to a new capital sentencing trial, as his Sixth, Eighth and Fourteenth Amendment rights were violated.

Pursuant to *Strickland v. Washington*, an attorney's representation is constitutionally inadequate when "that counsel's performance was deficient" and "the deficient performance prejudiced the defense."  466 U.S. 668, 687 (1984). Counsel's performance is deficient when counsel's "'representation f[alls] below an objective standard of reasonableness'" and the defendant is prejudiced where "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000) (quoting *Strickland*, 466 U.S. at 688, 694).

1. **The Performance of Mr. Buck's Trial Counsel was Deficient.**

In *Saldaño,* Texas's Attorney General accurately articulated the law governing the role of race in capital sentencing:

> [the United States Supreme] Court has held, in dicta, that race cannot be an aggravating factor in determining the death penalty. *Zant [v. Stephens*, 462 U.S. 862, 886 (1983)]. Other courts have made similar observations. *California v. Bacigulupo*, 862 P.2d 808, 820 (Cal. 1993); *Horton v. Georgia*, 295 S.E.2d 281, 285 (Ga. 1982).
>
> 'Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice.' *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). A defendant is 'entitled to have his punishment assessed by the jury based on consideration of the mitigating and aggravating circumstances concerning his personal actions and intentions, not those of a group of people with whom he share[s] a characteristic.' *Guerra v. Collins*, 916 F. Supp. 620, 636 (S.D. Tex. 1995), *aff'd*, 90 F.3d 1075 (5th Cir. 1996).
>
> The [Supreme] Court has recognized the harm associated with the introduction of race into the criminal justice system. In *McCleskey v. Kemp*, the Court explained:
>
>> Because of the risk that the factor of race may enter the criminal justice process, we have engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system. Our efforts have been guided by our recognition that 'the inestimable privilege of trial by jury . . . is a vital principle, underlying the whole administration of criminal justice.' Thus it is the jury that is a criminal defendant's fundamental 'protection of life and liberty against race and color prejudice.'

Resp. to Pet. for Cert. at 7-8, *Saldaño v. State*, 530 U.S. 1212 (2000) (No. 99-8119).

Thus, "[t]he concept that asking a jury to find future dangerousness based on one's race violates the Equal Protection clause is certainly not a new or novel one." *Buck*, 452 F. App'x at 430.

Given the prohibition on race as a factor in capital sentencing, Mr. Buck's trial and state post-conviction counsel knew, or should have known, that the use of Dr. Quijano's race-increases-dangerousness opinion and testimony was unconstitutional in a capital sentencing hearing. Effective counsel would have ensured that the sentencing jury never heard this prejudicial testimony.

Before trial, Dr. Quijano provided counsel with a report that made clear that he believed Mr. Buck's race made him more likely to be a future danger. *Buck*, 132 S. Ct. at 33. Given the clear and unequivocal law governing this subject, effective counsel receiving such a report would not have relied on Dr. Quijano as a testifying "expert" witness in the capital sentencing hearing of an African-American client; instead, they would have sought funding to retain an expert who did not harbor such racially biased, and constitutionally inadmissible, views.

Mr. Buck's trial counsel did not exercise this reasonable, readily available alternative. Instead, they introduced and relied on Dr. Quijano's testimony and report; they made no effort to ameliorate the harm that inevitably flowed from Dr. Quijano's testimony; they offered no objections; they sought no limiting or curative instruction; and they made no attempt in closing argument to limit, rebut, or contextualize Dr. Quijano's testimony.

Dr. Quijano's testimony relying on race as a predictor of dangerousness was so plainly prejudicial that there was no strategic advantage to relying on him at Mr.

Buck's capital sentencing.[11]   Having Dr. Quijano inform the sentencing jury that

Mr. Buck possessed an immutable characteristic that increased his likelihood of

future dangerousness eclipsed any possible benefits associated with the non-racial

aspects of Dr. Quijano's testimony.   And since both of the experts that evaluated

Mr. Buck concluded that he was unlikely to pose a future danger, it should have

been evident to Mr. Buck's trial counsel that they could have retained an alternate

expert – one who did not rely on race – to reach the same conclusion.

Trial counsel's performance was thus unreasonable and constitutionally

deficient.

      2.      **Mr. Buck was Prejudiced by Trial Counsel's Deficient Performance.**

Dr. Quijano's testimony was prejudicial to Mr. Buck.   Under Texas law, Mr.

