# EXHIBIT 1

**The New York Times** Reprints



This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

May 17, 2010

# A Lawyer Known Best for Losing Capital Cases

**By ADAM LIPTAK**

WASHINGTON — A good way to end up on death row in Texas is to be accused of a capital crime and have Jerry Guerinot represent you.

Twenty of Mr. Guerinot's clients have been sentenced to death. That is more people than are awaiting execution in about half of the 35 states that have the death penalty.

"People who are well represented at trial do not get the death penalty," Justice Ruth Bader Ginsburg has said.

So what is Mr. Guerinot's secret?

It seems to boil down to a failure to conduct even rudimentary investigations, said David R. Dow, a law professor at the University of Houston and the litigation director of the Texas Defender Service, which represents death row inmates, including not a few of Mr. Guerinot's former clients.

"He doesn't even pick the low-hanging fruit which is hitting him in the head as he's walking under the tree," Mr. Dow said.

Mr. Guerinot did not respond to two messages seeking comment. In 2007, he told The Observer, a London newspaper, that judges gave him only tough cases.

"The easy ones, somehow, never came to me," he said. "I think it's a recognition that if I represent them, the state is in for one hell of a fight. Nothing goes down easy."

Two weeks ago, the Supreme Court turned down an opportunity to review Mr. Guerinot's work in the case of Linda Carty, a 51-year-old British woman. The case has gotten a[t?] Britain, where journalists and a documentary filmmaker, Steve Humphries, h[a] examining Mr. Guerinot's performance.

"It is no exaggeration to suggest that Mr. Guerinot has perhaps the worst rec[ord]

**MORE IN U.S**

**Judge A[
Weddin[
Utah**

Read More ›

lawyer in the United States," Mr. Humphries said in a supporting brief urging the court to hear Ms. Carty's case.

Prosecutors said Ms. Carty had orchestrated a macabre plot to kidnap and murder Joana Rodriguez and claim Ms. Rodriguez's newborn son as her own. The evidence against Ms. Carty consisted mostly of testimony from four men said to be her accomplices, who were described by a prosecutor as "an armed robber, a dope dealer, a drive-by shooter and another armed robber."

Mr. Guerinot did not visit Ms. Carty for three months after he was appointed to represent her. Ms. Carty, in a video interview with Mr. Humphries, described her meeting with Mr. Guerinot just weeks before her trial: "I met this guy for less than 15 minutes. Once."

"Basically," she told The Observer, "he's an undertaker for the State of Texas."

Mr. Guerinot never interviewed Jose Corona, who was Ms. Carty's common-law husband but gave powerful testimony about a motive for her actions — that she desperately wanted a baby.

Mr. Corona later said he did not want to help the prosecution but believed he had no choice.

"It was never explained to me that there is a marital privilege, and under the privilege I had the right to refuse to testify," he said in a sworn statement.

Mr. Corona added that he would have appeared as a defense witness had he been asked. "I would have testified that Linda did not deserve the death penalty and that I do not believe she is an aggressive person or a threat to society," he said.

Mr. Guerinot also never contacted the British Consulate, which would have worked hard to help prevent one its citizens from being executed. But Ms. Carty's government did not learn of her case until it was too late, and the expensive lawyers it has since hired for her have faced procedural barriers. In rejecting some of their claims, Judge Vanessa D. Gilmore, a federal trial judge in Houston, acknowledged that this was "a harsh result."

And Mr. Guerinot failed to interview Charlie Mathis, a Drug Enforcement Agency officer for whom Ms. Carty had worked as an informant.

"Had Linda's counsel approached me, I would have been willing to testify on Linda's behalf," Mr. Mathis said in a sworn statement. "I would have testified that she is not a violent person, let alone a cold-blooded murderer."

The lower courts were not impressed with Mr. Guerinot's work in Ms. Carty's case. But they let

her death sentence stand.

Judge Gilmore, for instance, said Mr. Guerinot "made an imperfect attempt to avoid conviction and death."

"But," she added, "the Constitution does not require perfection in trial representation."

The Supreme Court lately seems to be washing its hands of the Texas capital justice system. Last month, two weeks before it turned down Ms. Carty, the court refused to hear an appeal from Charles Dean Hood, who was sentenced to death by a judge who had been sleeping with the prosecutor.

Mr. Guerinot, for his part, has given up capital work and now handles more ordinary criminal cases, on a volume basis. An analysis in The Houston Chronicle last year found that he had represented 2,000 felony defendants in 2007 and 2008 — far above the caseload limits recommended by bar associations and other groups that take criminal defense work seriously.

# EXHIBIT 2

# United States District Court
# Southern District of Texas

## Case Number: O3mc386

## ATTACHMENT

**Description:**

☐ State Court Record        ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part 114 of _____

☐ Exhibit to: _____
         number(s) / letter(s) _____

Other: _____

_____

_____

1    the prison system with Court-ordered

2    stipulations.  I did similar work for

3    the Federal Court in Florida.

4          After that I opened a full-time

5    private practice in Conroe.  I do much

6    criminal work.  I do evaluations and

7    treatment for both juveniles and adult

8    probations out of Montgomery County

9    District Courts as well as the 258th

10   Judicial District.  I do some work for

11   the Texas Rehabilitation Commission

12   doing vocational as well as disability

13   evaluations.  I do some work for DPS.  I

14   also have private clients coming from

15   various referral sources.

16   Q   How many years did you work for the

17       Texas Department of Corrections which is

18       the prison system in Texas?

19   A   I did as an employee for five years, and

20       I continued to do some work for them on

21       a case-by-case basis depending Court-

22       ordered evaluations.

23   Q   Were you appointed by Judge Collins of

24       the 208th District Court to do an

25       evaluation on the defendant Duane Edward

103

```
1              Buck?

2      A       Yes, I got an order to perform an exam

3              on Mr. Buck.

4      Q       Are you paid by the County to do this

5              work?

6      A       Yes.

7      Q       Have you been appointed in other cases

8              over the years since you've been in

9              private practice?

10     A       Yes.

11     Q       Can you give us a general estimate of

12             how many capital murder cases that

13             you've been appointed to evaluate?

14     A       About seventy.

15     Q       About seventy?

16     A       Yes.

17     Q       Have you also worked for the State of

18             Texas and District Attorney's Offices

19             throughout the State evaluating

20             defendants and testifying in their

21             behalf also?

22     A       Yes.

23     Q       Can you give us an estimate of how many

24             times you've testified for the State of

25             Texas?
```

104

# United States District Court
# Southern District of Texas

## Case Number: O3mc386

## ATTACHMENT

**Description:**

☐ State Court Record        ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part __115__ of _____

☐ Exhibit to: _____
              number(s) / letter(s) _____

Other: _____

_____

_____

1          in relation to that issue.

2                    If we have an inmate such as Mr.

3          Buck who is sentenced to life in prison,

4          what are some of the factors,

5          statistical factors or environmental

6          factors that you've looked at in regard

7          to this case?

8      A   Number one, among the statistical

9          factors we know to predict future

10         dangerousness is the fact of the crimes.

11         You have to look to see if the person

12         has in the past been assaultive or

13         aggressive, chances are he will be in

14         the future.

15                   Age, the younger the person, the

16         more aggressive and violent a person is.

17         The older a person is, over the age of

18         thirty or in the thirties, the

19         assaultiveness decreases to the point

20         whereby age fifty years old, there's

21         less than one percent of violent acts

22         committed by senior citizens.

23                   Sex.  The male for some strange

24         reason is more violent than a female and

25         more assaultive.

                                              110

```
 1                    Race.  It's a sad commentary

 2          that minorities, Hispanics and black

 3          people, are over represented in the

 4          Criminal Justice System.

 5                    Social-Economics.  The poorer

 6          the person, the more likely they are to

 7          be violent.  There is less violence in

 8          the upper social economic levels.  The

 9          more stable the employment, the less

10          violent the person is.

11                    Substance abuse.  The more

12          substance abuse there is, the more

13          violent a person is.

14                    Those are the statistical

15          factors in deciding whether a person

16          will or will not constitute a continuing

17          danger.

18     Q    If you have a defendant such as Duane

19          Edward Buck that has no prior violent

20          offenses, is it true that there would be

21          less of a probability that he's going to

22          be dangerous or commit acts of violence

23          in the future?

24     A    True.

25     Q    Let's talk about environmental factors
```

111

```
 1              if he's incarcerated in prison.  Let's
 2              talk about things such as the
 3              availability of victims and things like
 4              that.  Explain that in terms of
 5              probability to the jury.
 6        A     The availability of victims means the
 7              broadness or narrowness of the victim
 8              pool.  If the victim is randomly
 9              selected, then the more dangerous the
10              person is because there is no
11              predictability as to who the next victim
12              is.  The narrower the victim pool, the
13              less dangerous the person will be in the
14              future.
15                   In this particular case the
16              victim is not random, it's narrow, and
17              there is a pre-existing relationship.
18              It was, for lack of a better term, a
19              husband and wife difficulty that is
20              unlikely to be repeated.  In prison
21              there is, of course, a narrow victim
22              pool.  A sex relationship that this
23              person is prone to have will not be
24              pleasant in prison.  There will not be
25              wives or girlfriends in prison.
```

112

1           There are other potential

2     victims in prison like other inmates,

3     civilian staff, male and female guards,

4     nurses, teachers and so forth.  Those

5     are potential victims, but in this

6     particular case the probability of

7     developing a dependent relationship with

8     them would be very small, and those

9     potential victims in prison are more

10    alert to the danger and are less likely

11    to be victimized than in free society

12    where the victims are just victims of

13    crime.

14  Q   You were also provided with some data or

15    some history on Mr. Buck in relation to

16    how he reacts in custody.  Isn't it true

17    that the records from the County Jail as

18    well as from the prison system --

19                  MS. HUFFMAN:  I would

20            object.  He's asking for this

21            witness to testify from hearsay.

22                  MR. EASTERLING:  That's

23            what he's expected to do.  They

24            evaluate reports and form

25            opinions.  It's an exception to

                                        113

1                        the hearsay rule.

2                             THE COURT:  Lay your

3                        groundwork.

4

5       BY MR. EASTERLING:

6       Q    You have been provided data and some

7            records and information on Duane Buck's

8            behavior while he was in the jail and in

9            prison; is that correct?

10      A    Yes.

11      Q    When you looked at that information and

12           talked with me about the information,

13           you determined whether or not he had had

14           any disciplinary problems, didn't you?

15      A    Yes.

16      Q    And he hasn't had any disciplinary

17           problems in the County Jail or in the

18           Texas Prison System; isn't that correct?

19                            MS. HUFFMAN:  I'd object

20                       to the hearsay.

21                            THE COURT:  Sustained.

22

23      BY MR. EASTERLING:

24      Q    You used some data to determine whether

25           or not he would be a threat from his

                                              114 ·

```
 1              behavior in prison, correct?
 2      A       Yes.
 3      Q       What did you determine that from?
 4      A       From the disciplinary records he has no
 5              assaultive incidents either at TDC or in
 6              jail.
 7      Q       What does that tell you?
 8      A       Number one, that's a good sign that this
 9              person is controllable within a jail or
10              prison setting.  He has demonstrated
11              that to be so.  Some people do well from
12              an open environment and some people do
13              well in a restricted environment.  This
14              person seems to have adjusted to the
15              structures of the prison and has shown
16              himself to be not assaultive there.
17      Q       So if Duane Buck was sentenced to life
18              in prison, do you have an opinion about
19              whether there's a probability that he
20              would commit criminal acts of violence
21              that would be a continuing threat to
22              society?
23      A       The probability of that happening in
24              prison would be low.
25      Q       Let's talk about whether or not there's
```

                                                    115

# EXHIBIT 3

## Office of the Attorney General News Release Archive

Monday, June 5, 2000

# US SUPREME COURT GRANTS STATE'S MOTION IN CAPITAL CASE

### Case Remanded for New Sentencing Hearing

**AUSTIN - Texas Attorney General John Cornyn** today said the United States Supreme Court has granted a request by the State of Texas that the death sentence imposed in the capital murder case against Victor Hugo Saldano be vacated and remanded for a new sentencing hearing. The new trial will concern only the issue of punishment, not the judgment of guilt, which remains intact.

Saldano was convicted in 1996 of capital murder in Collin County for the murder of Paul King. Evidence presented at the trial showed that Saldano and an accomplice used a handgun to kidnap King from a grocery store parking lot. He was taken to a secluded spot on a country road where Saldano fatally shot King five times, including once in the head at point-blank range. Saldano stole King's wallet and watch.

"There is no doubt of Mr. Saldano's guilt. A jury properly convicted him of capital murder and that conviction remains in place. During the sentencing phase of the trial, there was sufficient evidence submitted to the jury of Mr. Saldano's 'future dangerousness,' justifying the imposition of the death penalty," Cornyn stated. "Unfortunately, however, evidence of the defendant's race was also introduced before the jury by a district attorney as a factor for the jury to weigh in making its determination. This violated Mr. Saldano's constitutional right to be sentenced without regard to the color of his skin."

Cornyn also said, "We've been conducting an audit over the past couple of months. We've identified eight other cases that may be similar. We will release our findings by the end of the week. We will continue to vigilantly monitor all death penalty cases. Our goal is to assure the people of Texas that our criminal justice system is fairly administered."

- 30 -

Contact Mark Heckmann, Heather Browne, or Tom Kelley at (512) 463-2050

# EXHIBIT 4

## Office of the Attorney General News Release Archive

Friday, June 9, 2000

**Statement from Attorney General John Cornyn regarding death penalty cases:**

"It has been eight weeks since I first identified problems associated with the testimony of Dr. Walter Quijano, an expert witness in the capital murder trial of Victor Hugo Saldano. As I explained in a filing before the United States Supreme Court on May 3, it is inappropriate to allow race to be considered as a factor in our criminal justice system. On June 5, the United States Supreme Court agreed. The people of Texas want and deserve a system that affords the same fairness to everyone. I will continue to do everything I can to assure Texans of our commitment to an equitable criminal justice system.

"After a thorough audit of cases in our office, we have identified eight more cases in which testimony was offered by Dr. Quijano that race should be a factor for the jury to consider in making its determination about the sentence in a capital murder trial.

"Six of these eight cases are similar to that of Victor Hugo Saldano. We have sent letters to opposing counsel and to the local prosecutors involved advising them of our findings. Two of these eight cases are dissimilar to the Saldano case. In one, the defendant is not a member of a racial group included in Dr. Quijano's statistical model. In the other, the prosecution did not introduce race as a factor.

"In addition, my office has reviewed case files for all executions in Texas since 1982 and we have not found any cases in which a defendant was executed on the basis of this kind of testimony by Dr. Quijano. Also, we have reviewed the cases of all inmates currently scheduled for execution and none of those involves this kind of testimony by Dr. Quijano.

"Additionally, local prosecutors have been advised to review their cases that have not yet reached the attorney general's office."

- 30 -

Contact Mark Heckmann, Heather Browne, or Tom Kelley at (512) 463-2050

# EXHIBIT 5

The New York Times

# U.S.

# Racial Bias Found in Six More Capital Cases

By JIM YARDLEY
Published: June 11, 2000

Less than a week after the United States Supreme Court has vacated the death sentence of a Texas inmate because of racially biased testimony in his case, the state attorney general announced that six other convicted killers are likely to have their death sentences overturned for the same reason.

A two-month investigation by Attorney General John Cornyn focused on capital cases involving Walter Quijano, a clinical psychologist who has often served as an expert witness for prosecutors across Texas in sentencing hearings. On Monday, the Supreme Court unanimously vacated the death sentence of a convicted murderer, Victor Saldano, because Dr. Quijano had testified that race could be considered a factor in determining whether Mr. Saldano should receive the death penalty.

On Friday, Mr. Cornyn announced that Dr. Quijano had provided similar, racially charged expert testimony in six other cases of inmates now on death row. Mr. Cornyn's staff has notified defense lawyers representing the six inmates that his office will not object if they seek to overturn the death sentences based on Mr. Quijano's testimony.

"The people of Texas want and deserve a system that affords the same fairness to everyone," Mr. Cornyn said in a statement released via e-mail late Friday.

This new development does not mean that these inmates will be set free. In fact, Mr. Cornyn asked the Supreme Court to vacate Mr. Saldano's death sentence so that he could hold a new sentencing hearing "in which race is not considered." Under Texas law, a jury must consider whether a defendant could be "a continuing threat to society" when deciding the death penalty. In the case of Mr. Saldano, who is an Argentine national, Dr. Quijano advised jurors that the defendant could be considered more dangerous based on the fact that Hispanics were "over-represented" in prisons.

In his review, Mr. Cornyn found eight capital cases involving Dr. Quijano but only six involved racially charged testimony. Mr. Cornyn also said his staff had reviewed the files of the 218 inmates executed in Texas since 1982 and found that none of those executions were based on "this kind of testimony by Dr. Quijano." He did not say whether other experts might have provided such testimony.