Buck could only be sentenced to death if his jury concluded that he was likely to be

dangerous in the future.   Tex. Code Crim. Proc. Ann, art. 37.071 (West 2013).   Thus,

to avoid a death sentence, any and all defense witnesses should have offered

testimony addressing how *unlikely* it was that Mr. Buck would pose a danger in the

future.   Dr. Quijano's testimony did the opposite.   It gave the jury a reason—*beyond*

*those already advanced by the prosecution*—to conclude that Mr. Buck was likely to

be a future danger.   And that reason was more pernicious and likely to influence the

---

[11] The Fifth Circuit *speculated* about why Mr. Buck's trial counsel might have relied on the testimony of Dr. Quijano, notwithstanding his offensive, inflammatory and inadmissible opinion regarding race and dangerousness. *See Buck*, 345 F. App'x at 930.   However, such "post hoc rationalization[s] of counsel's conduct" are inappropriate. *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003).   *Strickland* requires an objective analysis of the reasonableness of counsel's conduct, 466 U.S. at 688, and in this case that conduct was objectively unreasonable.

jury than any of the State's evidence, because the race-as-dangerousness testimony was offered by an "expert" endorsed by the trial court, who based his opinion on an immutable characteristic over which Mr. Buck possessed no control. None of the State's evidence of future dangerousness suggested this kind of permanent threat. *See* R.R. Vol. 28 at 5-74 (detailing the State's future danger evidence: Mr. Buck had nonviolent prior convictions; an abusive relationship with one prior girlfriend; and after the shooting was seen laughing and said that he had been forgiven by God for his conduct) (attached as Exhibit 7).

Dr. Quijano's testimony was also damning because, as summarized above, Texas's case in support of the future dangerousness special issue was not especially strong. The CCA has held similar evidence to be insufficient to meet the State's burden of proving future dangerousness beyond a reasonable doubt. *See Berry v. State*, 233 S.W.3d 847, 864 (Tex. Crim. App. 2007) (state failed to prove future dangerousness where the defendant murdered one child and abandoned another but witnesses testified that these incidents were out of character; defendant had no prior criminal record; the state presented no evidence of past violence; experts testified that the defendant was under stress and depressed at the time of her crimes; and her offenses involved pregnancy and the risk of her becoming pregnant if she received a sentence of incarceration was low). Thus, Dr. Quijano's testimony supplemented and exceeded the shortcomings in the State's future dangerousness evidence.

The Texas Attorney General has admitted that the injection of expert opinion testimony linking Mr. Buck's race to his prospect of future dangerousness was prejudicial and warrants relief. In *Saldaño*, the Attorney General explained that even though there was sufficient evidence to justify a finding of future dangerousness in that case, "the infusion of race as a factor for the jury to weigh in making its determination violated his constitutional right to be sentenced without regard to the color of his skin." Resp. to Pet. for Cert. at 8, *Saldaño v. State*, 530 U.S. 1212 (2000) (No. 99-8119.).

Finally, trial counsel's failure to object to Dr. Quijano's testimony significantly prejudiced Mr. Buck's viable opportunities for relief. A timely objection would have preserved the issue for direct appeal and, if necessary, a petition for certiorari to the United States Supreme Court. Because it is clear from the State's handling of *Saldaño* that Attorney General Cornyn would have conceded error in such a cert. petition, trial counsel's failure to object denied Mr. Buck this opportunity for relief. Second, a timely objection would have preserved the issue for Mr. Buck's initial federal habeas petition, allowing him to avoid the procedural bars which were ultimately asserted by Texas. Thus, Mr. Buck could have received federal merits review of his claim and, potentially, relief. Mr. Buck was prejudiced.

3. **State Habeas Counsel was Ineffective for Failing to Raise and Litigate this Claim in Mr. Buck's Initial State Habeas Application.**

State habeas counsel did not include a constitutional challenge to trial counsel's unreasonable reliance on race-based expert analysis in Mr. Buck's initial

state habeas application. Instead, as described above, state habeas counsel litigated only "non-cognizable or facially frivolous claims," including an assertion that "trial counsel was ineffective for failing to request a jury instruction based on a non-existent provision of the penal code." *Buck*, 2013 WL 6081001 at *4, *6. Given that trial counsel's decision was an obvious and significant error, state habeas counsel's decision to include only "frivolous" claims in Mr. Buck's initial state habeas application was plainly deficient performance that prejudiced Mr. Buck.

Mr. Buck's state habeas counsel knew, or should have known, that "the Texas procedural system – as a matter of its structure, design, and operation – does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921. As such, it was incumbent upon state habeas counsel to raise and litigate any and all viable claims of trial counsel's ineffectiveness in Mr. Buck's initial state habeas proceeding because "[w]hen an attorney errs [by failing to include such a claim] in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim." *Martinez*, 132 S. Ct. at 1316.

Notwithstanding the clear law governing Mr. Buck's state habeas proceedings, Mr. Buck's state habeas counsel failed to challenge the constitutionality of trial counsel's presentation of an aggravating race-based expert analysis at Mr. Buck's capital sentencing. Trial counsel's ineffectiveness was a clear violation of Mr. Buck's constitutional rights and would have been easily identified from even a cursory reading of the trial record. There was no tactical or

strategic reason for state habeas counsel to exclude this claim from Mr. Buck's initial state habeas application.