The six death row inmates whose sentences will likely be overturned are convicted murderers: John Alba, Carl Henry Blue, Eugene Alvin Broxton, Duane Buck, Gustavo Julian Garcia and Michael Dean Gonzales.

Copyright 2013 The New York Times Company | Privacy Policy | Help | Contact Us | Work for Us | Site Map | Index by Keyword

# EXHIBIT 6

Lexis®

Switch Client | Preferences | Help | Sign Out

| My Lexis™ | Search | Get a Document | Shepard's® | More | | History | Alerts |

FOCUS™ Terms [_____] Search Within  Original Results (1 - 100) ▼  Go    Advanced...

View Tutorial

Source: **News & Business > Combined Sources > Mega News, Combined file of National stories** ⓘ
Terms: **race and the death sentence**  (Suggest Terms for My Search | Feedback on Your Search)

↰Select for FOCUS™ or Delivery
☐

Copyright 2000 The Houston Chronicle Publishing Company
The Houston Chronicle

June 06, 2000, Tuesday 3 STAR EDITION

**SECTION:** A; Pg. 1

**LENGTH:** 544 words

**HEADLINE:** Texas **death** case set aside;
U.S. Supreme Court sees possible racial bias

**SOURCE:** Staff

**BYLINE:** STEVE LASH, Houston Chronicle Washington Bureau

**DATELINE:** WASHINGTON

**BODY:**
WASHINGTON - The U.S. Supreme Court on Monday set aside the **death sentence** of a Texas
killer who state prosecutors said might have been condemned because he is Hispanic.

Texas Attorney General John Cornyn, in a statement Monday, said the capital case the justices
sent back for resentencing might be part of a larger state problem of convicts being sentenced to
**death,** in part, because they are Hispanic or black.

A Texas audit of criminal trials has uncovered eight cases in which prosecutors might have used
testimony that equated being black or Hispanic with a propensity for violence to secure a **death
sentence,** Cornyn said.

In the Supreme Court case, the justices told Texas judges to reconsider Victor Hugo Saldano's
**death sentence,** which was based in part on pre-sentencing testimony that the Argentine
national poses a continuing threat of violence because he is Hispanic. Cornyn had urged the high
court to order a new sentencing hearing, saying the jury had improperly been told to consider
Saldano's **race** before recommending that he be put to **death.**

Under Texas law, "future dangerousness" is regarded as an aggravating circumstance that could
lead a jury to recommend a killer be executed.

"Because the use of **race** in Saldano's sentencing seriously undermined the fairness, integrity or
public reputation of the judicial process, Texas confesses error and agrees that Saldano is entitled
to a new sentencing hearing," Cornyn wrote in a legal brief to the justices.

Cornyn's office declined to disclose where any of the eight capital cases were decided but said the

Cornyn's office declined to disclose where any of the eight capital cases were decided but said the audit's findings will be released by the end of the week.

"We will continue to vigilantly monitor all **death**-penalty cases," Cornyn said. "Our goal is to assure the people of Texas that our criminal justice system is fairly administered."

Saldano's appellate attorney, Stanley Schneider of Houston, welcomed the high court's action and called it "absolutely shocking . . . that anyone in 1996 (when Saldano was sentenced) would even dream of introducing a person's **race** as a factor in life-or-**death** decisions."

Saldano was convicted of killing Paul King after kidnapping him from a Dallas grocery.

At sentencing, clinical psychologist Walter Quijano testified that Saldano's Hispanic heritage made it likely he was a threat for future dangerousness. Quijano added that Hispanics and blacks are over-represented in the prison population. Prosecutors then cited Quijano's testimony in successfully pressing the jury to recommend a **death sentence.**

The Texas Court of Criminal Appeals upheld the execution order, saying that using **race** as a factor at sentencing did not constitute "fundamental error" by the trial court.

Schneider, Saldano's attorney, urged the justices to set aside the **death sentence,** calling it "fundamentally unfair for the prosecution to use racial and ethnic stereotypes in order to obtain a **death** penalty."

Cornyn expressed confidence that a jury would again recommend that Saldano be executed. Saldano's "random, callous, cruel and bold" killing of King warranted the **death** penalty, Cornyn wrote in his brief.

Argentina and the governments of about 10 other Latin American countries urged the high court to throw out the **death sentence.**


**GRAPHIC:** Mug: Victor Hugo Saldano

**LOAD-DATE:** June 7, 2000

Source:   **News & Business > Combined Sources > Mega News, Combined file of National stories** [i]
Terms:  **race and the death sentence** (Suggest Terms for My Search | Feedback on Your Search)
View:  Full
Date/Time:  Monday, December 23, 2013 - 5:09 PM EST

LexisNexis®   About LexisNexis   | Privacy Policy   | Terms & Conditions   | Contact Us
Copyright ©  2013 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 7

# United States District Court
# Southern District of Texas

## Case Number: 03mc386

## ATTACHMENT

Description:

☐ State Court Record        ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part 112 of _____

☐ Exhibit to: _____
              number(s) / letter(s) _____

Other: _____

_____

_____

```
 1                      R. L. SCHIELD

 2       was called as a witness by the State and,

 3       having been duly sworn, testified as follows:

 4                          .

 5                    DIRECT EXAMINATION

 6       BY MS. HOOD:

 7       Q    Please state your name.

 8       A    R. L. Schield.

 9       Q    How are you employed, sir?

10       A    The Harris County Sheriff's Department.

11       Q    What is your assignment?

12       A    I'm assigned to the Identification

13            Division.

14       Q    What are your duties with the I.D.

15            Division?

16       A    We maintain print records of prisoners

17            and we also do crime scene

18            investigations.

19       Q    Do you have any experience and training

20            and that enables you to carry out your

21            duties?

22       A    Yes, ma'am.

23       Q    What would that consist of?

24       A    In regard to fingerprints, I've

25            completed basic and advanced fingerprint
```

1        courses with the FBI, and I've also had

2        sixteen years of day-to-day experience

3        in advanced latent fingerprint

4        comparison.

5    Q   What is a latent print?

6    A   A latent print is a print that's left

7        behind by a person and developed by

8        powder or chemicals.

9    Q   What's an ink print?

10   A   An ink print is when you take a person

11       and place their finger or thumb on an

12       ink pad and then roll their print out on

13       paper.

14   Q   Let me ask you this.  Do you ever have

15       two people who have the same prints?

16   A   No, ma'am.

17   Q   Is it possible to take a known print and

18       compare it to an unknown print to

19       determine if there are a match?

20   A   Yes, ma'am.

21   Q   I'd like you to take a look at what I've

22       just had marked as State's Exhibit No.

23       70.  Can you tell me what that is?

24   A   Yes, ma'am.

25   Q   What is it?

6

```
 1        A    It's a 3x5 card containing prints.

 2        Q    Where did those prints come from?

 3        A    The man at the table in the maroon

 4             shirt.

 5        Q    Did you take those prints?

 6        A    I did.

 7        Q    When?

 8        A    At 8:03 this morning.

 9        Q    Do the prints on that card belong to the

10             person that you've just identified?

11        A    Yes, ma'am.

12                       MS. HOOD:   May the record

13                  reflect that the Deputy has

14                  identified the defendant in this

15                  case?

16                       THE COURT:   The record

17                  will so reflect.

18

19        BY MS. HOOD:

20        Q    Have you had the opportunity to compare

21             the known prints on State's No. 70 with

22             some evidence including Jail Cards,

23             Judgment and Sentences, Pen Packet?

24        A    Yes, ma'am.

25        Q    I'd like to show you now what's been
```

7

1         marked State's Exhibits 59-A, 60-A, 61-

2         A, 62-A, 63-A, 64-A, and 65-A.  Can you

3         identify them?

4    A   Yes.

5    Q   Did you compare the prints on Exhibits

6         59-A through 65-A to the known prints?

7    A   Yes, ma'am, I did.

8    Q   What were the results?

9    A   They were all made by the same person.

10    Q   That would be the person that you

11         identified earlier?

12    A   Yes, the man at the table in the maroon

13         shirt.

14    Q   Do you know the name of that person?

15    A   Duane Edward Buck.

16    Q   I'd like to show you State's No. 66.

17         Can you identify this?

18    A   Yes, ma'am.

19    Q   What is it?

20    A   This is called a Pen Packet.

21    Q   Have you had the opportunity to compare

22         the prints in State's No. 70 with the

23         prints in State's 66, which is the Pen

24         Packet?

25    A   Yes, ma'am.

8

1    Q   What was the result of your comparison?

2    A   They were also made by the same person.

3    Q   Who is?

4    A   Duane Buck.

5    Q   What is a Pen Packet?

6    A   When you go to the penitentiary, that's

7        what you get from the Texas Department

8        of Corrections.  It contains the

9        Judgment and Sentence, photograph,

10       fingerprints.

11   Q   Can you tell me how Jail Cards

12       originate?

13   A   Jail Cards originate when someone is

14       booked into the Harris County Jail.

15       When a person comes in, they get

16       information about the case, what the

17       charge is, personal description of the

18       person, personal property items and

19       things like that are listed.

20                  MS. HOOD:  At this time

21              we'd offer into evidence State's

22              No. 66, the Pen Packet of Duane

23              Buck as well as State's Exhibits

24              59 through 65.

25                  MR. GUERINOT:  May we

                                              9

1          approach the bench?

2

3                  (The following proceedings

4          are held at the bench

5          outside the hearing of the

6          jury.)

7

8                  MR. GUERINOT:   I would

9          object to this portion of the

10         Judgment here.   Other than that,

11         I have no objection.

12                 MS. HUFFMAN:   I'll take

13         care of that.

14                 THE COURT:   Then I'll go

15         ahead and admit that as amended.

16

17                 (The following proceedings

18         are held in the hearing of

19         the jury.)

20

21    BY MS. HOOD:

22    Q    You've just examined State's Exhibits 59

23         through 65.   Can you tell me first of

24         all what they are?

25    A    They're copies of Jail Cards.

                                                        10

1    Q    Are they exact duplicates of Exhibits

2          59-A, 60-A, 61-A, 62-A, 63-A, 64-A, and

3          65-A?

4    A    Yes, ma'am.

5                 MS. HOOD:  We'd offer

6                State's 59 through 65 after

7                tendering them to Defense

8                Counsel.

9                 THE COURT:  Ladies and

10              gentlemen, I'd ask that you step

11              back to the jury room for just a

12              moment.

13

14              (The following proceedings

15              are held outside the

16              presence of the jury.)

17

18                 MR. GUERINOT:  We would

19              object to State's Exhibit No. 59

20              and the extensive verbiage down

21               here, the fact that he's

22               referred to as a parole

23               violator, all this verbiage

24               right here.

25                 We would object to State's

1   No. 60 which refers to a Motion

2   to Revoke Parole where it is

3   clear that it was dismissed and

4   therefore it's not relevant.  It

5   does not show any conviction.  I

6   assume that's what they mean by

7   dismissed.

8        THE COURT:  Are you

9   objecting to the language Motion

10  to Revoke Parole?

11       MR. GUERINOT:  Yes, all of

12  that because it does not result

13  in conviction.  It's not

14  admissible just because

15  something was filed.  It's not

16  relevant.

17       MS. HOOD:  It shows why

18  the booking card was originally

19  made in the first place.  The

20  origin of that whole exhibit is

21  relevant.

22       MR. GUERINOT:  It is not

23  relevant in that it does not

24  show a conviction.

25       MS. HOOD:  All of these

12

1    documents are relevant under

2    Rule 902.  They are certified

3    copies of public records.

4         MR. GUERINOT:  That

5    doesn't make them relevant.

6         MS. HOOD:  It is relevant.

7    That's why the document was

8    generated.  That's why he was

9    arrested.

10         MS. HUFFMAN:  It's

11    relevant at punishment because

12    in a capital murder case we have

13    to prove that the defendant

14    would be a continuing threat to

15    society.  We're not limited by

16    cases in which the defendant was

17    convicted or for which there

18    were convictions.  The fact is

19    that there was a Motion to

20    Revoke Parole and he was placed

21    in custody.  Those are facts

22    that the jury should have before

23    them to consider.  If there is

24    something that shows it was

25    dismissed, that may be something

13

1    they want to argue, but because

2    it was dismissed doesn't mean

3    it's not relevant for the jury

4    to know that he was put back

5    into jail because he violated

6    his parole in some fashion.

7         THE COURT:  This offense

8    is entitled Parole Violator and

9    then written underneath that is

10   nine cases, and I guess that's a

11   dollar figure there.

12        MS. HUFFMAN:  I believe

13   those are traffic tickets,

14   because the agency is HPD.  I'm

15   assuming those are some kind of

16   traffic violations.  It's a

17   traffic hold.

18        THE COURT:  Let me go back

19   then and do some re-thinking.

20        MS. HUFFMAN:  I would also

21   argue at this point that there

22   is Motion to Revoke Parole

23   pending that was based on this

24   new capital murder.  The jury

25   has convicted him of this

                                    14

1    capital murder.  I don't see why

2    that has to be whited out.

3         The first entry on 59 is

4    capital murder, multi-murder,

5    and the date is 7-30-95.  On

6    8-7-95 it's showing that there

7    was a Motion to Revoke Parole.

8         THE COURT:  So it's your

9    position that it's relevant to

10   this specific issue.

11        MR. GUERINOT:  The bottom

12   line is that it did not result

13   in a conviction.  Just the mere

14   fact that you're arrested for

15   something does not make that

16   admissible.  They are required

17   to bring eyewitnesses down here.

18   Just because they have some

19   document that they want to get

20   in doesn't make it admissible.

21   They have to have somebody --

22        THE COURT:  What I'm

23   trying to get at is that because

24   it says parole violator --

25        MR. GUERINOT:  That's

                                    15

```
 1            the --
 2                 THE COURT:  Let me finish.
 3            There was a Motion to Revoke his
 4            parole.   Their position is
 5            that's relevant to the
 6            punishment issues in a capital
 7            murder case.   Your response is
 8            what?
 9                 MR. GUERINOT:  My response
10            is that it did not result in
11            conviction.   Therefore, if they
12            want to prove up a parole
13            violation, they have to prove up
14            that Mr. Buck committed a
15            violation of his parole, was
16            adjudicated and sent back.   Just
17            the fact that there's a piece of
18            paper somewhere does not make it
19            in and of itself admissible.
20            This clearly did not result in a
21            conviction.   It says dismissed.
22            The presumption is that it
23            didn't happen.   If it didn't
24            happen, it's not admissible.
25                 MS. HUFFMAN:  I'm not sure
```

16

1    what he's referring to at this

2    point.

3         THE COURT:  State's 60

4    refers to a Motion to Revoke

5    Parole and shows dismissed.

6    Then under the offense title it

7    says parole violator.  On 59 it

8    says Motion to Revoke Parole

9    pending a capital murder.

10        MR. GUERINOT:  Also on

11    State's No. 60, Your Honor, it

12    says "caution escape risk."

13    We'd further object to that.

14    That hasn't been proved up.

15        MS. HUFFMAN:  I can

16    respond.  First of all, if the

17    Court would look at State's 66

18    which has already been

19    introduced, the Court will see

20    from this document that it's

21    clear that the defendant was

22    returned to TDC as a parole

23    violator.  It says that right

24    here.  Why is this any different

25    than any other case where we

17

1    prove up convictions through

2    documents when there are no live

3    witnesses in these cases either.

4    We can call them if we want to

5    at this phase or we don't have

6    to.

7         THE COURT:  It's my

8    understanding that he was in the

9    Harris County Jail as a result

10   of the capital murder charge and

11   then the Motion to Revoke was

12   filed.

13        MS. HUFFMAN:  That's the

14   case, but there was a prior case

15   where he was brought in as a

16   parole violator and sent back to

17   prison.

18        THE COURT:  Which is this

19   one.  Let me see if I have this

20   straight.  This resulted in him

21   going back to the penitentiary

22   and this one did not.  This one

23   says parole violator and then

24   dismissed.  It did not result in

25   any action taken by the

18

1    Government.

2              MS. HUFFMAN:  Yes, Your

3    Honor.

4              MR. GUERINOT:  Your Honor,

5    that one certainly did not

6    result in the action that's

7    reflected in State's 66.

8              THE COURT:  That was my

9    question.

10             MR. GUERINOT:  Therefore,

11   I don't think there is any

12   probative value at all.  I think

13   the Court can see the reason

14   it's not admissible.

15             MS. HUFFMAN:  Exhibit No.

16   59-A deals with the fact that a

17   Blue Warrant was filed after he

18   was charged with this Capital

19   Warrant.

20             THE COURT:  I thought this

21   was dismissed.

22             MS. HUFFMAN:  That's not

23   dismissed, Judge.

24             THE COURT:  That's what

25   this shows.