Ultimately, state habeas counsel recognized the legitimacy and viability of this claim and raised it in a subsequent state habeas application. By then, it was too late. The CCA dismissed the subsequent application – which included the Quijano-related ineffectiveness claim – without considering its merits. *Ex Parte Buck*, Nos. WR-57,004-01 & 57,004-02 (Tex. Crim. App. 2003). And "because [Mr. Buck's] initial habeas counsel failed to include any claims related to Quijano's testimony in his original Article 11.071 application, no court, state or federal, has ever considered the merits of those claims." *Buck*, 2013 WL 6081001, at \*5. State habeas counsel was ineffective.

4. **Mr. Buck's Claim of Trial Counsel Ineffectiveness is Eligible for Federal Review Pursuant to *Martinez* and *Trevino*.**

*Martinez v. Ryan* affords habeas petitioners a previously unavailable opportunity for federal review of procedurally defaulted claims of trial counsel ineffectiveness. *Martinez* dictates that "[w]here, under state law, claims of ineffective-assistance-of-trial-counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal court from hearing those claims if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez*, 132 S. Ct. at 1311. *Trevino* made clear that *Martinez* is applicable to Texas. 133 S. Ct. 1911 (2013),

To prove that a claim is "substantial" "the prisoner must demonstrate that

the claim has some merit." *Id*. at 1318-19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue). Thus, the standard as to whether a defaulted claim is substantial is the same as the standard for the granting of a Certificate of Appealability ("COA"). To obtain a COA, an applicant must make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and to meet this standard, the applicant must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 894 n.4 (1983))). A claim can be debatable "even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 338. Further, any doubts as to whether a COA should be granted must be resolved in favor of an applicant who has been sentenced to death. *Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir. 2005).

As detailed above, Mr. Buck has made a substantial showing that his constitutional right to the effective assistance of counsel at capital sentencing was violated. Jurists reviewing Mr. Buck's case have repeatedly observed that the introduction of Dr. Quijano's testimony raises serious constitutional concerns. *See Buck*, 132 S. Ct. at 33 (statement of Alito, J., respecting the denial of certiorari) (characterizing Dr. Quijano's testimony as "bizarre and objectionable"); *Buck*, 452 F.

App'x at 430 (noting that using race to find future dangerousness violates the Equal Protection clause); *Ex Parte Duane Edward Buck*, 2013 WL 6081001, at *1 (injection of "racist and inflammatory" testimony compromised the "integrity" of Mr. Buck's proceedings). And many have noted that Mr. Buck's trial counsel bore responsibility for the introduction of this offensive and unconstitutional testimony. *See Buck*, 132 S. Ct. at 34 (statement of Alito, J., respecting the denial of certiorari) (concluding that defense was at fault for the introduction of Quijano's testimony); *Buck*, 345 F. App'x at 930 (same). Thus, Mr. Buck has also shown that reasonable jurists could debate whether the issue he has presented deserves "encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal citations and quotations omitted).

B.     **The Purpose and Power of Rule 60(b).**

The central concern of Federal Rule of Civil Procedure 60(b)(6) is that justice is done. *Klapprott v. United States*, 335 U.S. 601, 615 (1949). Accordingly, Rule 60(b)(6) "vests power in courts . . . to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Id.* at 615. Pursuant to Rule 60(b)(6), a party can seek relief "from a final judgment, order, or proceeding" and request reopening of his case, for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Rule 60(b)(6) "reflects and confirms the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work

inequity." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233-34 (1995) (quoting *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U.S. 238, 244 (1944).

The Fifth Circuit has long identified Rule 60(b)(6) "as 'a grand reservoir of equitable power to do justice in a particular case. . . .'" *Williams v. Thaler*, 602 F.3d 291, 311 (5th Cir. 2010) (quoting *Harrell v. DCS Equip. Leasing Corp.,* 951 F.2d 1453, 1458 (5th Cir. 1992)); *see also Steverson v. GlobalSantaFe Corp.*, 508 F.3d 300, 303 (5th Cir. 2007) (Rule 60(b)(6) "is a means for accomplishing justice in exceptional circumstances.") (internal citations omitted). Specifically,

> [t]he purpose of Rule 60(b) is to delineate the circumstances under which relief may be obtained from the operation of final judgments, whether they are entered by default, [] or otherwise. By its very nature, the rule seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the incessant command of the court's conscience that justice be done in light of *all* the facts.

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981) (internal citations and quotations omitted) (emphasis added). Therefore, while finality is of critical importance, "the justice-function of the courts demands that [finality] must yield, in appropriate circumstances, to the equities of the particular case in order that the judgment might reflect the true merits of the cause." *Id.* Thus, the rule is "liberally construed in order to achieve substantial justice." *Id*. at 402.