19

1                MS. HUFFMAN:  That's a

2    different one.  This was May of

3    '92.

4                THE COURT:  What happened

5    to this?

6                MS. HUFFMAN:  That was

7    filed after he was charged with

8    capital murder.

9                THE COURT:  If you cannot

10   prove it up, it should probably

11   be deleted.  On 8-7-95 the

12   Motion to Revoke is still

13   pending.

14               MS. HUFFMAN:  I believe

15   that's correct.

16               THE COURT:  I'll grant

17   your objection as to that.

18               MR. GUERINOT:  How about

19   the words "caution escape risk"?

20               THE COURT:  Yes, sir.

21               MR. GUERINOT:  In the

22   upper left-hand corner on 61.

23               THE COURT:  I saw it.

24               MR. GUERINOT:  On 65 you

25   can barely read.

```
 1              MS. HUFFMAN:  On that one
 2         which is State's 65, the date is
 3         there.  It indicates that he was
 4         returned to TDC on a parole
 5         violation.  There was a final
 6         disposition on that one.  He was
 7         returned to TDC.
 8              MR. GUERINOT:  The bottom
 9         line is that they can't say why
10         he was returned to TDC.  I'd
11         like to take the witness on voir
12         dire.
13              THE COURT:  Why don't we
14         go through all of them first.  I
15         assume you're objecting to all
16         of them.
17              MR. GUERINOT:  Some of
18         them I don't have objection to.
19         Let's delete those now.  I don't
20         have an objection to State's 63.
21              THE COURT:  Then I'll
22         admit State's 63.  At this time
23         I'm going to admit State's No.
24         59 as amended and 61 as amended
25         subject to Defense Counsel's
```

21

1      verbal objection.

2              MR. GUERINOT:  I have no

3      objection to 59 as amended and

4      61 as amended.

5              THE COURT:  They are

6      admitted.

7              MR. GUERINOT:  As to

8      State's 62, I would object to

9      the first line.  I'd object to

10     all of that.  It did not result

11     in a conviction of any kind

12     whatsoever.

13             I'd object to the part

14     where it says repeat offender.

15     The Judgment does not

16     demonstrate a repeat offender

17     but just resulted in thirty

18     days.

19             MS. HUFFMAN:  That's the

20     reason, that's the class of

21     misdemeanor it is that indicates

22     it's more of the same thing,

23     what makes it that degree of

24     offense.

25             THE COURT:  What is it?

                                        22

1          MR. GUERINOT:  The

2     Judgment does not reflect a

3     second offender.

4          MS. HUFFMAN:  We don't

5     care, Judge.  Just take it out.

6          MR. GUERINOT:  I'm not

7     going to have an objection as to

8     State's Exhibit 64.

9          THE COURT:  State's

10     Exhibit No. 64 will be admitted.

11          MR. GUERINOT:  No

12     objection to 62 as amended.

13          THE COURT:  Sixty-two is

14     admitted.

15          What about 65?

16          MR. GUERINOT:  I'd object

17     here where it says escape risk.

18     You better look at this

19     document, Judge.  I'm going to

20     object to this whole document.

21     It has a stamp mark on there but

22     -- I would object in that it

23     does not show any kind of

24     conviction.  It does not show a

25     revocation of parole.  All it

23

1    has is an allegation.  Obviously

2    no action was taken on the part

3    of the Board of Pardons and

4    Paroles to return him to the

5    Texas Department of Criminal

6    Justice.

7          THE COURT:  That's 65?

8          MR. GUERINOT:  Yes.

9          MR. EASTERLING:  If I may

10    add something.  It's hearsay and

11    it denies our client

12    confrontation of witnesses or

13    whoever filed the motion,

14    whatever governmental agency

15    filed the motion.

16          THE COURT:  Is there a

17    reflection in the other

18    documents of the Motion to

19    Revoke referencing 65 was a

20    final disposition?  Is there

21    something in your documents?

22          MS. HUFFMAN:  No, ma'am,

23    not that's relevant to that.

24          THE COURT:  Then the

25    relevance of this document other

24

1    than --

2              MS. HUFFMAN:  I was going

3    to make the argument that the

4    document shows that he was

5    returned to TDC on August 24th

6    of 1994 as a result of being

7    placed in custody.  It shows

8    that the person was arrested and

9    charged and sentenced to some

10   jail time.

11             MR. GUERINOT:  This is a

12   transmittal order.  That's all

13   it is.

14             THE COURT:  What is there

15   on there to indicate that he was

16   returned?

17             MS. HUFFMAN:  If I may

18   call the jail card person, he

19   may be able to interpret this

20   better than I can.

21             THE COURT:  Did you have

22   an objection as to State's No.

23   66?

24             MR. GUERINOT:  As amended,

25   I have no objection to State's

                                        25

1     66.

2               THE COURT:  Then it's

3     admitted.

4               Thus far I have admitted

5     State's 59, 61, 62, 63, 64, and

6     66.  I have not yet admitted 60

7     and 65.

8               MS. HUFFMAN:  We'll

9     withdraw them.

10              THE COURT:  Then let the

11    record reflect that 59, 61, 62,

12    63, and 66 are admitted.

13              MS. HUFFMAN:  Sixty-seven

14    and 68, I'm going to offer them.

15              MR. GUERINOT:  And I'm not

16    going to have an objection.

17              THE COURT:  Then bring the

18    jury in.

19                   (The following proceedings

20                   are held in the presence

21                   of the jury.)

22

23         DIRECT EXAMINATION CONTINUED

24    BY MS. HOOD:

25    Q    Deputy, I'd refer your attention to

                                        26

```
 1              Exhibits 62 and 63 as well as State's

 2              Exhibits 67 and 68.  Do State's Exhibits

 3              62 and 63 relate to State's 67 and 68?

 4       A      Yes, ma'am.

 5       Q      For the record and for the jury's

 6              edification, what is State's 62?

 7       A      This is a copy of a jail card.

 8       Q      What is State's Exhibit 68?

 9       A      It's a Judgment and Sentence.

10       Q      As you've testified earlier, have you

11              had an opportunity to compare the

12              fingerprints on State's 62 to the known

13              prints that you have on State's No. 70?

14       A      Yes, ma'am.

15       Q      And they refer to this defendant, Duane

16              Buck?

17       A      Yes, ma'am.

18       Q      What is State's 68?

19       A      Sixty-eight is a Judgment and Sentence.

20       Q      Can you connect State's 62 which

21              contains the known print of Duane Buck

22              to State's No. 68?

23       A      Yes, ma'am by cause number.

24       Q      So does State's 62 refer to the same

25              Duane Buck that's reflected in 68?
```

27

1   A   Yes, ma'am.

2   Q   State's 63 is a jail card for this

3       defendant Duane Buck which you

4       determined from the prints on it,

5       correct?

6   A   Yes, ma'am.

7   Q   What is State' 67?

8   A   State's 67 is also a Judgment and

9       Sentence.

10  Q   To whom does it refer?

11  A   Duane Edward Buck.

12  Q   How did you connect that up?

13  A   By cause number.

14              MS. HOOD:  Your Honor, at

15          this time we would offer State's

16          68 and 67 after tendering the

17          same to Defense Counsel for his

18          inspection.

19              MR. GUERINOT:  We have

20          looked at them Judge and have no

21          objection.

22              THE COURT:  They are

23          admitted.

24              MS. HOOD:  Pass the

25          witness.

                                        28

1          MR. GUERINOT:   We have no

2     questions.

3

4          (At this time the witness

5     is excused from the

6     courtroom.)

29

# United States District Court
# Southern District of Texas

## Case Number: 03mc386

## ATTACHMENT

**Description:**

☐ State Court Record    ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part 113 of _____

☐ Exhibit to: _____
          number(s) / letter(s) _____

Other: _____

_____

_____

1                    VIVIAN JACKSON

2      was called as a witness by the State and,

3      having been duly sworn, testified as follows:

4

5                    DIRECT EXAMINATION

6      BY MS. HUFFMAN:

7      Q    Ma'am, would you please introduce

8           yourself to the jury?

9      A    My name is Vivian Jackson.

10     Q    Ms. Jackson, you're going to have to

11          speak into the microphone.

12     A    Yes, ma'am.

13     Q    How old are you?

14     A    Thirty-one.

15     Q    Are you married?

16     A    No.

17     Q    Are you engaged?

18     A    Yes.

19     Q    Do you have any children?

20     A    Yes.

21     Q    How many children do you have?

22     A    Three.

23     Q    How old are your children?

24     A    Eight, six and six months.

25     Q    Do you know the defendant in this case,

                                        30

1          Duane Edward Buck?

2     A    Yes.

3     Q    Do you see Mr. Buck in the courtroom

4          today?

5     A    Yes.

6     Q    Would you point him out to the jury by

7          describing something that he's wearing?

8     A    The man in the burgundy shirt.

9                    MS. HUFFMAN:  May the

10                record reflect that the witness

11                has identified the defendant

12                Duane Buck?

13                   THE COURT:  The record

14                will so reflect.

15

16    BY MS. HUFFMAN:

17    Q    Ms. Jackson, do you recall approximately

18         when you first met Mr. Buck?

19    A    Yes.

20    Q    When was that?

21    A    About 1985.

22    Q    What was the nature of your relationship

23         with Mr. Buck?  What kind of

24         relationship did you have with him?

25    A    An abusive relationship.

                                             31

1      Q    Was he your boyfriend?

2      A    My boyfriend.

3      Q    When you started out in 1985, did he

4           start out as your boyfriend?

5      A    Yes.

6      Q    How long or how many years did you have

7           a relationship with Mr. Buck?

8      A    About four and a half or·five years.

9      Q    During that time period did you live

10          together or did you live apart, or what

11          kind of relationship did you have?

12     A    We lived together.

13     Q    Do you have any children by him?

14     A    Yes.

15     Q    How many?

16     A    One.

17     Q    What is the child's name?

18     A    Duane Edward Buck.

19     Q    ·How old is he now?

20.    A    ·Eight.

21     Q    Were you ever legally married to Mr.

22          Buck?

23·    A    No.

24     Q    During the time you lived with Mr. Buck,

25          I think you told the jury it was an

                                                      32

```
 1          abusive relationship?
 2     A    Yes.           .
 3     Q    Did he ever cause physical harm to you?
 4     A    Yes.
 5     Q    Did he ever assault you?
 6                    MR. EASTERLING:  That
 7               calls for a legal conclusion,
 8               Your Honor.  We would object.
 9                    THE COURT:  Overruled.
10
11     BY MS. HUFFMAN:
12     Q    Do you know what the word assault means?
13     A    Restate it.
14     Q    Did he ever hit you with his fists?
15     A    Yes.
16     Q    On what part of your body?
17     A    My face, and all over really.
18     Q    At the beginning of the relationship did
19          he beat you initially?
20     A    No, it wasn't often at the beginning.
21     Q    At some point did it get worse?
22     A    Yes.
23     Q    When did that happen?
24     A    About at the end.
25     Q    How often was he assaulting you or
```

                                                    33

1    beating you during the end part of your

2    relationship?

3  A  Almost every day.

4  Q  Did he ever use a weapon against you?

5  A  Yes.

6  Q  Tell us about that.

7  A  At one incident he put a gun to my

8    throat and another incident he put a gun

9    to my face, but I didn't know if it was

10   loaded or not.

11 Q  You don't know if it was loaded?

12 A  Yes.

13 Q  Did he ever use anything to hit you with

14   other than his hand?

15 A  Yes.

16 Q  What did he beat you with?

17 A  A belt, a coat hanger, and one time he

18   had a cast on his arm and he beat me in

19   the head with it.

20 Q  Did he ever try to burn you?

21 A  He threatened to pour boiling water on

22   me before.

23 Q  During all those years he abused you,

24   did you ever call the police?

25 A  No.

34

```
 1      Q    Why not?

 2      A    Because I was afraid.

 3      Q    Did you ever try to leave?

 4      A    I left him one time.

 5      Q    What happened?

 6      A    I went over to my sister's house and he

 7           came over and threatened me so I went

 8           back.

 9      Q    What did he say?  How did he threaten

10           you?

11      A    He threatened to hit me if I wouldn't go

12           back so I went back.

13      Q    You said you had an abusive relationship

14           with him.  What kind of abuse was it?

15           Was it just physical?

16      A    Physically and mentally and emotionally.

17      Q    How was it that you were finally able to

18           break away from Mr. Buck?

19      A    Well, a friend of mine called my mother

20           and told her what was going on and she

21           came and got me.

22      Q    Once you were able to leave, did you

23           ever go back?

24      A    No.

25      Q    In the years since you've been apart
```

                                                              35

 1          from Mr. Buck -- I guess that was in

 2          1989 approximately?

 3     A    About that time, yes.

 4     Q    Has he ever paid any child support for

 5          his child?

 6     A    No.

 7     Q    Ms. Jackson, during the time Mr. Buck

 8          assaulted you and attacked you, did

 9          those injuries hurt or cause you pain?

10     A    Yes.

11                    MS. HUFFMAN:  Pass the

12               witness, Your Honor.

13

14               CROSS-EXAMINATION

15   BY MR. EASTERLING:

16     Q    Ms. Jackson, my name is Danny

17          Easterling.  I represent Mr. Buck.  How

18          are you?

19     A    Fine.

20     Q    Did I make an attempt to communicate

21          with you to get to talk to you about

22          what happened back in 1985?

23     A    Yes.

24     Q    But you never called me back or never

25          made an attempt to contact me, did you?

                                              36

1    A   No, but I talked to P.I..

2    Q   Why didn't you talk with me?

3    A   I don't know.

4    Q   Whenever you say that Duane would hit

5         you, were you fighting when that

6         happened?

7    A   Was I fighting?

8    Q   Yes.  Were you fighting over something?

9    A   No.

10   Q   Did you fight back with him?  Did you

11       hit him back?

12   A   At one point I did but when I tried to

13       fight him back, it made it worse.

14   Q   But you would hit him sometimes?

15   A   You mean like start it?

16   Q   Yes.

17   A   No.

18   Q   But you would hit back sometimes?

19   A   Every once in awhile.

20   Q   Did you know that Duane was going to

21       jail at times throughout your

22       relationship?

23   A   Did I know he was going to jail?

24   Q   Yes.  Did he go to jail during some of

25       those years of your relationship?

37

```
 1    A    Once or twice that I can remember.
 2    Q    And the child you said is Duane Buck's,
 3         you say he is nine years old?
 4    A    Yes.
 5    Q    Was there paternity testing done to
 6         determine that it was child?
 7    A    No.
 8    Q    Was there any doubt about that?
 9    A    No.
10    Q    When did you file for any type of court
11         order for paternity to establish that
12         the child is entitled to get child
13         support?
14    A    Well, Welfare, they make you do that
15         anyway.
16    Q    When did you do that, if you did?
17    A    It's been a couple of years now.  When I
18         did do it, I came to court and he was in
19         jail at that time so they put a default
20         on it.
21    Q    You can't pay child support if you're in
22         jail, can you?
23    A    No.
24    Q    So who's been supporting Duane?
25    A    I have.
```

38

```
 1      Q    And the Welfare Department?

 2      A    Yes.

 3      Q    Do you work?

 4      A    No.

 5      Q    Did you take care of your kids?

 6      A    Yes, I do.

 7      Q    You're a housewife?

 8      A    Yes.

 9      Q    Who's the father of the other two

10           children?

11      A    Excuse me?

12                      MS. HUFFMAN:  I'd object

13               to the relevance.

14                      THE COURT:  Rephrase your

15               question.  Sustained.

16

17    BY MR. EASTERLING:

18      Q    You have two other children by other

19           men?

20      A    I have two children by different men,

21           yes.  Yes, I do.

22      Q    Three children with three different

23           fathers, correct?

24      A    Yes.

25      Q    Do you get child support on the other
```

39

1        two children?

2    A   On one.

3    Q   But you've never been married to any of

4        these men?

5    A   No.

6    Q   You alleged that you remember some kind

7        of gun being pointed at you.  What kind

8        of gun was it?

9    A   It looked like a rifle to me.

10   Q   Do you know where he got it from?

11   A   I don't know.

12   Q   Were you living with him at the time?

13   A   Yes.

14   Q   But you don't know where he got it from?

15   A   I can't recall.

16                  MR. EASTERLING:  Pass the

17            witness, Your Honor.

18                  MS. HUFFMAN:  No further

19            questions.

20

21            (At this time the witness

22            is excused from the

23            courtroom.)

24

25                  THE COURT:  Ladies and

                                            40

1                         gentlemen, I'm going to ask you

2                         to step back to the jury room.

3                         We'll call you back shortly.

4

5                              (The following proceedings

6                              are held outside the

7                              presence of the jury.)

8

9                              MS. HUFFMAN:   The next

10                        witness the State would call

11                        before the jury would testify as

12                        to the oral statements made by

13                        the defendant.   I think we need

14                        to have a brief hearing outside

15                        the presence of the jury.