District courts have jurisdiction to consider Rule 60(b) motions in habeas proceedings when such motions "attack[ ] not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceeding." *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005). Thus, a district

court can consider a Rule 60(b) motion when a petitioner "asserts that a previous ruling which precluded a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default or statute-of-limitations bar." *Id*. at 532 n.4

Rule 60(b) is particularly important where a procedural bar will prevent federal review of the merits of a petitioner's claims. Accordingly, the Fifth Circuit has held that the "'main application'" of Rule 60(b) "is to those cases in which the true merits of a case might never be considered" and it has "reversed where denial of relief precludes examination of the full merits of the cause," because in such instances "even a slight abuse may justify reversal." *Ruiz v. Quarterman*, 504 F.3d 523, 532 (5th Cir. 2007) (internal citations and quotations omitted); *see also Phelps v. Alameida*, 569 F.3d 1120, 1140 (9th Cir. 2009) ("a central purpose of Rule 60(b) is to correct erroneous legal judgments that, if left uncorrected, would prevent the true merits of a petitioner's constitutional claims from ever being heard.").[12]

1. **The Determination of Extraordinary Circumstances for Relief Pursuant to Rule 60(b)(6) Requires a Fact-Intensive, Individualized Inquiry**

A movant entitled to relief under Rule 60(b)(6) must "show extraordinary circumstances justifying the reopening of a final judgment." *Gonzalez*, 545 U.S. at 535 (internal citations and quotation marks omitted). This means that courts must examine the unique facts and "equities of the particular case." *Seven Elves Inc.*, 635

---

[12] Rule 60(b) "has an unquestionably valid role to play in habeas cases" and, "like the rest of the Rules of Civil Procedure, applies in habeas corpus proceedings. . . ." *Gonzalez*, 545 U.S. at 529, 534.

F.2d at 401. The Supreme Court's fact-intensive assessment of Rule 60(b)(6) motions is instructive.

In *Gonzalez v. Crosby*, the Supreme Court examined both a change in decisional law and the distinctive facts of the case to determine whether the petitioner demonstrated extraordinary circumstances justifying relief. 545 U.S. at 537; *see also id.* at 540 (Stevens, J. dissenting) (explaining that a district court considering a Rule 60(b)(6) motion will "often take into account a variety of factors . . . includ[ing] the diligence of the movant, the probable merit of the movant's underlying claims, the opposing party's reliance interests in the finality of the judgment, and other equitable considerations.").

The Supreme Court took the same fact-intensive approach to revisit a default judgment of denaturalization of citizenship in *Klapprott*. 335 U.S. at 602-03. It carefully considered the circumstances that produced the default judgment, including the petitioner's illness, absence of counsel, lack of funds, and imprisonment at the time of the proceedings that led to his denaturalization. *Id.* at 614. After close scrutiny, the Court determined that the petitioner's allegations amounted to "facts 'justifying relief from the operation of the judgment.'" *Id.*

Similarly, in *Ackerman v. United States*, the Court compared the petitioner in *Ackerman* and the petitioner in *Klapprott* to determine whether the factual circumstances faced by Ackerman constituted "extraordinary circumstances" justifying Rule 60(b)(6) relief. 340 U.S. 193, 199 (1950) (describing *Klapprott* as "a case of extraordinary circumstances.").

The Fifth Circuit also engages in a fact-intensive, case-by-case analysis to determine eligibility for relief under Rule 60(b)(6), and set forth eight factors to inform a district court's consideration:

> (1) That final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to achieve substantial justice; (4) whether the motion was made within a reasonable time; (5) whether -- if the judgment was a default or a dismissal in which there was no consideration of the merits -- the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgments, and there is merit in the movant's claim or defense; (6) whether -- if the judgment was rendered after a trial on the merits -- the movant had a fair opportunity to present his claim or defense; (7) whether there are intervening equities that would make it inequitable to grant relief; and (8) any other factors relevant to the justice of the judgment under attack.

*Seven Elves Inc.*, 635 F.2d at 402. Thus, the Fifth Circuit has consistently assessed Rule 60(b) motions using this case-specific, fact-intensive, individualized inquiry, guided by the equitable considerations set forth in *Seven Elves*. *See Ruiz*, 504 F.3d at 528-32 (engaging in fact-specific analysis of a Rule 60(b)(6) motion); *Steverson*, 508 F.3d at 305-06 (citing *Seven Elves* factors and conducting fact-specific analysis); *U.S. ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 397 F.3d 334, 337 (5th Cir. 2005) ("We must decide whether the Supreme Court's decision [resulting in a change in the law] *combined with the facts* of this case gave rise to 'extraordinary circumstances' warranting the district court's exercise of its discretion under Rule 60(b)(6) to grant relief from our final judgment.") (emphasis added)).