16                             THE COURT:   Oral

17                        statements of the defendant?

18                             MS. HUFFMAN:   Yes, Your

19                        Honor.

20                             THE COURT:   Then let's

21                        proceed.

22                             MS. HUFFMAN:   The State

23                        would call Deputy McGinty.

                                                        41

1              DEPUTY P. E. McGINTY

2       was called as a witness by the State and,

3       having been previously duly sworn, testified

4       as follows:

5

6                DIRECT EXAMINATION

7       BY MS. HUFFMAN:

8       Q    Please state your name.

9       A    Paul McGinty.

10      Q    Are you the same Paul McGinty who

11           testified at the guilt-innocence stage

12           of the trial?

13      A    Yes, ma'am.

14      Q    You're the arresting officer of the

15           defendant Duane Buck?

16      A    Yes, ma'am.

17      Q    You testified that after you arrested

18           Mr. Buck that you placed him in your

19           patrol car; is that correct?

20      A    Yes, ma'am.

21      Q    At some point after you placed him in

22           the patrol car, did you go back to the

23           patrol car and read the defendant his

24           Miranda Warnings?

25      A    Yes, ma'am.

                                              42

1    Q    Do you recall at what point in the
2         morning you did that?
3    A    It would have been sometime after Mr.
4         Butler had been pronounced DOA which was
5         8:06.
6    Q    So at sometime after 8:06 A.M.?
7    A    Yes, ma'am.
8    Q    When you approached Mr. Buck and read
9         him his warnings, where was he at that
10        time?
11   A    In the back seat of my patrol car.
12   Q    Was he located where he could hear the
13        warnings?
14   A    Yes, ma'am.
15   Q    Did you give him his warnings?
16   A    Yes, ma'am, I did.
17   Q    Did you use anything to assist you in
18        presenting his Miranda Warnings to him?
19   A    Yes, ma'am, I did.
20   Q    What did you use?
21   A    I carry a Blue Card with me that has the
22        warnings on it.
23   Q    Did you read those warnings directly
24        from the Blue Card that morning?
25   A    Yes, ma'am, I did.

43

1    Q    Could you read into the record the

2         warnings you read to Mr. Buck that

3         morning?

4                   MR. EASTERLING:  I would

5              stipulate as to those warnings.

6                   MS. HUFFMAN:  For the

7              record I would rather have him

8              read it.

9                   THE COURT:  All right.

10   A    It says:  You have the right to remain

11        silent and not make any statement at

12        all, and any statement that you make can

13        be used against you and probably will be

14        used against you at your trial.

15             At that point I asked him if he

16        understood that.

17   Q    Did he acknowledge that he understood

18        that right?

19   A    Yes, ma'am.

20   Q    Please continue.

21   A    Any statement that you make may be used

22        as evidence against you in court.

23             I asked him if he understood.

24   Q    What was his answer?

25   A    That he did.

                                        44

1    Q    Next.

2    A    You have the right to have a lawyer to

3         represent you prior to and during any

4         questioning.

5              I asked him if he understood.

6    Q    What did he say?

7    A    He said he did.

8    Q    Next.

9    A    If you're unable to employ a lawyer, you

10        have the right to have a lawyer

11        appointed to advise you prior to and

12        during any questioning.

13             Again I asked Mr. Buck if he

14        understood.

15   Q    What was his response?

16   A    He said yes.

17   Q    Go on.

18   A    You have the right to terminate the

19        interview at any time.

20   Q    Did you ask him if he understood that?

21   A    Yes, ma'am, I did.

22   Q    What was his response?

23   A    His response was yes.

24   Q    Are those all the rights that you read

25        to him?

                                                45

1    A    Yes, ma'am.

2    Q    After you read him his rights, would you

3         tell us whether or not he appeared to

4         understand those rights?

5    A    He appeared to understand the rights.

6    Q    Did he have any questions about his

7         rights?

8    A    No, ma'am, he did not.

9    Q    Did you have any conversation with him

10        at that point?

11   A    No, ma'am.

12                 MS. HUFFMAN:  Your Honor,

13            I would pass the witness for

14            this hearing.

15                 MR. EASTERLING:  I'd like

16            to hear what the proffer is.

17                 MS. HUFFMAN:  I'm not

18            proffering anything with him.

19            I'm just setting it up.

20                 THE COURT:  Do you have

21            any questions?

22                 MR. EASTERLING:  You're

23            not going to offer the oral

24            statement?

25                 MS. HUFFMAN:  Not through

                                          46

1               him.  That would be his

2               testimony.

3                     MR. EASTERLING:  Then I

4               have no questions.

5

6                     (At this time the witness

7                   is excused from the

8                   courtroom.)

47

1              D. R. WARREN

2      was called as a witness by the State and,

3      having been duly sworn, testified as follows:

4

5              DIRECT EXAMINATION

6      BY MS. HUFFMAN:

7      Q    Sir, please state your name.

8      A    D. R. Warren.

9      Q    Deputy Warren, how are you employed?

10     A    I'm employed by the Harris County

11          Sheriff's Department.

12     Q    You're employed in what capacity?

13     A    I'm a Patrolman for District 4.

14     Q    Deputy Warren, did you have occasion

15          back on July 30th of 1995 to respond to

16          a multiple murder at 7327 Puerta

17          Vallarta?

18     A    Yes, ma'am, I did.

19     Q    Was it your duty that day to be the

20          transporter?

21     A    Yes, ma'am.

22     Q    Did you transport the defendant, Duane

23          Buck, from the scene of the shooting to

24          the Police Station?

25     A    Yes, ma'am.

                                              48

1    Q    Do you see Mr. Buck in the courtroom

2         today?

3    A    Yes, ma'am.

4    Q    Would you please point him out by

5         describing what he's wearing?

6    A    He's the black gentleman with the maroon

7         shirt and dark-colored pants on.

8                    MS. HUFFMAN:  May the

9                    record reflect that the witness

10                   has identified Duane Buck, the

11                   defendant in this case?

12                   THE COURT:  The record

13                   will so reflect.

14

15   BY MS. HUFFMAN:

16   Q    Prior to you transporting Mr. Buck, did

17        you have some contact with Mr. Buck

18        before you actually put him in the car?

19   A    Yes, ma'am.

20   Q    What was that contact?

21   A    I was there and I walked up to the car

22        and handcuffed him before I walked him

23        to my car.

24   Q    Did you have occasion during that time

25        to observe his demeanor?

49

1 A Yes, ma'am.

2 Q At some point did you place him into

3   your patrol car?

4 A Yes, ma'am, I did.

5 Q Did you drive him to the Police Station?

6 A Yes, ma'am, I did.

7 Q During the drive to the Police Station,

8   did you ever threaten the defendant in

9   any way?

10 A No, ma'am.

11 Q Did you ever attempt to elicit

12   conversation with him or interrogate him

13   in any way?

14 A No, ma'am.

15 Q Did you have any desire whatsoever to

16   talk to the defendant or ask him

17   questions about what had happened?

18 A No, ma'am.

19 Q At some point did you make a comment to

20   him?

21 A Yes, ma'am, I did.

22 Q What did you say?

23 A I just told him I didn't feel that the

24   situation was very funny.

25 Q Why did you say that?

50

1    A    Because he was laughing.

2    Q    Had he been laughing almost continuously

3         since you had him in custody?

4    A    Yes, ma'am, he did.

5    Q    Was it sort of a little gentle smile, or

6         how would you describe the laugh?

7    A    Well, it went from grinning to laughing.

8         He was smiling and laughing both.

9    Q    And your comment again to him?

10   A    I told him that I didn't feel the

11        situation was very funny.

12   Q    What was his response?

13   A    His response was:  "The bitch deserved

14        what she got."

15   Q    Those were his words, "The bitch

16        deserved what she got?"

17   A    Yes, ma'am.

18   Q    What was the next thing he said, if

19        anything?

20   A    He said that he wasn't afraid of

21        anything because he told me that he had

22        already been forgiven by God and he

23        wasn't afraid because he knew he was

24        going to go to heaven.

25   Q    Did he make some comment that God

                                              51

1   forgave him before he did it?

2 A Yes, he said God forgave him before he

3   even did it because she did him wrong.

4 Q Did he make any further remarks to you,

5   any verbal remarks to you at that point?

6 A No, ma'am.

7 Q How about when you got to the Police

8   Station?

9 A No, ma'am.

10 Q At the time that he made those comments

11   to you, were you asking him any

12   questions?

13 A No, ma'am.

14 Q He voluntarily stated those words to

15   you?

16 A Yes, ma'am, he did.

17     MS. HUFFMAN:  Pass the

18    witness.

19

20    CROSS-EXAMINATION

21 BY MR. GUERINOT:

22 Q Deputy Warren, as I understand it, you

23   were proceeding downtown with the

24   defendant and you were having a

25   conversation with him; is that correct?

52

```
 1    A   I was proceeding to Station 4
 2        Substation.
 3    Q   That's over on Highway 6?
 4    A   Yes, and Clay Road.
 5    Q   And your initial conversation is when
 6        you said you didn't think it was very
 7        funny?
 8    A   Yes, sir.
 9    Q   Then he stated those words in response
10        to your comment.  Is that the way it
11        goes?
12    A   Yes, sir.
13    Q   And the conversation continued on your
14        way to the Clay Road Substation?
15    A   Just for that brief moment right there.
16                  MR. GUERINOT:  That's all
17              I have, Judge.
18                  MS. HUFFMAN:  That's all I
19              have, Judge.
20                  THE COURT:  Did you ever
21              say anything to him other than
22              this wasn't very funny?
23                  THE WITNESS:  No, ma'am.
24                  THE COURT:  Argument?
25                  MR. GUERINOT:  I have
```

53

1          another question.

2

3              CROSS-EXAMINATION CONTINUED

4     BY MR. GUERINOT:

5     Q   Did you ever say anything else to Mr.

6         Buck during that conversation going down

7         to the substation other than you didn't

8         think it was very funny?  You had a

9         conversation or a dialogue with him, did

10        you not?

11    A   Possibly a couple of words.  I told him

12        I didn't think it was very funny and he

13        told me what I told you and I said it

14        wasn't very funny.  I think I said it to

15        him twice.

16    Q   So he made other remarks?

17    A   Yes.

18                  MR. GUERINOT:  That's all

19             I have.

20                  THE COURT:  You can leave

21             the courtroom.  You're not

22             excused but you can leave for

23             now.

24

25                  (At this time the witness

                                                      54

1    is excused from the

2    courtroom.)

3

4

5        MR. GUERINOT:  We're

6    objecting under 38.22.  It's not

7    reduced to writing and it's not

8    a spontaneous utterance made by

9    the defendant.  It's a direct

10   response to a remark made by the

11   Deputy which provoked or evoked

12   a response.  It is not a

13   spontaneous utterance.  It's not

14   like he just said that she

15   deserved this or she did him

16   wrong or she got what she

17   deserved.  It was not a

18   spontaneous utterance.  It was

19   in response to the Deputy's

20   statement to him and we would

21   object to it.

22        MS. HUFFMAN:  The State

23   would argue under 38.22, Section

24   5, that the statement is

25   admissible.  It was not the

55

1       result of custodial

2       interrogation.  It was

3       voluntarily made, and the

4       defendant had received his right

5       prior to him making the

6       statement.  I don't see how he

7       could rationally arguably say

8       that the officer making the

9       statement that it wasn't very

10      funny after the defendant had

11      been laughing -- he had a reason

12      to say that because he had been

13      laughing so he made that

14      comment.  The officer told you

15      that he was not trying to elicit

16      some response from him.  I

17      believe the officer is credible.

18      There is no reason to believe

19      that he was trying to

20      interrogate the defendant.  He

21      told you that the only thing

22      that he said to the defendant

23      was that he didn't think it was

24      very funny.

25              I'd ask the Court to find

                                        56

```
 1          that the statement was voluntary
 2          and did not stem from custodial
 3          interrogation, that it was a
 4          spontaneous response on the part
 5          of the defendant.  We'd ask that
 6          the statement be admitted before
 7          the jury.
 8                THE COURT:  I'm going to
 9          overrule your objection and make
10          the determination that the oral
11          statements were voluntarily made
12          and were not in response to
13          custodial interrogation.
14                Bring the jury back in.
15
16                (The following proceedings
17                are held in the presence
18                of the jury.)
```

```
1                    P. E. McGINTY

2    was called as a witness by the State and,

3    having been previously duly sworn, testified

4    as follows:

5

6                 DIRECT EXAMINATION

7    BY MS. HUFFMAN:

8    Q    State your name to the jury, please.

9    A    Paul E. McGinty.

10   Q    Deputy McGinty, you testified before

11        this jury at the guilt-innocence phase

12        of the case; is that correct?

13   A    Yes, ma'am.

14   Q    Recalling back to July 30, 1995 when you

15        responded to a call at the address on

16        Puerta Vallarta, did you have occasion

17        at that time to read the defendant his

18        Miranda Warnings?

19   A    Yes, ma'am, I did.

20   Q    Do you recall approximately what time

21        you did that?

22   A    Yes, ma'am, it would be after the time

23        Mr. Butler was DOA, after 8:06.

24   Q    Sometime after 8:06 A.M.?

25   A    Yes, ma'am.
```

58

1    Q    Where was the defendant when you read

2         him his Miranda Warnings?

3    A    In the back of the patrol car.

4    Q    Where were you at?

5    A    I went over to the back door and opened

6         up the back door so we could see and

7         hear each other.

8    Q    That's where you read him the rights?

9    A    Yes, ma'am.

10   Q    Did you use anything to assist you in

11        reading Mr. Buck his Miranda Warnings?

12   A    Yes, ma'am, I did.

13   Q    What did you use?

14   A    The Blue Card that I keep with me.

15   Q    Is that the very card that you used?

16   A    The exact card.

17   Q    Would you read for the jury the warnings

18        that you read to him?

19   A    You have the right to remain silent and

20        not make any statement at all, and any

21        statement that you make may be used

22        against you and probably will be used

23        against you at your trial.

24   Q    Did you ask him anything after you read

25        him that warning?

59

1    A   Yes, ma'am, I would have asked him if he

2        understood.

3    Q   And his response was?

4    A   Yes.

5    Q   What was the second warning?

6    A   Any statement you make may be used

7        against you in court.

8    Q   And his response?

9    A   He understood it.

10   Q   The next one.

11   A   You have the right to have a lawyer

12      present to advise you prior to and

13      during any questioning.

14   Q   Did you ask him anything after that?

15   A   Yes, ma'am, I would have asked him if he

16      understood it.

17   Q   What was his response?

18   A   Yes.

19   Q   The next one.

20   A   If you are unable to hire a lawyer, you

21      have the right to have a lawyer

22      appointed to counsel with you prior to

23      and during any questioning.

24   Q   Did you ask him if he understood that

25      right?

60

```
 1      A    Yes, ma'am.

 2      Q    What was his response?

 3      A    His response was yes.

 4      Q    And the next one?

 5      A    You have the right to terminate the

 6           interview at any time.

 7      Q    Did you ask him if he understood that

 8           one?

 9      A    I did.

10      Q    What was his response?

11      A    That he understood.

12      Q    Is that all of them?

13      A    Yes.

14      Q    After you read Mr. Buck his rights, did

15           you leave him then in the patrol car?

16      A    Yes, ma'am.

17      Q    You're not the officer who transported

18           him; is that correct?

19      A    That's correct.

20                       MS. HUFFMAN:  Pass the

21                  witness.

22                       MR. GUERINOT:  No

23                  questions, Your Honor.

24

25                       (At this time the witness
```

61

```
 1                              is excused from the
 2                              courtroom.)
 3
 4
 5                         D. R. WARREN
 6      was called as a witness by the State and,
 7      having been previously duly sworn, testified
 8      as follows:
 9
10                    DIRECT EXAMINATION
11      BY MS. HUFFMAN:
12      Q    Sir, please introduce yourself to the
13           jury.
14      A    Deputy D. R. Warren.
15      Q    Deputy Warren, how are you employed?
16      A    I'm employed by the Harris County
17           Sheriff's Department as a Patrolman.
18      Q    How long have you been with the
19           Sheriff's Department?
20      A    It will be ten years next month.
21      Q    What part of town do you patrol?
22      A    The west side at the Clay Road
23           Substation.
24      Q    Deputy, back on July 30th of 1995, did
25           you respond to a multiple murder which
```

62

```
 1            had occurred at 7327 Puerta Vallarta?
 2      A     Yes, ma'am, I did.
 3      Q     When you arrived there, was there any
 4            other officers on the scene?
 5      A     Yes, ma'am, there was.
 6      Q     Did you have the opportunity to see any
 7            of the victims of the murder?
 8      A     Yes, ma'am, I did.
 9      Q     In particular do you recall seeing the
10            victim by the name of Debra Gardner, a
11            female victim, who was shot in the
12            middle of the street?
13      A     Yes, ma'am.
14      Q     Did you have the opportunity to go up
15            and look at her?
16      A     Yes, ma'am, I stayed with her while she
17            was in the street.
18      Q     What was her condition when you had
19            contact with her during those early
20            morning hours?
21      A     She was doing very bad.
22      Q     What do you mean?
23      A     She had a gunshot wound to her chest and
24            there was a puddle of blood.
25      Q     Did she appear to have problems with her
```

                                                63

```
 1           physical condition?
 2    A      Yes, ma'am, she was struggling for
 3           breath.
 4    Q      Did you ever see any of her family
 5           members who were around there?
 6    A      Yes, ma'am.
 7    Q      Who did you see?
 8    A      There were three young children, a boy
 9           and a girl around there.  Then there was
10           a little girl who was three or four.
11           She was running around and crying trying
12           to come over to her mom on the street.
13    Q      She was crying?
14    A      Yes, ma'am.
15    Q      What happened?
16    A      I was the only Deputy on the street so I
17           let her come over.
18    Q      What happened?
19    A      She was very upset but the woman wanted
20           her to be with her so I let her come
21           over.  The lady on the street wasn't
22           doing very well.
23    Q      Based on your observations of the woman
24           on the street, what was your opinion
25           about what was going to happen to her?
```

64

1    A    She wasn't going to make it.

2    Q    Did the woman on the street make some

3         conversation with the little four-year

4         old girl who came up to her?