The Fifth Circuit's analysis is consistent with that of other courts of appeals, which also require district courts to engage in individualized, case-by-case inquiries

to determine whether extraordinary circumstances warrant relief under Rule 60(b)(6). *See, e.g., City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147, 1150 (8th Cir. 2013) (engaging in fact specific analysis in review of Rule 60(b) request for relief); *Ungar v. Palestine Liberation Org.*, 599 F.3d 79, 87 (1st Cir. 2010) ("The district court enjoys a long familiarity with the case, and that court's fact-finding capabilities put it in a better position to construct the fact-specific balance that Rule 60(b)(6) demands."); *Phelps,* 569 F.3d at 1133 ("the proper course when analyzing a Rule 60(b)(6) motion predicated on an intervening change in the law is to evaluate the circumstances surrounding the specific motion before the court."); *Pichardo v. Ashcroft*, 374 F.3d 46, 56 (2d Cir. 2004) (examining facts to determine whether  extraordinary circumstances exist); *Blue Diamond Coal Co. v. Trs. of UMWA Combined Benefit Fund*, 249 F.3d 519, 529 (6th Cir. 2001) ("the decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts.") (internal citations and quotations omitted)); *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 962 F.2d 1528, 1530 (10th Cir. 1992) (reviewing facts before the court and concluding extraordinary circumstances did not exist); *Moolenaar v. Gov't of Virgin Islands*, 822 F.2d 1342 (3d Cir. 1987) (requiring examination of facts that amount to extraordinary circumstances); *Ritter v. Smith*, 811 F.2d 1398, 1401 (11th Cir. 1987) (examining several case-specific factors to determine whether "circumstances are sufficiently

extraordinary to warrant relief"); *Margoles v. Johns*, 798 F.2d 1069, 1073 (7th Cir. 1986) (reviewing factual allegations in measuring extraordinary circumstances).

In keeping with the fact-intensive, individualized review required to assess Rule 60(b)(6) motions, when courts have considered the intervening change in the law brought about by *Martinez*, they have engaged in holistic analyses of the facts and circumstances of each Rule 60(b)(6) application to determine whether relief was warranted in each individual case. Accordingly, in *Barnett v. Roper*, a district court, in ruling on a Rule 60(b)(6) motion filed by a capital habeas petitioner, explained that "consideration of extraordinary circumstances under Rule 60(b)(6) relies on *several factors*, not just a determination as to whether the nature of the intervening law in *Martinez* is extraordinary." 941 F. Supp. 2d 1099, 1118 (E.D. Mo. 2013). Thus, the court examined the state's "interest in finality," the "capital nature of the case combined with a claim never considered on its merits," the petitioner's diligence, the connection between *Martinez* and the claim raised by the petitioner, and the strength of the petitioner's ineffective assistance of counsel claim in its analysis. *Id.* at 1120. The court concluded that "although the type of supervening change in law in *Martinez* may not alone warrant the reopening of a habeas judgment, here, the equitable factors offered in conjunction with the strength of the underlying constitutional error alleged enables [petitioner] to satisfy the high standard of Rule 60(b)(6)." *Id.* at 1120-21.

Like *Barnett*, the capital habeas petitioner in *Landrum v. Anderson* relied on *Martinez* and was granted Rule 60(b)(6) relief. No. 1:96-cv-641, 2012 WL 6022810

(S.D. Ohio Dec. 4 2012) (adopting in its entirety Report and Recommendation of magistrate). Again, the court considered multiple factors beyond *Martinez*, including the strength of the petitioner's claim and the capital nature of the case. Report and Recommendation at 16, *Landrum v. Mitchell*, No. 1:96-cv-00641-TMR-MRM (S.D. Ohio Aug. 22, 2012), ECF No. 240 (attached as Exhibit 8). After "weighing the factors required" under Rule 60(b)(6), the court granted relief. *Id.* at 18.[13]

---

[13] The Third, Fifth, and Ninth Circuits have denied Rule 60(b)(6) motions premised on *Martinez*. In *Stroll v. Johnson*, the Third Circuit affirmed the district court's ruling that *Martinez* was inapplicable to the petitioner's case and did not warrant reopening of a judgment under Rule 60(b). No. CA 13-1675, 2013 WL 6074160, at *1 (3d. Cir. 2013). However, Stroll's *pro se* pleadings requesting Rule 60(b)(6) relief focused largely on *Martinez*'s applicability, rather than on factors specific to his case demonstrating extraordinary circumstances. Pet. Requesting to Vacate the Dec. 4, 2003 Order in Regards to Procedurally Defaulted Claims in Light of the U.S. Supreme Court Decision Entered on March 20, 2012 Pursuant to Fed. R. Civ. P. 60(b), *Stroll v. Johnson*, No. 00-1959 (M.D. Pa. June 4, 2012), ECF No. 35; Pet. Reply to Resp't's Answer to Pet.'s Rule 60(b) Mot., *Stroll v. Johnson*, No. 00-1959 (M.D. Pa. Aug. 3, 2012), ECF No. 44; Supplemental Reply to Resp't's Answer to Pet.'s Rule 60(b) Mot., *Stroll v. Johnson*, No. 00-1959 (M.D. Pa. Aug. 27, 2012), ECF No. 48. The Fifth Circuit in *Adams v. Thaler* found a capital habeas petitioner's Rule 60(b)(6) motion based on *Martinez* to be "without merit" and noted that *Martinez* does not constitute extraordinary circumstances required for relief. 679 F.3d 312, 320 (5th Cir. 2012). In *Diaz v. Stephens*, the Fifth Circuit denied relief after it "assume[d] *arguendo*" that a capital habeas petitioner's state post-conviction counsel was ineffective and that *Adams* did not bar Rule 60(b)(6) relief. 731 F.3d 370, 377 (5th Cir. 2013). *Diaz* applied the *Seven Elves* factors and concluded that the petitioner made a "poor showing of equitable factors necessary to reopen his judgment." *Id.* at 378. The Ninth Circuit, in *Lopez v. Ryan*, determined that *Martinez* "constitutes a remarkable—if limited—development in the [Supreme] Court's equitable jurisprudence," and conducted an assessment of "the equitable considerations" before denying relief to a capital habeas petitioner. 678 F.3d 1131, 1136-37 (9th Cir. 2012) (internal citation and quotations omitted). Among the factors *Lopez* examined were "the petitioner's exercise of diligence"; the "interest in finality"; the "time period between the finality of [the petitioner's] federal habeas proceedings and his Rule 60(b) motion"; the "degree of connection between [the