5    A    Yes.

6    Q    Did you hear that conversation?

7    A    Yes, she told her she loved her.  The

8         little girl was crying and hugging her.

9         She told her it was going to be all

10        right.

11   Q    Then what happened?

12   A    Then I took the little girl away.  At

13        that time she passed away.

14   Q    The woman died after she told the little

15        girl that she loved her?

16   A    Yes, ma'am.

17   Q    How did the little girl respond when you

18        took her away?  Were you holding her or

19        what?

20   A    I was holding her for awhile, yes.

21   Q    Why were you continuing to hold her?

22   A    Because she wouldn't let me put her down

23        and wouldn't go to anyone else.

24   Q    At some point did you observe Life

25        Flight arrive?

65

```
 1    A   Yes, ma'am.

 2    Q   How many Life Flights came out there

 3        that day?

 4    A   Three.

 5    Q   Three different helicopters coming and

 6        going?

 7    A   Yes, ma'am.

 8    Q   Did they land in the street?

 9    A   Yes, ma'am, they did.

10    Q   During this time period when you were

11        dealing with all of this going on in the

12        middle of the street, did you also have

13        occasion to observe Duane Buck?

14    A   Yes, ma'am, I did.

15    Q   Do you see him in the courtroom today?

16    A   Yes, ma'am, I do.

17    Q   Would you point him out and describe an

18        article of clothing that he's wearing?

19    A   He's the gentleman over there with the

20        maroon shirt on.

21               MS. HUFFMAN:  May the

22               record reflect that the witness

23               has identified the defendant

24               Duane Buck?

25               THE COURT:  The record
```

66

```
 1                         will so reflect.

 2

 3      BY MS. HUFFMAN:

 4      Q    When did you first come into contact

 5           with Mr. Buck?

 6      A    When they told me to transport him to

 7           the station.

 8      Q    Did you do what you were told?

 9      A    Yes, he was placed in my vehicle.

10      Q    While he was in your vehicle, did you

11           look at him and observe his demeanor?

12      A    Yes, ma'am.

13      Q    What was his demeanor at that time?

14      A    He was pretty upbeat and laughing.

15      Q    Did you at any time see any crying or

16           tears on his part?

17      A    No, ma'am, I did not.

18      Q    Did you see him laughing?

19      A    Yes, ma'am, I did.

20      Q    Did you see him talking to any family

21           members?

22      A    Yes, ma'am, I did.

23      Q    Were there other family members who were

24           there around the scene?

25      A    Yes, ma'am, outside of the tape.
```

                                                          67

```
 1    Q    At some point did you place Mr. Buck
 2         into your patrol car for transport?
 3    A    Yes, ma'am, I did.
 4    Q    During the time that you transported him
 5         to the substation, was anyone else in
 6         the car besides you and Mr. Buck?
 7    A    No, ma'am, there was not.
 8    Q    What was his demeanor during that trip
 9         while he was in the back seat of the
10         patrol car?
11    A    Smiling and laughing.
12    Q    At some point, based on his laughing,
13         did you make a comment?
14    A    Yes, ma'am, I did.
15    Q    What did you say?
16    A    I told him that I didn't think the
17         situation was very funny at all.
18    Q    How were you feeling at that time after
19         what you had been a witness to?
20    A    It was very stressful and sad the way it
21         went down.
22    Q    When you told the defendant that you
23         didn't think the situation was so funny,
24         what did the defendant respond?
25                   MR. GUERINOT:  We would
```

68

```
 1                        object for the same reasons we
 2                        did outside the presence of the
 3                        jury.
 4                             THE COURT:  Overruled.
 5                             MR. GUERINOT:  May we have
 6                        a running objection to the
 7                        conversation which I anticipate
 8                        he's going to testify about at
 9                        this point?
10                             THE COURT:  Yes, sir.
11
12      BY MS. HUFFMAN:
13      Q    What did the defendant say after you
14           made that comment that you didn't think
15           it was funny?
16      A    "The bitch got what she deserved."
17      Q    Did you make any further comment about
18           the fact that you didn't think it was
19           funny?
20      A    Yes, ma'am.  I told him that I still
21           didn't think it was a funny situation.
22      Q    What did he say then?
23      A    He said that God had already forgiven
24           him before and that he was going to
25           heaven because he was forgiven.
```

69

1    Q    En route to the Police Station, what was

2         his demeanor?

3    A    The same.  He was happy, upbeat.

4    Q    During the time that you spent with Mr.

5         Buck that morning, did you ever see him

6         demonstrate any type of tears or remorse

7         for the crime that he had committed?

8    A    No, ma'am.

9                    MS. HUFFMAN:  Pass the

10                witness, Your Honor.

11

12            CROSS-EXAMINATION

13   BY MR. GUERINOT:

14   Q    Deputy Warren, at the time you say the

15        defendant was in the car and he was

16        laughing, isn't it a fact that Harold

17        Ebnezer was out there taunting him and

18        saying that he was going to get this or

19        that or get what he deserved?

20   A    I don't know who Harold Ebnezer is.

21   Q    You never saw him out there?

22   A    I don't know who he is.

23   Q    That man right there.  Did you ever see

24        him out there?

25   A    Yes, I did.

                                              70

1     Q   At that time he was near the patrol car,

2          wasn't he?

3     A   No, sir.

4     Q   He was near the patrol car?

5     A   Not to my recollection, no, sir.

6     Q   What family members were out there if it

7          wasn't him?

8     A   I don't know exactly but I know there

9          were family members there.

10    Q   So the fact of the matter is you cannot

11         identify any of them but you think they

12         were family members?

13    A   They come up and told me they were the

14         aunt or uncle and stuff.  I didn't pay

15         much attention because I had a job to

16         do.

17    Q   Were they close to the vehicle?

18    A   They were behind the tape a few car

19         lengths away from my vehicle.

20    Q   At least thirty feet; is that not

21         correct?

22    A   Yes.

23    Q   Or maybe even more than that?

24    A   It's possible.

25    Q   But at least thirty feet?

71

1    A    Yes, sir.

2    Q    After you put Mr. Buck in the vehicle

3         and you started driving over to the Clay

4         Road Substation, did you ask him what he

5         found so funny or did you say you didn't

6         think it was funny?

7    A    I said I didn't think it was so funny.

8    Q    This conversation continued all the way

9         to the substation; is that what you're

10        saying?

11   A    It didn't last that long, no.

12   Q    One brief exchange and that was it?

13   A    Yes.

14             MR. GUERINOT:   That's all

15        we have, Judge.

16

17        REDIRECT EXAMINATION

18   BY MS. HUFFMAN:

19   Q    Deputy Warren, let me show you what's

20        been marked State's 69.  Do you

21        recognize State's 69?

22   A    Yes, ma'am.

23   Q    Have you had the opportunity this

24        morning to view State's No. 69?

25   A    Yes, ma'am, I have.

                                          72

1    Q    Is it a true and accurate depiction of

2         the scene at the point you're removing

3         Mr. Buck and transporting him to your

4         car for transport to the Police Station?

5    A    Yes, ma'am.

6                   MS. HUFFMAN:  Your Honor,

7              at this time I'm going to offer

8              State's 69 in evidence.  The

9              State is not introducing the

10             audio portion of it but only the

11             video.

12                  MR. EASTERLING:  Then we

13             have no objection.

14                  MS. HUFFMAN:  May this be

15             published to the jury?

16                  THE COURT:  Yes, ma'am.

17             Make sure the audio is turned

18             off.

19

20             .    (At this time State's

21                  Exhibit No. 69 is

22                  published to the jury.)

23

24                  MS. HUFFMAN:  Pass the

25             witness, Your Honor.

                                              73

```
 1              MR. GUERINOT:   No further
 2      questions.
 3
 4              (At this time the witness
 5              is excused from the
 6              courtroom.)
 7
 8              MS. HUFFMAN:   The State
 9      would reoffer all the evidence
10      it offered during the guilt-
11      innocence phase of the trial.
12              The State of Texas rests
13      its case.
14              MR. EASTERLING:   We have a
15      motion.
16              THE COURT:   Ladies and
17      gentlemen, I'm going to excuse
18      you for a break at this time.
19      You can go get a cup of coffee
20      if you want to do so.  We'll
21      resume in about thirty minutes.
22      Remember all the admonitions
23      you've been given.
24
25              (The following proceedings
```

74

# EXHIBIT 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

LAWRENCE LANDRUM,

                Petitioner,  :                Case No. 1:96 CV 641

  - vs -                              District Judge Thomas M. Rose
                                         Magistrate Judge Michael R. Merz

CARL S. ANDERSON, Warden,

                Respondent.  :

---

# REPORT AND RECOMMENDATIONS

---

This case is before the Court on Petitioner's Motion for Relief from Judgment Pursuant to Civ. R. 60(b)(Doc. No. 235).   The Warden has opposed the Motion (Doc. No. 238) and Petitioner has filed a Reply in support (Doc. No. 239).  Post-judgment motions such as those under Fed. R. Civ. P. 60(b) are deemed referred to the Magistrate Judge under 28 U.S.C. § 636(b)(3) for a report and recommendations.

### Procedural History

Among other claims of ineffective assistance of trial counsel, Petitioner Lawrence Landrum asserted his trial attorney should have sought admission of testimony from Rameal Coffenberger that co-perpetrator Grant Swackhammer admitted to being the principal offender (hereinafter the "Coffenberger Claim").  The District Court found this claim meritorious and

1

granted a conditional writ requiring that Landrum be released unless he was retried and again convicted.  *Landrum v. Anderson*, 2006 U.S. Dist. LEXIS 27510 (Apr. 17, 2006).

The Court of Appeals reversed.  *Landrum v. Mitchell,* 625 F.3d 905 (6th Cir. 2010).  It found that this claim was procedurally defaulted on two bases.  To the extent the claim should have been raised on direct appeal under Ohio law, appellate counsel's failure to do so might have been ineffective assistance of appellate counsel, but the ineffective assistance of appellate counsel claim was itself procedurally defaulted by failure to timely file an application to reopen the direct appeal under Ohio R. App. P. 26(B), a so-called *Murnahan* proceeding.[1]  *Id.* at 916-918.  To the extent the claim could have been raised in post-conviction, it was procedurally defaulted by post-conviction counsels' failure to do so properly.  *Id.* at 918-919.  Ineffective assistance of post-conviction counsel could not excuse that default "because there is no constitutional right to an attorney in post-conviction proceedings." *Id.* at 919, *citing Coleman v. Thompson*, 501 U.S. 722, 752-53 and *Pennsylvania v. Finley*, 481 U.S. 551 (1987).  The United States Supreme Court denied certiorari in October, 2011.  *Landrum v. Mitchell*, 132 S. Ct. 127, 181 L. Ed. 2d 49 (2011).

### The Decision in *Martinez v. Ryan*

Landrum now seeks to have the judgment reopened, not to correct any error this Court made, but because of an intervening change in the law the Sixth Circuit applied.  That change was wrought by *Martinez v. Ryan,* 566 U.S. ___, 132 S. Ct. 1309, 182 L. Ed 2d 272 (2012), decided March 12, 2012, five months after certiorari was denied in this case.

---

[1] Ohio R. App. P. 26(B) as amended effective July 1, 1993, was drafted by the Ohio Supreme Court rules Advisory Committee at the express direction of the Ohio Supreme Court in *State v. Murnahan*, 63 Ohio St. 3d 60, 584 N.E. 2d 1204 (1992), which held that claims of ineffective assistance of appellate counsel must be raised in the courts of appeals rather than in trial court post-conviction proceedings under Ohio Revised Code § 2953.21.

In *Coleman v. Thompson,* 501 U.S. 722 (1991), the Supreme Court had held that an attorney's ignorance or inadvertence in a postconviction proceeding did not qualify as cause to excuse a procedural default. *Coleman* remained the law for twenty years and the District Court in *Martinez* and the Ninth Circuit on appeal in that case applied *Coleman* to bar consideration of an ineffective assistance of trial counsel claim which had been procedurally defaulted by failure to raise the claim in the first proceeding where it could have been raised. The Supreme Court reversed, holding:

> To protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel, it is necessary to modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default. This opinion qualifies *Coleman* by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.

132 S. Ct. at 1315. The Court noted that Arizona "does not permit a convicted person alleging ineffective assistance of trial counsel to raise that claim on direct review. Instead, the prisoner must bring the claim in state collateral proceedings." *Id.* at 1313. As the Court noted, citing *Massaro v. United States,* 538 U.S. 500 (2003), Arizona parallels the federal system in this regard: federal court claims of ineffective assistance of trial counsel cannot be raised on direct appeal even if they depend on the record; they must be raised by motion to vacate under 28 U. S.C. § 2255. Because a collateral petition was the only proceeding in which an ineffective assistance of trial counsel claim could be raised in Arizona, the Supreme Court thought it should be made more like the situation where a claim of ineffective assistance of trial counsel can be raised on direct appeal, where a defendant is constitutionally guaranteed the effective assistance

3

of counsel, so that a defective representation on direct appeal can provide excusing cause. See discussion, *Martinez*, 132 S. Ct. at 1317.

The precise holding in *Martinez* is

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U. S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Cf. Miller-El v. Cockrell*, 537 U. S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).

*Id.* at 1318-1319. The Court emphasized the narrowness of the new rule. "*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial." *Id.* at 1319. "The rule of *Coleman* governs in all but the limited circumstances recognized here." *Id.* at 1320. The Sixth Circuit relied on *Coleman* to find that ineffective assistance of Landrum's post-conviction counsel could not excuse his procedural default in those proceedings. *Landrum*, 625 F.3d at 919.

The Supreme Court did not grant habeas relief in *Martinez*, but remanded for decision of (1) "whether Martinez's attorney in his first collateral proceeding was ineffective," (2) "whether his claim of ineffective assistance of trial counsel is substantial," and (3) "the question of prejudice." *Id.* at 1321. Those same considerations must be applied here.

**Analysis**

To prevail on his instant Motion, Petitioner must show:

1.     That Ohio is sufficiently like Arizona in its treatment of ineffective assistance of trial counsel claims to make *Martinez* applicable at all;

2.     That failure to present on initial postconviction review the ineffective assistance of trial counsel claim accepted by this Court but rejected by the Court of Appeals itself meets the standard of *Strickland v. Washington, supra,* i.e., that it was unreasonably deficient performance and prejudiced the Petitioner;

3.     That the ineffective assistance of trial counsel claim is "substantial" or "has some merit"; and

4.     That the Motion otherwise meets the requirements of Fed. R. Civ. P. 60(b)(6).

**1.     Comparing the Ohio and Arizona Procedures for Raising Ineffective Assistance of Trial Counsel Claims**

In *Martinez* the Supreme Court noted that Arizona requires ineffective assistance of trial counsel claims to be raised in collateral proceedings.  Ohio law is more complex, as described by the Sixth Circuit in *Williams v. Anderson*, 460 F.3d 789, 799 (6th Cir. 2006):

> Ohio law requires criminal defendants to bring ineffective assistance of counsel claims on direct review if the defendant has new counsel on appeal, and the trial court record contains sufficient evidence to support the claim. *State v. Cole,* 2 Ohio St. 3d 112, 443 N.E.2d 169, 171 (1982). Where the trial court record does not contain sufficient evidence to support the claim, however,

5

the defendant must instead bring the claim in post-conviction proceedings. *See State v. Cooperrider,* 4 Ohio St. 3d 226, 4 Ohio B. 580, 448 N.E.2d 452, 454 (Ohio 1983). Unlike on direct review, in post-conviction proceedings a petitioner may introduce evidence outside the trial court record to support the claim. *See id.* If a defendant chooses to bring an ineffective assistance of counsel claim on direct review, however, Ohio's "res judicata" rule precludes the defendant from re-raising the claim in post-conviction proceedings. *Id.*

In the instant case, Petitioner chose to bring his ineffective assistance of counsel claim on direct review, thereby foregoing the opportunity to present evidence outside the trial court record to support his claim. Ohio has finality and judicial economy interests in enforcing its prohibition on re-litigation of ineffective assistance of counsel claims in post-conviction proceedings. *State v. Saxon,* 846 N.E.2d 824, 109 Ohio St. 3d 176, 2006 WL 759668, at *5 (2006). Thus, normally, we would respect the Ohio court's decision to enforce "res judicata" and decline to consider a petitioner's evidence where the petitioner chose to raise his or her ineffective assistance of counsel claim on direct review. *Cf. Coleman v. Thompson,* 501 U.S. 722, 730-31, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) (stating that procedurally defaulted claims are not reviewed for comity and federalism reasons).