Thus, in cases like Mr. Buck's, where a state procedural rule foreclosed a district court's evaluation of the merits of an ineffective assistance of counsel claim and where review of the specific facts of the case demonstrate its extraordinariness, relief under Rule 60(b)(6) is appropriate.

### C. The Unique and Extraordinary Circumstances of Mr. Buck's Case Compel Relief Under Fed. R. Civ. P. 60(b)(6).

The factors that inform this Court's consideration of Mr. Buck's Rule 60(b)(6) motion warrant relief. *See Seven Elves Inc.*, 635 F.2d at 402 (identifying factors).

The first consideration, "that final judgments should not be lightly disturbed," *id.*, weighs in favor of relief. Mr. Buck's case is truly unique as the legitimacy of Mr. Buck's death sentence has *repeatedly* been called into question by courts, including the U.S. Supreme Court, and the Texas Attorney General himself. Rule 60(b)(6) relief in this case could not and would not be construed as "lightly" disturbing the judgment at issue, but instead would properly allow this Court to correct a grave injustice.

Second, the Fifth Circuit's admonition that a "Rule 60(b)(6) motion is not to be used as a substitute for appeal," *id.*, is not a concern in this case. When Mr. Buck presented his claim of ineffective assistance of trial counsel to this Court in

petitioner's] case and *Martinez*"; "comity" and the "substantiality of the underlying [ineffective assistance of counsel] claim." *Id.* at 1136-37. In *Jones v. Ryan*, the Ninth Circuit undertook a similar analysis, "assuming for the sake of argument" that a death-sentenced habeas petitioner's Rule 60(b) motion was permissible. 733 F.3d 825, 838 (9th Cir. 2013). *Jones* evaluated *Martinez* as an intervening change in the law, weighed the equitable factors relevant in the petitioner's case, and concluded that "extraordinary circumstances" did not exist for relief under Rule 60(b)(6). *Id.* at 840. Mr. Buck, unlike these petitioners, has fulfilled the requirement of extraordinary circumstances necessary for Rule 60(b)(6) relief.

his federal habeas petition, well-settled law – *Coleman*, 501 U.S. at 730-31 (1991) – prevented Mr. Buck from appealing it after this Court concluded that federal merits review was foreclosed by the state court default of that claim. Mem. & Order at 15-16, *Buck v. Thaler*, No. 4:04-cv-03965, ECF No. 15. *See also Martinez v. Johnson*, 255 F.3d 229, 240-41 (5th Cir. 2001) (Rejecting argument that state habeas counsel's ineffectiveness excuses default of an ineffective assistance of trial counsel claim and explaining that "[t]his court is foreclosed by precedent from considering whether an exception exists under the *Coleman* rule."). [14] *Martinez* and *Trevino* have created a new opportunity for the litigation of otherwise defaulted claims of ineffective assistance of trial counsel. Mr. Buck now seeks to litigate his ineffective assistance of counsel claim before this Court.

Third, federal review of the merits of Mr. Buck's ineffective assistance claim would "achieve substantial justice":

---

[14] Indeed, capital litigants in Texas were routinely foreclosed from raising such arguments. *See Beazley v. Johnson,* 242 F.3d 248, 271 (5th Cir.2001)(affirming district court's dismissal of claim that ineffective assistance of habeas counsel Robin Norris served as cause for procedural default); *Jones v. Johnson,* 171 F.3d 270, 277 (5th Cir. 1999) ("The law is well-established, however, that such error committed in a post-conviction application, where there is no constitutional right to counsel, cannot constitute cause."); *Callins v. Johnson,* 89 F.3d 210, 212 (5th Cir. 1996) ("Callins contends that his habeas attorney's alleged ineffectiveness constitutes cause. We have already rejected that argument. '[C]ounsel's ineffectiveness will constitute cause only if it is an independent constitutional violation.' " (quoting *Coleman,* 501 U.S. at 755); *Irving v. Hargett,* 59 F.3d 23, 26 (5th Cir. 1995) ("Because a petitioner does not have a constitutional right to counsel in post-conviction habeas proceedings, it follows that a petitioner cannot claim ineffective assistance of counsel in such proceedings. Thus, error or misconduct by Irving's counsel cannot establish cause . . . .").