460 F.3d at 799.

Landrum relies on an exception to the Ohio direct review requirement for defendants represented on appeal by the same attorney as at trial.  His trial attorney, Thomas Phillips, continued to represent him in both the Ross County Court of Appeals and in the Ohio Supreme Court (Motion, Doc. No. 235, PageID 1091, citing record proof of that fact).  In *State v. Lentz,* 70 Ohio St. 3d 527 (1994), the Ohio Supreme Court made explicit what had been implicit in *State v. Cole,* 2 Ohio St. 3d 112 (1982): Ohio's criminal *res judicata* doctrine, announced in *State v. Perry,* 10 Ohio St. 2d 175 (1967), does not bar raising an ineffective assistance of trial counsel claim in post-conviction, even if it could have been raised on direct appeal, when trial and appellate counsel are the same. *Lentz,* 70 Ohio St. 3d at 530.

The Warden recognizes this as current Ohio law, but argues that it does not save Landrum's claim.  Because he had an opportunity to raise the claim on direct appeal, the Warden asserts, he was not required to raise it in a collateral proceeding (Memo in Opp., Doc. No. 238, PageID 1123).  The Warden argues this takes Landrum's case outside the holding in *Martinez*.

The Magistrate Judge agrees that the holding in *Martinez* does not reach quite to this case, but the rationale certainly does.  The Supreme Court in *Martinez* was very concerned that a criminal defendant have effective assistance in raising serious ineffective assistance of trial counsel claims.  When the same attorney has the case on appeal as at trial, he or she cannot reasonably be expected to assert his own inadequacy or incompetence. *State v. Carter,* 36 Ohio Misc. 170 (Mont. Cty. C.P. 1973)(Rice, J., now of this Court).  Under those circumstances, Ohio law practically requires the claim be made in post-conviction, although it does not do so by statute or Supreme Court rule.  This Court reads *Martinez* as reaching a case such as this one where an ineffective assistance of trial counsel claim had to be raised in post-conviction because the same attorney represented the petitioner at trial and on appeal.

Landrum faced another procedural default ruling in the Sixth Circuit.  As noted, his direct appeal counsel did not raise the Coffenberger Claim.  The only way to raise a claim that it was ineffective assistance of appellate counsel not to include the Coffenberger Claim on direct appeal was to file an application to reopen the direct appeal under Ohio R. App. P. 26(B).  As the Sixth Circuit recognized, ineffective assistance of appellate counsel can excuse failure to raise an ineffective assistance of trial counsel claim, but only if the ineffective assistance of appellate counsel claim is itself not defaulted. *Landrum*, 625 F. 3d at 916, *citing Edwards v. Carpenter*, 529 U.S. 446 (2000).  But the Sixth Circuit found this ineffective assistance of appellate counsel claim was itself defaulted by missing the filing deadline for such motions by about five years.

*Id.* at 916-917.  It also found the timeliness rule was an adequate and independent state ground

of decision.  *Id.*

Landrum now asserts that the ineffectiveness of counsel in not filing a timely Rule 26(B)

application can be excusing cause under *Martinez* (Motion, Doc. No. 235, PageID 1096-1099).

This Court disagrees.  Justice Kennedy makes it clear that the *Martinez* exception to *Coleman* is

limited to claims of ineffective assistance at trial.  He notes the distinction between initial-review

collateral proceedings and other collateral proceedings and notes that the exception is carved

from *Coleman* only for the former.  132 S. Ct. at 1316.  In discussing possible *stare decisis*

objections to *Martinez*, Justice Kennedy wrote:

> *Coleman* held that an attorney's negligence in a postconviction
> proceeding does not establish cause, and this remains true **except**
> as to initial-review collateral proceedings **for claims of ineffective
> assistance of counsel at trial.** *Coleman* itself did not involve an
> occasion when an attorney erred in an initial-review collateral
> proceeding with respect to a claim of ineffective trial counsel; and
> in the 20 years since *Coleman* was decided, we have not held
> *Coleman* applies in circumstances like this one.

132 S. Ct. at 1319 (emphasis added).  Finally, at the end of his opinion, he stated:

> Where, under state law, claims of ineffective assistance of trial
> counsel must be raised in an initial-review collateral proceeding, a
> procedural default will not bar a federal habeas court from hearing
> a substantial claim of ineffective assistance at trial if, in the initial-
> review collateral proceeding, there was no counsel or counsel in
> that proceeding was ineffective.

132 S. Ct. 1320.

Ineffective assistance by 26(B) counsel does not come within *Martinez* because 26(B)

applications can raise only ineffective assistance of appellate counsel claims, not ineffective

assistance of trial counsel claims. Including an ineffective assistance of trial counsel claim as an

underlying claim to a claim of ineffective assistance of appellate counsel does not preserve the underlying claim for habeas merit review. *Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001).

Landrum relies on *Williams v. Alabama*, No. 1:07-cv-1276, 2012 U.S. Dist. LEXIS 51850 (N.D. Ala. Apr. 12, 2012), which read *Martinez* broadly enough to encompass all ineffective assistance of counsel claims, rather than just trial counsel. In support of that reading, Landrum cites Justice Scalia's dissent in *Martinez*. Whatever the logic of that position, it did not command a majority of the Supreme Court, which limited its holding to ineffective assistance of trial counsel claims.

## 2.    Was it Ineffective Assistance of Post-Conviction Counsel to fail to Include the Coffenberger Claim in the Petition for Post-Conviction Relief?

To succeed on his Motion, Landrum must also show that failure to present the Coffenberger Claim on initial postconviction review itself meets the standard of *Strickland v. Washington, supra*, i.e., that it was unreasonably deficient performance and prejudiced the Petitioner.

The Supreme Court in *Martinez* did little to adumbrate a standard for ineffective assistance of post-conviction counsel beyond saying *Strickland v. Washington,* 466 U.S. 668 (1984), would provide the governing standard. *Martinez*, 132 S. Ct. at 1318. Ineffective assistance of appellate counsel claims are also governed by *Strickland. Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Burger v. Kemp*, 483 U.S. 776 (1987). However, the tasks to be performed and the possibilities of prejudice are quite different on appeal than at trial, so the *Strickland* standard is applied to different conduct and decisions when ineffective assistance of

appellate counsel claims are being considered. See, e.g., *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999).

Rather than attempting to create a detailed general standard in this first case the Court has confronted in applying this branch of *Martinez*, it is more appropriate to proceed in common law fashion to consider just the conduct exhibited here.  Landrum provides no assistance on this question, as his Motion argues only the ineffective assistance of *Murnahan* counsel claim (Motion, Doc. No. 235, PageID 1099-1100).

As a reminder, the governing standard for ineffective assistance of counsel in *Strickland* is

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.  In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice.  *Berghuis v. Thompkins,* ___ U.S. ___, ___, 130 S.Ct. 2250, 2255 (2010), *citing Knowles v. Mirzayance,* 556 U.S.111 (2009).

In this case, the procedural default in post-conviction which the state courts enforced against Landrum and to which the Sixth Circuit deferred was failure to include the Coffenberger Claim in the post-conviction petition itself, although it was included in an attached affidavit:

Although Landrum did raise an ineffective assistance of trial counsel claim in his post-conviction petition, he did not include the allegation about introducing Coffenberger's testimony in the guilt phase. In this court, Landrum argues that his general allegation of ineffective assistance of counsel, along with affidavits from his trial counsel and another attorney that were attached to his post-conviction petition, sufficed to have presented the claim to the post-conviction trial court. Landrum's trial counsel's affidavit recited that additional time was needed to develop background information regarding Swackhammer's relative culpability. In the other affidavit, an attorney not involved in the trial opined that Landrum's trial counsel was deficient for failing to present Coffenberger's testimony in the trial phase. Reference to Coffenberger in Landrum's post-conviction petition itself can only be fairly read as a reference to the penalty phase of the trial, not the guilt phase. The affidavits on which Landrum relies did not present the factual basis for the ineffective assistance claim raised here because no corresponding claim was made in the state post-conviction petition and, thus, the state court would have had to read beyond the petition to discover it. See *Baldwin [v. Reese]*, 541 U.S. at 32; *Pillette [v. Foltz]*, 824 F.2d at 497-98.

*Landrum*, 625 F.3d at 918-919.

In other words, post-conviction counsel recognized the Coffenberger Claim and presented it twice in affidavits attached to the post-conviction petition, but did not actually plead the claim in the body of the petition. This Court finds that to be deficient performance. That it was prejudicial can be inferred from the fact that this Court found the Coffenberger Claim meritorious but the Sixth Circuit declined to reach the merits because of this procedural default.

## 3.      The Coffenberger Claim is Substantial

The third branch of the *Martinez* test requires that the ineffective assistance of trial counsel claim be "substantial" or have "some merit."

In the Report and Recommendations, the Magistrate Judge found the Coffenberger Claim sufficiently meritorious as to warrant a conditional writ (Report and Recommendations, Doc. No. 205). In particular, I concluded "Trial counsel had in Coffenberger's testimony an admission of principal offender status by an admitted co-perpetrator which admission, if believed by the jury, would have prevented imposition of a death sentence." *Id.* at PageID 641.

The Sixth Circuit found this was error. It noted "The district court was incorrect in believing that Landum could not receive the death penalty if a jury believed Swackhammer's admission that he slit White's throat." *Landrum*, 625 F.3d at 915, n. 3. It continued:

> Moreover, Ohio does not require a defendant to be the principal offender to receive a death specification. See *Ohio v. Herring*, 94 Ohio St. 3d 246, 2002 Ohio 796, 762 N.E. 2d 940, 949-50 (Ohio 2002).

*Id.* at 919. Finally it held:

> Even if the jury believed that Landrum did not personally slit the victim's throat, Landrum would still likely have been convicted of aggravated murder and aggravated burglary, either as an aider and abettor or based on the felony-murder rule. See Ohio Rev. Code. §§ 2923.03, 2903.01(B). The district court was simply incorrect in its observation that Swackhammer's admission, if believed, would have prevented Landrum from being sentenced to death.

*Id.* at 919, n. 4.

In *State v. Herring, supra,* the jury found the defendant guilty of the capital specification in Ohio Revised Code § 2929.04(A)(5) which provides in pertinent part that "the offense at bar was part of a course of conduct involving the purposeful killing or attempt to kill two or more persons by the offender." Justice Pfeiffer, principal sponsor of Ohio's current death penalty statute, wrote the majority opinion in *Herring*. He wrote:

> In his third proposition of law, Herring argues that the term "offender" in the (A)(5) multiple-murder specification means the

principal offender--i.e., the actual killer. He argues that since the jury did not find him to be the actual killer in any of the three murders, he cannot be guilty of this specification.

We reject this contention. As he must, Herring concedes that R.C. 2929.04(A)(5) contains neither an express requirement of prior calculation and design nor an express requirement that the offender be the actual killer. R.C. 2929.04(A)(5) uses the unadorned term "offender," rather than "principal offender." Nor does the term "prior calculation and design" appear therein.

Nevertheless, Herring attempts to read a principal-offender requirement into our precedents. He cites *State v. Smith* (1997), 80 Ohio St. 3d 89, 117, 684 N.E.2d 668, 693, and *State v. Sneed* (1992), 63 Ohio St. 3d 3, 10-11, 584 N.E.2d 1160, 1168, fn. 3, as supporting his claim. These cases do not support Herring's argument. Smith holds that the Eighth Amendment permits a state to sentence to death one who aids and abets a killing with prior calculation and design. It does not hold, or even suggest, that prior calculation and design is necessary to convict an aider and abettor of the (A)(5) specification. *Sneed* involved the felony-murder specification of R.C. 2929.04(A)(7), not the (A)(5) multiple-murder specification. Unlike the (A)(5) specification, R.C. 2929.04(A)(7) specifically requires that "either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."

Herring's third proposition of law is overruled.

94 Ohio St. 3d at 252.  There were three deceased victims in *Herring*, but only one in Landrum's case, Robert White.  In *Herring* the Ohio Supreme Court distinguished the Ohio Revised Code § 2929.04(A)(5) death specification from that in Ohio Revised Code § 2929.04(A)(7), the felony murder death specification, where there must be a jury finding that the defendant is the principal offender or acted with prior calculation and design.  Landrum was charged under both the (A)(3) specification ("purpose of escaping detection") and also the (A)(7) section and was convicted of both, so that he could have been sentenced to death on either conviction.

13

Thus *Herring* is inapposite because it interprets only the multiple victim specification. However, Landrum was convicted of the Ohio Revised Code § 2929.04(A)(3) specification as well as the (A)(7) specification; a principal offender finding is necessary for the latter but not for the former.

Even if the Sixth Circuit was incorrect in its conclusion that a principal offender finding was not necessary for the (A)(7) conviction, its conclusion to the contrary is the law of the case. Under the doctrine of law of the case, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation.  *United States v. Moored*, 38 F 3d 1419, 1421 (6th Cir. 1994), *citing United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993). "As most commonly defined, the doctrine [of law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983), *citing* 1B Moore's Federal Practice ¶0.404 (1982); *Patterson v. Haskins*, 470 F.3d 643, 660-61 (6th Cir. 2006); *United States v. City of Detroit*, 401 F.3d 448, 452 (6th Cir. 2005). "While the 'law of the case' doctrine is not an inexorable command, a decision of a legal issue establishes the 'law of the case' and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *White v. Murtha*, 377 F.2d 428 (5th Cir. 1967), *quoted approvingly in Association of Frigidaire Model Makers v. General Motors Corp.*, 51 F.3d 271, 1995 U.S. App. LEXIS 7615, *12 (for full text) (6th Cir. 1995). The purpose of the doctrine is twofold:  (1) to prevent the continued litigation of settled

issues; and (2) to assure compliance by inferior courts with the decisions of superior courts. *United States v. Todd*, 920 F.2d 399 (6th Cir. 1990), *citing* Moore's Federal Practice.

If Coffenberger's testimony had been heard by the jury during the guilt phase, there is a reasonable probability that at least one juror would have concluded Landrum was not the principal offender and therefore he could not have been convicted on the (A)(7) specification. However, there was sufficient evidence to support a conviction on the (A)(3) specification. The Court concludes that the Coffenberger Claim is substantial, but not determinative.


**4. Does the Motion Otherwise Meet the Requirements of Fed. R. Civ. P. 60(b)(6)?**


Relief should be granted under Fed. R. Civ. P. 60(b)(6) only in unusual circumstances where principles of equity mandate relief, *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 365 (6th Cir. 1990), and the district court's discretion under 60(b)(6) is particularly broad. *Johnson v. Dellatifa*, 357 F.3d 539 (6th Cir. 2004); *McDowell v. Dynamics Corp.*, 931 F.2d 380, 383 (6th Cir. 1991); *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989). Relief is warranted only in exceptional or extraordinary circumstances not addressed by the other numbered clauses of Rule 60. *Dellatifa*, supra; *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989). A change in decisional law is usually not, by itself, an extraordinary circumstance. *Agostini v. Felton*, 521 U.S. 203, 239 (1997); *Blue Diamond Coal Co. v. Trs. of the UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001). Subsection (b)(6) is properly invoked only in "unusual and extreme situations where principles of equity mandate relief." *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 597 (6th Cir. 2006) (internal quotation marks omitted).

Landrum argues that the following extraordinary circumstances exist in this case. First, it is a death penalty case (Motion, Doc. No. 235, PageID 1106). Second, the "change in law in *Martinez* precisely addresses the default issues that the Sixth Circuit found barred it from reaching the merits of the Coffenberger issue" *Id.* "Third, Landrum's *Martinez* cause and prejudice claim is strong" because without relief from judgment his ineffective assistance of trial counsel claim will never have been heard on the merits by any court. *Id.* at 1107.