- The integrity of Mr. Buck's capital sentencing hearing was corrupted by the introduction of false and prejudicial testimony linking his race to his likelihood of future dangerousness, with the appearance of the trial court's imprimatur.

- Courts that have reviewed Mr. Buck's appeals of his death sentence have repeatedly indicated that the injection of race into his capital sentencing hearing undermined the integrity of that proceeding.

- The attorneys appointed to *defend* Mr. Buck knowingly proffered expert opinion that turned Mr. Buck's race into an aggravating circumstance increasing the likelihood that he would be sentenced to death.

- The trial prosecutor who, in her pursuit of a death sentence, is constitutionally permitted to strike hard, but not foul, blows, *Berger v. U.S.*, 295 U.S. 78, 88 (1935), used her cross-examination and closing argument to encourage a finding of future dangerousness – and, thereby, a death sentence – based on Mr. Buck's race.

- The Texas Attorney General concluded that Mr. Buck was one of seven death-sentenced prisoners whose sentencing hearings were so contaminated by considerations of race that they should be set aside; promised that each of those prisoners – including Mr. Buck – would receive new, fair sentencing hearings; and kept its promise to every prisoner *except Mr. Buck*.

- Mr. Buck's state habeas counsel failed to raise and litigate any aspect of this error in Mr. Buck's initial state habeas application.

- At all times during Mr. Buck's prior federal habeas litigation, the law precluded federal merits review of his claim of ineffective assistance of trial counsel.

- In 2012, the Supreme Court created an avenue for federal review of defaulted ineffectiveness claims in *Martinez*. In 2013, *Trevino* made clear that the law set forth in *Martinez* applied to death-sentenced prisoners in Texas.

- Mr. Buck's request for a new, fair sentencing hearing has received widespread support. One of his trial prosecutors and one of the surviving victims support Mr. Buck's appeal. *See* Manny Fernandez, *Victim and Prosecutor Back Death Row Inmate's Bid for Resentencing*, N.Y. Times, March 28, 2013, http://www.nytimes.com/2013/03/29/us/texas-death-row-inmates-resentencing-bid-has-support-of-victim-and-prosecutor.html?_r=0

(attached as Exhibit 9). Other supporters include former Texas Governor, Mark White, who presided over nineteen executions, along with numerous elected officials, faith leaders, civil rights leaders and others. *See* Brian Rogers, *Former Gov. White Calls for New Hearing in Death Row Case*, Hous. Chron., Mar. 21, 2013, (attached as Exhibit 10); Jordan Smith, *Execution Assemblyline Gets Rolling*, The Austin Chron., Mar. 29, 2013, http://www.austinchronicle.com/news/2013-03-29/execution-assembly-line-gets-rolling/ (attached as Exhibit 11); Bob Allen, *Faith Leaders Protest Race in Sentencing*, Associated Baptist Press News, Nov. 21, 2013, http://www.abpnews.com/culture/social-issues/item/9038-faith-leaders-protest-race-in-sentencing#.UrTv5NJDvE0 (attached as Exhibit 12); Charles J. Ogletree, Jr., *Condemned to Die Because He is Black*, N.Y. Times, July 31, 2013, http://www.nytimes.com/2013/08/01/opinion/condemned-to-die-because-hes-black.html (attached as Exhibit 13); William A. "Bill" Lawson, Joseph A. Fiorenza, Samuel Karff, *In Meting Out Justice, Race Can't Play a Role*, Hous. Chron., Mar. 8, 2013, http://www.chron.com/opinion/article/In-meting-out-justice-race-can-t-play-a-role-4337289.php (attached as Exhibit 14).

- National and state-wide newspapers have published editorials calling for a new, fair sentencing for Mr. Buck. *See*, *e.g.*, The Editorial Board, *Racism in a Texas Death Case*, N.Y. Times, May 10, 2013, http://www.nytimes.com/2013/05/11/opinion/racism-in-a-texas-death-case.html (attached as Exhibit 15); *Race and the Death Sentence*, Hous. Chron., Mar. 26, 2013, http://www.chron.com/opinion/editorials/article/Race-and-the-death-sentence-4386680.php (attached as Exhibit 16).

Given the incredible series of errors and injustices to which Mr. Buck has been subjected, federal merits review of his ineffectiveness claim would *finally* provide him with the opportunity to "achieve substantial justice."

Fourth, Mr. Buck makes this motion "within a reasonable time." Mr. Buck files the instant motion approximately thirty days after the CCA dismissed his 2013 application for state post-conviction relief and nine months after the U.S. Supreme Court made clear that its decision in *Martinez* applies to Texas prisoners.