*Stokes v. Williams*, 475 F.3d 732 (6th Cir. 2007), cited by Landrum, is a habeas case in which the petition had been dismissed as untimely under circuit law as it existed before *Abela v. Martin*, 348 F.3d 164 (6th Cir. 2003). The petition would have been timely under *Abela* and the petitioner sought relief from judgment under Fed. R. Civ. P. 60(b)(6). Affirming denial of relief from judgment and summarizing the standard under Fed. R. Civ. P. 60(b)(6), the Sixth Circuit wrote:

> As recognized by the district judge in this case, in evaluating claims for relief pursuant to Rule 60(b)(6), federal courts have consistently held "that a change in decisional law is usually not, by itself, an 'extraordinary circumstance' meriting Rule 60(b)(6) relief." *Blue Diamond Coal Co.,* 249 F.3d at 524. See also Gonzalez v. Crosby, 545 U.S. 524, 125 S. Ct. 2641, 2650, 162 L. Ed. 2d 480 (2005); *Agostini v. Felton,* 521 U.S. 203, 239, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997); *Overbee*, 765 F.2d at 580. The respondent in this case in fact cites this line of decisions in opposing Stokes's claim for relief based upon the en banc *Abela* ruling. Especially prominent in his appellate argument is his reliance upon *Gonzalez*, a case in which the United States Supreme Court ruled that a change in the way the applicable habeas corpus statute-of-limitations period could be tolled did not resurrect a habeas petition that had been dismissed as untimely in accordance with earlier precedent. As stated by the Court, "The District Court's interpretation was by all appearances correct under the Eleventh Circuit's then-prevailing interpretation of 28 U.S.C. § 2244(d)(2). It is hardly extraordinary that subsequently, after petitioner's case was no longer pending, this Court arrived at a different interpretation." *Gonzalez*, 125 S. Ct. at 2650.

16

475 F.3d at 735-736.  The *Stokes* court particularly noted that a change in decisional law is less supportive of 60(b)(6) relief when the judgment has become final, as has the judgment in this case with issuance of the mandate.  *Id.*  at 736. Although *Stokes* was not a capital case, the petitioner was serving a life sentence for rape.  The effect of denying 60(b)(6) relief was that the petitioner never got federal court consideration of any of his habeas corpus claims, not just the one claim asserted here.  The *Stokes* court quoted with approval the test under 60(b)(6) enunciated in *Blue Diamond Coal Co., supra*: "[T]he decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the 'incessant command of the court's conscience that justice be done in light of all the facts.'" 249 F.3d  at 529 (*quoting Griffin v. Swim-Tech Corp.,* 722 F.2d 677, 680 (11th Cir. 1984)).

Although this is a death penalty case, that fact cuts both ways with respect to the instant Motion.  This case has been thoroughly considered by the Ohio and federal courts.   It is always in the interest of a death row inmate to seek further review because further review delays execution of sentence.   In his typically trenchant fashion, Justice Scalia spelled out the likely dynamics in his dissent in *Martinez*:

> Whether counsel appointed for state collateral review raises the ineffective-assistance-of-trial-counsel claim or not, federal habeas review will proceed. In practical effect, that may not make much difference in noncapital cases (except for the squandering of state taxpayers' money): The defendant will stay in prison, continuing to serve his sentence, while federal habeas review grinds on. But in capital cases, it will effectively reduce the sentence, giving the defendant as many more years to live, beyond the lives of the innocent victims whose life he snuffed out, as the process of federal habeas may consume. I guarantee that an assertion of ineffective assistance of trial counsel will be made in all capital cases from this date on, causing (because of today's holding) execution of the sentence to be deferred until either that claim, or

> the claim that appointed counsel was ineffective in failing to make
> that claim, has worked its way through the federal system.

132 S. Ct. at 1323-1324. Thus the fact that this is a death penalty case does not weigh unequivocally in favor of reopening the judgment.

Second, contrary to Landrum's assertion, the change in law in *Martinez* does not "precisely address[ ] the issue with Landrum's IAC claim." (Motion, Doc. No. 235, PageID 1106.)  As pointed out at length above, Ohio is not a State like Arizona in which all claims of ineffective assistance of trial counsel must be brought in post-conviction. In fact, the "fit" of the change of law with a habeas petitioner's claims was much closer in *Stokes, supra*, and in *Gonzalez v. Crosby*, 545 U.S. 524 (2005), but relief under Fed. R. Civ. P. 60(b)(6) was denied in both of those cases.

Third, however, Landrum's *Martinez* claim is strong.  It was on the basis of *Coleman, supra*, that the Sixth Circuit denied the writ when this Court had granted it.  Had *Martinez* been the law at the time the Sixth Circuit decided the case, the ineffective assistance of post-conviction counsel in not pleading the Coffenberger Claim in the body of the Ohio Revised Code § 2953.21 petition would have been available as excusing cause.

## Conclusion

Having weighed the factors required under Fed. R. Civ. P. 60(b)(6), the Magistrate Judge concludes the Motion should be granted.  This Court can then reconsider the Coffenberger Claim

in light of the Sixth Circuit's decision.  This will allow the Sixth Circuit on appeal to reconsider

its decision in light of *Martinez*.

August 22, 2012.


s/ *Michael R. Merz*
United States Magistrate Judge


## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

# EXHIBIT 9

Texas Death Row Inmate's Bid for Resentencing Has Support Of Victim, Prosecutor And Ex-Governor - NYTimes.com

# The New York Times

March 28, 2013

# Victim and Prosecutor Back Death Row Inmate's Bid for Resentencing

By MANNY FERNANDEZ

HOUSTON — One morning in July 1995, Phyllis Taylor stood inside her best friend's house here, face to face with her stepbrother. He was holding a .22-caliber rifle, his eyes bloodshot red. Then he pulled the trigger.

Ms. Taylor survived — the bullet came within one inch of her heart and lodged in her right shoulder. More than 17 years later, a scar the size of a nickel remains on her chest, but her anger has faded: She has forgiven her stepbrother, Duane E. Buck, 49, and has been trying to secure his release from Texas' death row.

"This is not an easy thing," said Ms. Taylor, 46, who visited him last month at the prison that houses death row in Livingston, Tex. "It's very hard. I still have moments. But I know that I'm doing the right thing. The Bible says that I have to forgive, and that's just my key to my everyday living."

Ms. Taylor is part of an unusual network of supporters who have been trying to halt Mr. Buck's execution. His advocates include leaders of the N.A.A.C.P., one of the lawyers who prosecuted him and a former governor of Texas. While many contested death-row cases center on guilt or innocence, Mr. Buck's case is different — his guilt has never been disputed, but the testimony of a psychologist has raised questions about the role that race played in the jury's decision to sentence him to die by lethal injection.

Mr. Buck, who is black, was convicted of killing his former girlfriend Debra Gardner and her friend Kenneth Butler at Ms. Gardner's house the same morning in 1995 when he shot Ms. Taylor. Mr. Buck and Ms. Gardner had ended their relationship a week earlier, and he stormed into the house with a rifle and a shotgun. He shot Mr. Butler and then shot Ms. Gardner as she tried to flee outside, her two children looking on in horror, according to court documents.

At a sentencing hearing in May 1997, Walter Quijano, a former chief psychologist for the state prison system who had evaluated Mr. Buck, testified that race was one of several factors that could be used to predict whether a person would be a future danger to society. "It's a sad commentary that minorities, Hispanics and black people, are overrepresented in the criminal justice system," Dr. Quijano said in the courtroom.

Dr. Quijano had been called to the stand by the defense, and ultimately found that the probability that Mr. Buck would commit future acts of violence was low. But under cross-examination, the prosecutor for the Harris County district attorney's office asked him about the various factors. "You have determined that the sex factor, that a male is more violent than a female because that's just the way it is, and that the race factor, black, increases the future dangerousness for various complicated reasons," the prosecutor asked Dr. Quijano. "Is that correct?"

"Yes," he replied.

In her closing argument, the prosecutor reminded the jury of the psychologist's testimony. "You heard from Dr. Quijano, who had a lot of experience in the Texas Department of Corrections, who told you that there was a probability that the man would commit future acts of violence," she said.

Last week, a statement calling for a new sentencing hearing for Mr. Buck that was signed by Ms. Taylor and dozens of others — including another of the prosecutors who had helped convict him, Linda Geffin — was delivered to the Harris County district attorney, Mike Anderson. It was handed to him by Mark W. White Jr., a governor of Texas in the 1980s.

Mr. White and Mr. Buck's lawyers said that they believed his death sentence was a product of racial discrimination, and that Dr. Quijano's testimony — and the prosecutor's emphasis on that testimony — made the color of Mr. Buck's skin a factor in the jury's deliberations, violating his constitutional rights. In addition to their claims of racial bias, they said Texas was failing to follow through on a promise it had made to Mr. Buck.

In 2000, the attorney general at the time, John Cornyn, identified six capital cases in which Dr. Quijano had presented race-based testimony. Mr. Cornyn, now a United States senator from Texas, admitted that the state had erred in relying on such testimony in those and other cases, and that it was "inappropriate to allow race to be considered as a factor in our criminal justice system."

Mr. Buck's case was among the six. But he is the only defendant who has not been granted a new sentencing hearing. The others had all been on death row, and were ultimately resentenced to death after their new hearings. The state has opposed Mr. Buck's attempts to receive a new hearing, but did not oppose the requests for new hearings made by the five other defendants.

"I think that's what's caused the outrage," said a lawyer for Mr. Buck, Kate Black. "Not only was race used, but they promised to rectify the situation, and then did for five individuals, but not for him."

Mr. Buck's lawyers have filed an appeal, and are awaiting a ruling from the Court of Criminal Appeals.

It was the latest twist in his years of seeking a new sentence. In September 2011, the United States Supreme Court granted a last-minute temporary stay of execution — Mr. Buck had eaten his last meal when he got the news — but ultimately denied his appeal.

Justice Samuel A. Alito Jr., who wrote the majority decision, called Dr. Quijano's testimony "bizarre and objectionable." But he wrote that the psychologist was called as a defense witness, and that Mr. Buck's lawyers, not the prosecutor, first presented Dr. Quijano's race-based testimony to the jury.

In court papers, lawyers for Attorney General Greg Abbott have made similar arguments, writing that Mr. Buck's "constitutional rights were not violated because Buck himself presented the testimony about which he complains."

Mr. White, a Democrat who oversaw the executions of 19 people as governor from 1983 to 1987, disagrees. "It's a racially charged statement that has tainted the deliberations of the jury," he said. "It doesn't matter which side said it. It's kind of like, once you got the skunk in the jury box, it doesn't matter who presented the witness."

Dr. Quijano remains a state-licensed psychologist who testifies in criminal cases and has an office in Conroe, Tex. In an interview, he stood by his testimony, saying that his comments have been distorted and adding that he never said Mr. Buck would be a continuing threat because he is black.

"I was asked a question whether there is a relationship between race and violence or dangerousness," he said. "The literature suggests that there is a correlation. So I had to say yes." He added: "It's not because of the blackness of the person that is causing the violence. It is what goes with it. Poverty, the exposure to lack of education, exposure to criminal elements."

Dr. Quijano said research supporting his views included the work of John Monahan, a psychologist and professor at the University of Virginia Law School and expert in the clinical prediction of violent behavior.

Dr. Monahan, however, said in an interview that the literature did not support more than a trivial association between race and recidivism. "When you take into account the major risk factors for criminal recidivism, such as the number of prior convictions, age at first arrest, unemployment, education and substance abuse, race plays at most an extremely small role in predicting whether an offender will commit another violent crime," he said.

# EXHIBIT 10



14 of 100 DOCUMENTS

Copyright 2013 The Houston Chronicle Publishing Company
All Rights Reserved
The Houston Chronicle

March 21, 2013 Thursday
3 STAR EDITION

**SECTION:** B; Pg. 3

**LENGTH:** 82 words

**HEADLINE:** DEATH ROW;White urges 'fair' hearing;

**BYLINE:** Houston Chronicle

**BODY:**

Former Texas Gov. Mark White said Wednesday that race played an unfair role in death row inmate Duane Buck's 1997 murder trial and urged "a new, fair sentencing hearing." White was joined at the Harris County Criminal Justice Center by death penalty foes, religious leaders, former judges and ex-prosecutors who said the case represented a "fundamental injustice" because a psychologist testified that being black enhanced Buck's chances for future violence, after which he was sentenced to death.

**GRAPHIC:** Johnny Hanson / Houston Chronicle Former Texas Gov. Mark White said Wednesday that race played an unfair role in death row inmate Duane Buck's 1997 murder trial and urged "a new, fair sentencing hearing." White was joined at the Harris County Criminal Justice Center by death penalty foes, religious leaders, former judges and ex-prosecutors who said the case represented a "fundamental injustice" because a psychologist testified that being black enhanced Buck's chances for future violence, after which he was sentenced to death. Buck

**LOAD-DATE:** March 21, 2013

# EXHIBIT 11

# THE AUSTIN CHRONICLE

http://www.austinchronicle.com/news/2013-03-29/execution-assembly-line-gets-rolling/

# Execution Assembly Line Gets Rolling

BY JORDAN SMITH, MARCH 29, 2013, NEWS

What originally looked like a sparse execution schedule for 2013 has spiked dramatically, with a total of 12 executions now scheduled through July; nine of those are slated to take place in April and May.

The schedule resumes April 3, with the planned execution of **Kimberly McCarthy**, previously stayed in order to allow time for the courts and Dallas District Attorney **Craig Watkins** to consider whether racial bias infected her case. Specifically at issue is whether Dallas County prosecutors unlawfully struck all but one minority potential juror from McCarthy's jury pool. At press time, McCarthy's appeal remained unresolved, yet her execution remains on the calendar; she would become the 494th inmate put to death since reinstatement, and only the fifth woman – and third black woman – executed in Texas since 1854.

The issue of racial bias is also central to the ongoing case of **Duane Buck**, sentenced to death in 1997 for the double murder of **Debra Gardner**, his former girlfriend, and **Kenneth Butler** in Houston; a third victim, **Phyllis Taylor**, survived the attack. Last week, 102 people – including Taylor, 10 members of the Legislature, one former governor, and a former Harris County prosecutor who helped to try his case – signed a letter imploring Harris County D.A. **Mike Anderson** to grant Buck a new punishment hearing, arguing that his original sentencing was marred by racial bias.

Buck's case is one of seven identified in 2000 by Texas' then-Attorney General **John Cornyn** as having been tainted at sentencing by racially-biased testimony from psychologist **Walter Quijano**; Buck is the only defendant not yet granted a new sentencing hearing. In his case, as in two others, Quijano was hired by the defense; he testified that Hispanics and blacks are overrepresented in the criminal justice system. On cross-examination, however, then-prosecutor, now state Sen. **Joan Huffman**, R-Houston, focused Quijano on the race issue: "[T]he race factor, black, increases the future dangerousness for various complicated reasons; is that correct?"

"Yes," Quijano replied.

Whether a person poses a future danger to others is among three questions jurors must consider before imposing a death sentence. In her closing, Huffman argued that jurors should consider Quijano's judgment as reliable. Buck was ultimately sentenced to death. Signatories to the letter in support of giving Buck a new sentencing hearing suggest that to allow him to die without remedying the tainted sentencing hearing would be to "condone" racial discrimination in the courtroom.

The latest push to get Buck a new hearing comes in anticipation that Anderson would soon seek a new date for Buck's execution. Anderson has said that he will not act – either to agree to a new hearing, or to

push for an execution date – before the Court of Criminal Appeals weighs in on the most recent appeal of the case, filed earlier this month, that again seeks a new sentencing hearing. "We are waiting on a ruling and we will act accordingly," he said.

As in McCarthy's case, lawyers for Buck argue that his conviction and death sentence reflect a larger pattern of discrimination. McCarthy's lawyers point out that Dallas County had a long and documented history of rejecting minority jurors, and in Buck's case they cite new research that shows that in the 1990s at least, prosecutors in Harris County were three times more likely to seek death for black defendants than for white defendants. Ultimately, both cases reflect the ongoing specter of racial bias and discrimination that critics charge infect Texas' capital punishment system.

Pending legislation seeks to address that charge. Senate Bill 1270 by Sen. **Royce West**, D-Dallas, would let condemned inmates challenge their death sentences as being racially motivated. It would require a defendant to prove by a preponderance of evidence that, but for the racial bias, they would not have been sentenced to death. The bill is identical to North Carolina's **Racial Justice Act**, which, as of November 2012, had provided relief to four condemned inmates.

In a March 22 court filing, McCarthy seeks again to have her execution date withdrawn, citing the filing of SB 1270, "which would govern and vindicate precisely the circumstances and violations reflected in the claims" she's raised about her impermissibly rigged jury. The issues in McCarthy's case "are precisely the facts and issues that the recently introduced Texas Racial Justice Act is intended to redress," lawyer Maurie Levin wrote in last week's filing. "A stay of Ms. McCarthy's execution is necessary to permit a full presentation of these facts and the constitutional claims arising therefrom."