Fifth, "the interest in deciding [Mr. Buck's] case[] on the merits outweighs …the interest in the finality of [the] judgment[], and there is merit in [Mr. Buck's] claim." *Seven Elves*, 635 F.2d at 402. **As detailed repeatedly above, no state or federal court has reviewed the merits of Mr. Buck's claim of trial counsel ineffectiveness because state habeas counsel failed to raise it in Mr. Buck's initial state habeas application.** As the Fifth Circuit has explained Rule 60(b) applies "most liberally to judgments in default . . . [because] . . . truncated proceedings of this sort are not favored . . . . Thus, unless it appears that no injustice was done by the judgment, the equities in such cases will militate strongly in favor of relief." *Harrell*, 951 F.2d at 1459 (quoting *Seven Elves*, 635 F.2d at 403). In a default case such as this one, "[t]he absence of injustice is clear when the movant is unable to show the existence of a defense of sufficient merit to indicate the possibility that the outcome would differ upon retrial." *Seven Elves*, 635 F.2d at 403. Here, Respondent has previously recognized the prejudicial harm of Dr. Quijano's testimony, and — as Mr. Buck does now — pointed to trial counsel as the source of that harm. Furthermore, Texas waived its procedural defenses in six other cases like Mr. Buck's – including two others where Dr. Quijano was a defense witness – after concluding that its interest in finality was outweighed by its interest in ensuring that death sentences are not compromised by racial discrimination. There is nothing unique about Mr. Buck's case that requires a rebalancing of these interests.

The sixth *Seven Elves* factor is only implicated "if the judgment was rendered after a trial on the merits." 635 F.2d at 402. "[B]ecause [Mr. Buck's] initial habeas counsel failed to introduce any claims related to Quijano's testimony in his original 11.071 application, no court, state or federal, has ever considered the merits of those claims." *Buck*, 2013 WL 6081001, at *5.

Finally, there are no "intervening equities that would make it inequitable to grant relief." *Seven Elves*, 635 F.2d at 402. As detailed above, the "other factors relevant to the justice of the judgment under attack" weigh in favor of granting Rule 60(b)(6) relief. *Id*.

## Conclusion

"Because of the risk that the factor of race may enter the criminal justice process, [the U.S. Supreme Court] ha[s] engaged in 'unceasing efforts' to eradicate racial discrimination from our criminal justice system." *McCleskey v. Kemp*, 481 U.S. 279, 309 (1987) (quoting *Batson v. Kentucky*, 476 U.S. 79, 85 (1986)). This is because when such discrimination does take place, the injury is not "limited to the defendant – there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." *Rose*, 443 U.S. at 556 (internal citations and quotations omitted). Trial counsel's introduction of false and inflammatory expert opinion linking race to dangerousness into Mr. Buck's capital sentencing proceeding implicated all of these concerns. That fatal error, in combination with the other extraordinary aspects of Mr. Buck's case, establish that relief under Rule 60(b) is warranted.

Respectfully submitted,

/s Christina A. Swarns

_____

**Christina A. Swarns***
Admitted *Pro Hac Vice*
Pennsylvania Bar No. 83616
Fed ID No. 635946
NAACP LEGAL DEFENSE
    & EDUCATION FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006
Tel. (212) 965-2200
cswarns@naacpldf.org
*Counsel in Charge*

**Katherine C. Black***
Texas Bar No. 24064907
Fed ID No. 963500
LAW OFFICES OF
KATHERINE C. BLACK, PLLC
Post Office Box 2223
Houston, Texas 77007
Tel. (713) 226-7027
kblack@blacklawoffice.org

**Kathryn M. Kase**
Texas Bar No. 11104050
 Fed ID No. 33075
TEXAS DEFENDER SERVICE
1927 Blodgett Street
Houston, Texas 77004
Tel. (713) 222-7788
kmkase@texasdefender.org

*Appointed Counsel for Duane Buck*

## CERTIFICATE OF SERVICE

I certify that on Monday, December 23, 2013, a copy of the foregoing pleading was served on Respondent by filing the document with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court.

Edward L. Marshall
Assistant Attorney General
Post-Conviction Unit
Office of the Texas Attorney General
300 West 15th Street, 8th Floor
Austin, TX 78701
Edward.Marshall@texasattorneygeneral.gov

/s Christina A. Swarns

**Christina A. Swarns**

## CERTIFICATE OF CONFERENCE

I hereby certify that on Friday, December 21, 2013, co-counsel Kathryn M. Kase conferred with counsel for the Respondent and this motion is opposed.

Edward L. Marshall
Assistant Attorney General
Post-Conviction Unit
Office of the Texas Attorney General
300 West 15th Street, 8th Floor
Austin, TX 78701
Edward.Marshall@texasattorneygeneral.gov

/s Christina A. Swarns

**Christina A. Swarns**