*Copyright © 2013 Austin Chronicle Corporation. All rights reserved.*

# EXHIBIT 12

Print this page

---

THURSDAY, NOVEMBER 21, 2013                                              SOCIAL ISSUES

# Faith leaders protest race in sentencing

Twenty-seven evangelicals are seeking re-sentencing of a murderer condemned to death in a trial marked with racial overtones.



---

*By Bob Allen*

Local and national Baptists are among 27 evangelical leaders signing a Nov. 21 letter on behalf of an African-American man condemned to death after his sentencing jury was told he was likely to be a future danger because of his race.

Alan Bean, an ordained American Baptist minister who leads the Arlington, Texas,-based Friends of Justice and David Gushee, were among signers to the letter asking Harris County District Attorney Devon Anderson to allow a new hearing for Duane Buck, a black man on death row for double murder.

The evangelical leaders joined more than 100 civil rights leaders, elected officials, former prosecutors and judges and a former Texas governor advocating on Buck's behalf after a Texas court of appeals voted 5-3 to reject his appeal and allow the DA's office to set a date for his death by lethal injection.

Buck was convicted in 1997 for the murders of his ex-girlfriend, Debra Gardner, and the man who was with her, Kenneth Butler. He also shot a third person, but she survived.

In testimony, an expert witness listed race among a number of "statistical factors we know to predict future dangerousness." The psychologist was later cited for giving racially influenced testimony to juries. Seven cases, including Buck's, were identified. The other six were granted resentencing hearings, but Buck's was denied.

"As Evangelical Christians, we are disturbed by the impact of racial bias on our justice system," the faith leaders said. "We are all created in the image of God, and race should never blind us to that fundamental truth in our interactions with others. Racial discrimination in any form is incompatible with Christ's message in the Gospels – it should have no room in our hearts or in our justice system."

The letter signers also cited the fact that Buck is now a Christian, who has expressed deep remorse for his crimes and never received a disciplinary write-up during his incarceration.

Others signing the letter included Paul Basden and Jim Johnson, pastors of Preston Trail Community Church in Frisco, Texas; Roger Olson, Foy Valentine Professor of Christian Theology and Ethics at Baylor University; Chris Seay, pastor of Ecclesia in Houston; Shaine Claiborne of The Simply Way in Philadelphia;

Fisher Humphreys, retired professor at Samford University; Christian author Brian McLaren; Sojourners founder Jim Wallis; and Jonathan Wilson-Hartgrove, associate pastor of St. John's Missionary Baptist Church in Durham, N.C.

© 2013 Associated Baptist Press, Inc.

Tagged under:   Capital punishment   Race



## Bob Allen

Bob Allen is managing editor of Associated Baptist Press.

print this story

email this story

## ABPnews Comment Policy

We welcome your comments on news and opinion articles on www.abpnews.com and www.abpnews.com/blog. Please keep in mind that this is a comments feature of our websites, not a discussion board.

If your comment has been deleted or edited, it is the result of violating one or more of these rules.

**Please review our comments policy here.**

Comments for this thread are now closed.                                                        ✕

# 0 comments                                                                          ★ ◀ 0

Best ▾    Community                                                        Share 🔗    Login ▾

Be the first to comment.



© 2013 Associated Baptist Press, Inc.

# EXHIBIT 13

The New York Times

July 31, 2013

# Condemned to Die Because He's Black

**By CHARLES J. OGLETREE Jr.**

CAMBRIDGE, Mass. — NEARLY 50 years after the end of Jim Crow, African-Americans are still facing execution because of their race.

Duane Buck could end up being one of them. He was convicted in 1997 of the murders of two people in Harris County, Tex., home to the city of Houston. He does not deny his guilt in these terrible crimes, so there is no question that he must be punished. But what happened at Mr. Buck's sentencing hearing is appalling, even for Texas, which was once among the handful of states that led the country in the lynching of African-American men and which is now the country's most prolific executioner.

During the presentation of evidence at the penalty phase of Mr. Buck's trial — when the jury was required to decide between the death penalty and a life sentence — the trial prosecutor elicited testimony from a psychologist for the defense indicating that Mr. Buck's race made him more likely to be violent in the future.

The prosecutor asked, "You have determined that the sex factor, that a male is more violent than a female because that's just the way it is, and that the race factor, black, increases the future dangerousness for various complicated reasons; is that correct?"

"Yes," the psychologist, Walter Quijano, answered.

Because a finding of future dangerousness is a prerequisite for a death sentence in Texas, the prosecutor then argued in closing that the jury should rely on that race-based expert testimony to find that Mr. Buck would pose a future danger. The jury accepted the prosecutor's recommendation, and Mr. Buck was sentenced to death.

Shockingly, Mr. Buck's was not the only case in which Texas relied on this false and offensive link between race and dangerousness to secure a death sentence. In 2000, John Cornyn, the Texas attorney general at the time and now a United States senator, identified six cases where prosecutors relied on the same expert's race-based prediction — testifying three times for the prosecution and three times for the defense — to send African-American and death row. In an attempt to restore integrity to the state's criminal-justice sy a Republican, acknowledged then that Texas' exploitation of racial fears and s unconstitutional and he promised that all six men — including Mr. Buck — wo

**MORE IN OP**

**Op-Doc**
**'For Sea**

Read More ›

sentencing hearings free of racial discrimination.

Texas kept its promise in five of the six cases, but for no discernible reason it has reversed course and pursued Mr. Buck's execution.

As outrageous as it is, the prosecutor's appeal to racial prejudice is not the only evidence showing that race played a role in Mr. Buck's death sentence. A recently released study by the University of Maryland statistician Ray Paternoster shows that at the time of Mr. Buck's trial, the Harris County district attorney's office was over three times more likely to seek the death penalty against African-American defendants like Mr. Buck than against similarly situated whites, and Harris County juries were twice as likely to impose death sentences on African-Americans like Mr. Buck. Thus, it is abundantly clear that in Mr. Buck's case, racial fears and prejudices supplanted reliable evidence in the assessment of proper punishment.

Mr. Buck's death sentence powerfully echoes this country's most lawless and discriminatory past, a past that includes a time when African-American men were lynched on suspicion of crimes that sent white men to jail for a year. While lynchings are a relic of the past, the racial discrimination that motivated them retains a stranglehold on today's criminal-justice system.

President Obama spoke about that past recently in remarks addressing George Zimmerman's acquittal on charges of second-degree murder and manslaughter in the death of Trayvon Martin. "And when you think about why, in the African-American community at least, there's a lot of pain around what happened here, I think it is important to recognize that the African-American community is looking at this issue through a set of experiences and a history that — that doesn't go away," he said.

No execution date has been set for Mr. Buck; meanwhile, efforts continue on his behalf. More than 100 prominent individuals from Texas and around the country — including a former Texas governor, Mark W. White Jr., and other elected officials, former judges and prosecutors, civil rights leaders, members of the clergy, past presidents of the American Bar Association — have called for a new, fair sentencing hearing. So have more than 50,000 people who have petitioned the Harris County district attorney. Even the surviving victim in this case, Phyllis Taylor, and one of Mr. Buck's trial prosecutors, Linda Geffin, agree that Mr. Buck is entitled to another sentencing hearing. This is because no one can credibly argue that Mr. Buck — or anyone else — should be capitally prosecuted, sentenced to death or executed because of his race.

There is no question that this country has made enormous progress since the days when lynchings were commonplace. But Duane Buck's case reminds us that we still have a long way to go. Mr. Buck cannot be executed based on a death sentence that is the product of racial bias and

discrimination. Texas must keep its promise and ensure that Mr. Buck receives a new, fair sentencing hearing. Fixing the problem of race in America's criminal justice system is complicated. Fixing Mr. Buck's case is not.

*Charles J. Ogletree Jr. is a professor of law at Harvard and the executive director of the Charles Hamilton Houston Institute for Race and Justice.*

# EXHIBIT 14



# In meting out justice, race can't play a role

By William A. "Bill" Lawson, Joseph A. Fiorenza and Samuel Karff | March 7, 2013 | Updated: March 8, 2013 8:09pm

Comments 0 |    E-mail |    Print



Photo By Cody Duty/Staff

1 of 2

Shennel Gardner holds a portrait of her brother Devon Green, left; her mother, Debra Gardner, center; and herself, right; at a Gardner family home in Houston. Both Shennel and Devon were present when their mother, Debra, was shot by Duane Edward Buck in 1995.

 

As clergymen, we are called upon by God to do what is right, to seek justice, and to defend the oppressed. When people of faith accept this direction, we assume an obligation to ensure that any actions that are taken in our names - including by our government - meet this standard of righteousness. Today, we are confronted by a grave injustice in the case of Duane Edward Buck, who was unfairly sentenced to death. So today we accept our responsibility, stand up and speak out for what is right: a new, fair sentencing hearing for Mr. Buck.

First, a disclaimer. We are not lawyers, and cannot argue with learned legalese all the issues involved in determining guilt or innocence, or in imposing proper penalties on accusees. Our case is moral and spiritual, based on how we think God would view this situation. And that is the perspective from which we speak.

In 1997, Duane Buck was convicted of murder and sentenced to death in the shooting deaths of Debra Gardner and Kenneth Butler in Harris County. There is no question that Mr. Buck must be held responsible for his senseless taking of two innocent lives, but the death sentence he received was fundamentally flawed. First, he is not a mass murderer, likely to strike again. Second, this was not a carefully planned, deliberately orchestrated murder; it was a crime of passion, a sudden explosion of rage. But third, Mr. Buck's sentencing jury was told by a psychologist that African Americans, like Mr. Buck, are more likely to be dangerous in the future because of their race. The trial prosecutor elicited this testimony on cross-examination and argued it to the jury at closing. The jury accepted the psychologist's testimony and the prosecutor's argument, declared Mr. Buck a future danger, and sentenced him to death.

Although there are diverse views across the spectrum about the death penalty, there is no dispute that capital punishment can never be administered in a racially biased way. It is therefore quite clear that Mr. Buck's death sentence is unjust. Thus, it is not surprising that three years after he was sentenced to death, then-Attorney General (now U.S. Senator) John Cornyn rightly acknowledged this unfairness and promised that Mr. Buck - and six others who were sentenced to death based on identical testimony - would receive a new, fair sentencing hearing. Although each of the six other men have been resentenced, Mr. Buck has not. This notwithstanding the fact that Mr. Buck has abundantly demonstrated that, irrespective of his race, he does not pose a future danger; in the 15 years of imprisonment since his arrest, Mr. Buck has not had a single disciplinary infraction.

When we accept a system of capital punishment, we also accept responsibility for ensuring that it is administered fairly and in the common good. Texas has put to death more people than any state in the Union - over 1,200 as of March 1. And because we know that racial discrimination perverts justice, we also must oppose any death sentence that is a product of such bias. It is for this reason that we are speaking out against Mr. Buck's execution and calling for a new, fair and color-blind sentencing hearing for Mr. Buck.

We hope that Texas will join us and fellow clergy in doing what is right. Our new District Attorney, Judge Mike Anderson, has the authority to decide whether or not to seek an execution in this case. He has taken a significant first step toward demonstrating his commitment to equal justice by allowing Mr. Buck to appeal his death sentence without an execution date hanging over his head. We hope he will finish the job by honoring Texas's promise and giving Mr. Buck a new sentencing hearing.

Mr. Buck's case is ultimately as much about his life and his humanity as it is about the life and humanity of each member of our community who allows, or refuses to allow, the injustice in his case to go unchecked. Thus, to save Mr. Buck, and to save ourselves, we must speak out with boldness and urgency as God did, when He answered the Prophet Habbakuk's prayer for justice (Habakkuk 2:1-4). I must stand up, speak up, and do what is right, and call for a new, fair sentencing for Mr. Buck.

# EXHIBIT 15

The New York Times

May 10. 2013

# Racism in a Texas Death Case

**By THE EDITORIAL BOARD**

In the annals of racism in the Texas criminal justice system, seven death penalty cases are in a class by themselves. In 2000, after the Supreme Court ordered a new sentencing hearing in one of them, Senator John Cornyn, who was then the state attorney general, called for new sentencing hearings in the other cases for the same reason: because race was improperly and explicitly considered as a factor in determining the sentence.

Duane Buck, who was convicted of two murders, is the only one among the defendants who was not granted a new sentencing hearing. His post-conviction lawyers have uncovered a lot of mitigating evidence that his trial counsel did not present to the jury that sentenced him to death. He is seeking life without parole and is awaiting a decision on this matter by the Texas Court of Criminal Appeals.

Texas has long fought his request for resentencing because it insists that Mr. Buck is responsible for introducing race into his case. A psychologist called by the defense testified at the hearing that being black increased Mr. Buck's "future dangerousness." But this statement was elicited by the prosecutor on cross-examination and was used by the prosecutor in his closing argument to the jury. This egregious error clearly violated Mr. Buck's constitutional rights. One of the prosecutors in the case has been campaigning for years against Mr. Buck's execution.

The racial bias in this case reflects a wide and disturbing pattern in death penalty prosecutions in Harris County, Tex., where Mr. Buck was tried. A recent study found that from 1992 to 1999 the county prosecutor was three times as likely to seek the death penalty for blacks in murder cases as they were for whites, and juries were twice as likely to impose capital punishment. The Buck case is yet more evidence that capital punishment should be abolished.

*Meet The New York Times's Editorial Board »*

# EXHIBIT 16



Subscribe to the Houston Chronicle | Shopping | Classifieds | Obits | Place an Ad | La Voz          Like {54k}     Register | Sign In

**Monday December 23, 2013**

54°F  Partly Cloudy | Houston Weather

[ Search ]

⊙ Chron.com ○ Local Directory

Home | Local | US & World | Sports | Business | Entertainment | Lifestyle | Jobs | Cars | Real Estate    FIND&SAVE

Opinion > Editorials

# Race and the death sentence

Keep race out of death sentence hearings to help ensure that justice is equal for all.
Copyright 2013: Houston Chronicle | March 26, 2013

Comments 0 | E-mail | Print       f Share {29}    Tweet {8}    g+1 {0}

Whenever Texas juries sentence a criminal to death, they have to find beyond a reasonable doubt that the convicted is a continuing threat to society. When Duane Buck was sentenced to death, prosecutors relied on his race to help prove this point. As a black man, the jury heard, Buck was more likely to pose a future criminal threat.

There is no doubt that Buck is guilty of murder. There is also no doubt that his death sentence is tarnished by racial considerations.

The Texas Court of Criminal Appeals is currently considering an appeal arguing that Buck deserves a new sentencing hearing. Our state needs to show our criminal justice system is free of racial discrimination, and it can start by granting Buck a clean, unbiased hearing.

Buck's case should not be controversial nor should it have come this far. When he was known as attorney general instead of senator, John Cornyn called for Buck and five other death row inmates to have new hearings due to improper racial considerations during their sentencing.

"It is inappropriate to allow race to be considered as a factor in our criminal justice system," he said back in 2000.

The five other inmates received their rehearings, and each again was sentenced to death. Buck has not received a rehearing because Texas argues his defense opened the door to racial considerations. This is pushing a tenuous argument through a pinhole opening, and we're disappointed that Sen. Cornyn has fallen silent on the matter. This is a prime opportunity for Texas' senior senator to provide strong leadership.

While Texans wait to hear from the Court of Criminal Appeals, the Harris County district attorney should acknowledge the racial bias in Buck's sentence and drop any opposition to a new hearing. But Texas seems to lack that leadership at the local level as well.

Our state criminal justice system does not have a sterling reputation for race-blind procedure. Juries in Harris County are twice as likely to sentence black criminals with the death penalty than they are white criminals, according to a recent study by University of Maryland criminologist Ray Paternoster.

Texas has to prove that everyone, no matter how cruel or evil, receives proper due process in our courts, free of immoral and now illegal racial bias. And we can do so by granting Duane Buck a new sentencing.

Comments 0 | E-mail | Print       f Share {29}    Tweet {8}    g+1 {0}

**Copyright 2013: Houston Chronicle**

### From Around the Web

- Michelle Obama's DNA Test Show Slave Owner as Ancestor (Ancestry.com)
- 10 Celebs We Didn't Know Were Gay (Rant

### We Recommend

- Restaurant owner accused of duping employees out of their paychecks
- 18 arrested in 2-day Harris County prostitution sting

## Join the Conversation

   

**Follow Us on Social Media**

## Top Videos

### Today's Opinion

- An alternative to fossil fuels
- Monday letters: Free speech, Ashby high-rise, affluenza
- Houston is riding high
- Dionne: Duck Dynasty, meet Pope Francis

### Editorial Cartoons

**Nick Anderson**
*Opinion*